VOLUME 4

Pages 617 - 642

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable JEFFREY S. WHITE, Judge**

MICHAEL ORTIZ, on behalf of )
himself and all others )
similarly situated, )
　 )
　　　　　Plaintiff, ) NO. C-17-3820 JSW
　 )
　vs. ) Friday, June 25, 2021
　 )
AMAZON.COM LLC, ET AL., ) Oakland, California
　 )
　 ) BENCH TRIAL
　 )
　　　　　Defendants. )
_____)

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:　　　　　　　SCOTT COLE & ASSOCIATES, APC
　　　　　　　　　　　　　　555 12th Street, Suite 1725
　　　　　　　　　　　　　　Oakland, California 94607
　　　　　　　　　**BY: LAURA G. VAN NOTE, ESQUIRE**


For Defendants:　　　　　　GIBSON, DUNN & CRUTCHER LLP
　　　　　　　　　　　　　　1050 Connecticut Avenue, N.W.
　　　　　　　　　　　　　　Washington, DC 20036
　　　　　　　　　**BY: JASON C. SCHWARTZ, ESQUIRE**


(APPEARANCES CONTINUED)


Reported By:　　　　　　　Diane E. Skillman, CSR 4909, RPR, FCRR
　　　　　　　　　　　　　　Official Court Reporter

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1

 2    For Defendants:              GIBSON, DUNN & CRUTCHER LLP
                                   3161 Michelson Drive
 3                                 Irvine, California 92612
                              BY:  MEGAN COONEY, ESQUIRE
 4

 5                                 GIBSON, DUNN & CRUTCHER LLP
                                   333 South Grand Avenue
 6                                 Los Angeles, California 90071
                              BY:  BRADLEY J. HAMBURGER, ESQUIRE
 7

 8                                 GIBSON, DUNN & CRUTCHER
                                   555 Mission Street, Suite 3000
 9                                 San Francisco, California 94105
                              BY:  JOSEPH ROSE, ESQUIRE
10

11

12    Also Present:               TERESA MAK, AMAZON REPRESENTATIVE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Defendants' Witness:**                                    **Page**     **Vol.**

**Nevado, Diego**

Cross-examination by Ms. Van Note                          621          4

Redirect Examination by Mr. Hamburger                      633          4


Trial Exhibit 177                                          639          4

<u>Friday, June 25, 2021</u>                                    <u>7:52 a.m.</u>

1

2                        P R O C E E D I N G S

3                              o0o

4           **THE COURT:**  Please be seated.  Call the case.

5           **THE CLERK:**  Calling Civil Case Number C-17-3820

6    Michael Ortiz versus Amazon.com, LLC.

7        Counsel, please approach the podiums and state your

8    appearances.

9           **MS. VAN NOTE:**  Good morning, Your Honor.  Laura Van

10   Note with Scott Cole & Associates for the plaintiff.

11          **THE COURT:**  Good morning.

12          **MR. SCHWARTZ:**  Good morning, Your Honor.  Jason

13   Schwartz with my colleagues Bradley Hamburger, Megan Cooney,

14   and Joseph Rose and our client representative Teresa Mak for

15   Amazon.

16          **THE COURT:**  Good morning, everybody.

17       All right.  Are we ready to continue with the

18   cross-examination?

19          **MS. VAN NOTE:**  I believe so, Your Honor.

20          **THE COURT:**  Let's get the witness up and continue.

21          **THE CLERK:**  Ms. Van Note, did you reboot your --

22          **MS. VAN NOTE:**  I think I still need to be let in.

23          **THE CLERK:**  I just let you in.  Mr. Nevado is

24   joining.

25          **THE COURT:**  Good morning, Mr. Nevado.  How are you,

1   sir?

2           **THE WITNESS:**  Good.  How are you?

3           **THE COURT:**  Just to remind you, you are still under

4   oath.  Thank you.

5       You may continue.

6                       <u>**CROSS-EXAMINATION**</u>

7   **BY MS. VAN NOTE:**

8   **Q.**  Good morning, Mr. Nevado.  I am Laura Van Note.  I'm an

9   attorney for Mr. Ortiz, and I will be asking you some

10  questions here this morning.

11  **A.**  Great.

12  **Q.**  You testified on direct examination that you would be

13  present to see the night sort during the time you worked with

14  Mr. Ortiz about once a month, correct?

15  **A.**  Yeah.  On occasion the team would visit the night sort to

16  observe and I'd travel through the region.  So once a month

17  was a ballpark number.

18  **Q.**  Once a month when you visited the night sort, would it

19  always be Mr. Ortiz who was the manager or were there other

20  L4s who might be working that night sort?

21  **A.**  The configuration should have been front half and back

22  half night sort so it would have been Mr. Ortiz or another

23  manager.

24  **Q.**  One of the other things you said on direct examination was

25  that L4 shift managers might jump into the sort for the power

1    hour.  Can you tell us --

2    **A.**  That's correct.

3    **Q.**  Can you tell us what is a power hour?

4    **A.**  Yeah.  A power hour is a motivational tool that the

5    manager can use at their discretion to improve rates or kind

6    of push through a trying hour.  Normally it is kind of like a

7    beat-your-leader type of fun game and activities that the

8    teams all engage in used to increase productivities.

9    **Q.**  And it lasts an hour, as the name would suggest, right?

10   **A.**  Yeah, for the most part.  You know, it could be a quarter,

11   which is 15 minutes, or the full hour, yeah.

12   **Q.**  You would agree that Mr. Ortiz was a good employee, right?

13   **A.**  I have no reason to not believe that he was not a good

14   employee.

15   **Q.**  You believe he was a good employee, right?

16   **A.**  Yeah.  Based on my experience with him on his night sorts,

17   you know, gauging him, yes.

18   **Q.**  And he met expectations?

19   **A.**  Yeah.  He had effective sorts in his roles and, yeah, no

20   reason to --

21   **Q.**  Mr. Ortiz was doing the job that was expected of him,

22   wasn't he?

23   **A.**  You know, as I mentioned, I wasn't in night sort all the

24   time, but based on what I understood and outputs from his

25   delivery and performance, he was achieving what we expected of

1    the night sort managers to complete sort on time, which is the

2    primary objective.

3    **Q.**   That is a yes, he was doing the job you expected of him?

4    **A.**   As I see it, yes.

5    **Q.**   And the core duties of the night sort are to sort the

6    packages, ensure everyone is safe, and get them out on time,

7    right?

8    **A.**   Safety, service, quality, and cost of the shift.  So in

9    addition to those responsibilities, obviously, managing the --

10   completing all reports required, providing feedback to the

11   teams, yes.

12   **Q.**   So my description of those three points, is that

13   inaccurate?

14   **A.**   They are part of the whole responsibility of the manager,

15   yes.

16   **Q.**   They are the core duties, aren't they?

17   **A.**   Can you repeat them again?

18   **Q.**   Sort the packages, ensure everyone is safe, get them out

19   on time.

20         **MR. HAMBURGER:**  Objection, asked and answered.

21         **THE COURT:**  Sustained.

22   BY MS. VAN NOTE:

23   **Q.**   You would agree those are the core duties, right?

24         **MR. HAMBURGER:**  Same objection.

25         **THE COURT:**  Sustained.

1    Move on, please.

2    **BY MS. VAN NOTE:**

3    **Q.**  There are stand-up meetings at the beginning of the night

4    shift, right?

5    **A.**  At the beginning of any shift that we would host, we would

6    do a stand-up meeting, that's correct.

7    **Q.**  That includes the night shift?

8    **A.**  Yes, it does.

9    **Q.**  In the stand-up meetings, everyone does stretches, right?

10   **A.**  Yes.  Part of the safety protocol is to do stretches

11   before shift, as well as, I believe, the time of return of

12   lunch break as well.

13   **Q.**  That would include the L4 shift managers doing the

14   stretching, right?

15   **A.**  The leader of the stretches would either be the manager,

16   the process assistant, or a Tier 1.

17   **Q.**  You testified on direct examination that if a shift was

18   not completed, and there were packages left that had not been

19   sorted, one of the options was to roll volume into the later

20   shifts, right?

21   **A.**  That is correct.  If nothing else worked and couldn't get

22   it done, rolling was the next option.

23   **Q.**  In your experience working with Mr. Ortiz, so just

24   limiting it to that time period, how often would the shifts

25   roll volume into the next shift?

1    **A.**  Yeah, I can't -- I don't recall specific numbers.  I don't

2    want to speculate on a specific number of times.  It's been

3    many years ago.

4    **Q.**  Do you recall any specific instance where volume was

5    rolled over into the next shift?

6    **A.**  Nothing stands out.  I mean, I wouldn't be surprised if it

7    happened and I just don't recall, but nothing stands out.

8    **Q.**  You can't put any kind of a range on how many times that

9    actually happened?

10   **A.**  No.

11   **Q.**  And isn't it true that rolling volume into the later

12   shifts would cause more burden on the next shift, right?

13   **A.**  Any rolled volume would have to be sorted by the next

14   shift.  So add to the responsibilities, yes.

15   **Q.**  Don't you agree that could cause problems in the

16   operation?

17   **A.**  The problems of delaying a sort are far greater than

18   creating a sort on time and getting the parcels on road.  It

19   causes opportunities for a missed failure customer delivery,

20   but the guidance is to finish sorts so you do not impact the

21   large number of packages and you manage the smaller

22   exceptions.

23   **Q.**  Isn't it true that the expectation was that the sort would

24   be completed and all volume would be handled, right?

25   **A.**  Yes.  The shift was designed to be able to support the

1    volumes that were coming in to get them out on time.

2    Q.  If you had a shift that was repeatedly not completing all

3    of its volume, that would be a problem, right?

4    A.  Yeah.  If a shift was -- any shift was not hitting their

5    marks or their goals, teams would (Zoom glitch) and figure out

6    what was driving the issue.

7    Q.  Now you were not Mr. Ortiz's direct supervisor, right?

8    A.  That's correct.

9    Q.  You are familiar with the term "learning coordinator?"

10   A.  Yeah.

11   Q.  And the learning coordinator did onboarding and training

12   of new associates?

13   A.  Yes.  They participated in the -- on the -- in the basic

14   Day One trainings of the associates, yes.

15   Q.  Typically night sort starts at 10:00 p.m., right?

16   A.  It varies by building, but it would, you know, tentatively

17   be anywhere from 9:00 to midnight depending on the facility.

18   Q.  And it ends at 6:00 a.m.?

19   A.  Again, that depends on the start time.  But, yeah,

20   roughly.

21   Q.  And you would agree that an L4's shift is a 10-hour shift,

22   right?

23   A.  The structure of the shift is defined as a 4/10 shift,

24   yes.

25   Q.  And you've seen L4 shift managers work more than 10 hours,

```
 1    right?

 2    A.   Yes.  I've seen that, yes.

 3    Q.   You've seen them work up to 12 hours?

 4    A.   Yeah.

 5    Q.   And you would agree that the L4 shift managers, including

 6    Mr. Ortiz, were not required to punch in or out.

 7    A.   Yeah.  No managers were required to punch in or out of the

 8    building.  That's correct.

 9    Q.   We've talked in this trial a couple of times about an

10    end-of-shift report.  So I won't spend time going over what

11    that is.

12         You would agree that one of the things an L4 shift manager

13    does is complete a report at the end of their shift, right?

14    A.   Yeah.  Any end of shift is completed and handed off to the

15    subsequent shift, yes.

16    Q.   That report can take as little as 15 minutes to complete?

17    A.   I think it varied by the manager depended on their

18    approach of handling the shift.  A lot of the data was

19    generated throughout the shift, and so if they were populating

20    it throughout the shift, or writing notes or summaries, it can

21    be completed very quickly, yes.

22    Q.   That is a yes, it can be completed in as little as 15

23    minutes?

24    A.   Yes.

25    Q.   And the shift report consists of gathering data from other
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

1    sources and putting it into a template, right?

2    **A.**  Yeah, it would include time and attendance, total volumes,

3    rates, any safety issues, safety concerns, et cetera.

4    **Q.**  So the L3 shift assistant can do the end-of-shift report,

5    right?

6    **A.**  The L3 provided support to the manager and could do it,

7    yes.

8    **Q.**  And you have seen L3s help out with that report.

9    **A.**  Yes.

10   **Q.**  Another thing that an L4 shift manager does is routing,

11   right?

12   **A.**  Yes.  They run -- I'm just trying to remember from then.

13   They would run the route planner, yes.

14   **Q.**  Okay.  And running the route is just clicking a button in

15   the software, right?

16   **A.**  I believe it was essentially setting -- like clicking go

17   once all packages were received, sorted, and sort was done.

18   **Q.**  Okay. the software would automatically assign the route to

19   a company?

20   **A.**  I don't believe so.  I believe it generated routes.  And

21   I'm thinking back to when I was running shifts.

22        Generate the routes, the team would then allocate routes

23   to the driver and courier depending on the number of drivers

24   that were allocated and present.  And then they would sort it

25   and then load it into the trucks.

1          **MS. VAN NOTE:**  Your Honor, I would like to read from

2     the deposition transcript page 168, lines 2 through 18.

3          And, Your Honor, if I may return to my table to show the

4     transcript.

5          **THE COURT:**  Yes, sure.

6          Is there any objection?

7          **MR. HAMBURGER:**  Lines 2 through 16?

8          **THE COURT:**  Lines 2 through 18, I think counsel said.

9          **MR. HAMBURGER:**  No objection.

10         **THE COURT:**  Okay.  You may read.

11         **MS. VAN NOTE:**  (Reading)

12         "Question:  The assigned part of this is where it

13         says 'assign delivery routes.'  Is that sort of

14         synonymous with the first two parts?

15         "A:  Define --

16         "Question:  I'm trying to find out when it says

17         'assign' here, does that mean you're going to do this

18         sort of thing?

19         "A:  Correct.  So the -- proceed.  Sorry.

20         "Question:  Was there anything more to it than that?

21         "A -- Answer:  When they click the button, it tells

22         the manager which company to assign it to.

23         "Question:  Based on everything we have gone over so

24         far, sounds like what you are saying is the -- build,

25         optimize, and assigned delivery, the build optimize

1          and assign delivery routes on your shift is really a

2          computer-generated function; is that right?

3          "Answer:  That's correct."

4    **BY MS. VAN NOTE:**

5    **Q.**  Going back to the stand-up meetings, those should be seven

6    minutes long, right?

7    **A.**  Yeah.  The target time for stand-up was seven minutes.

8    **Q.**  And they should not exceed 10 minutes?

9    **A.**  The goal was seven minutes.

10   **Q.**  They should not exceed 10 minutes?

11         **MR. HAMBURGER:**  Objection, asked and answered.

12         **THE COURT:**  Overruled.

13         **THE WITNESS:**  The goal that was set was seven

14   minutes.  They shouldn't exceed seven minutes.

15   **BY MS. VAN NOTE:**

16   **Q.**  They shouldn't exceed seven minutes?

17   **A.**  Seven minutes for stand-up, yeah.

18   **Q.**  You would agree that an L4 shift manager needs to be able

19   to move boxes of up to 49 pounds.

20   **A.**  Yes.

21   **Q.**  And you have seen L4 shift managers move boxes?

22   **A.**  Yeah.  I think there's a variety of reasons the manager

23   would need to move boxes.  Boxes pile up, essentially ensuring

24   it doesn't violate safety –– (Zoom glitch) obviously that's a

25   first priority.  So if there's a box in the way, move it.

1    Yes.

2    **Q.**   You've seen them do that?

3    **A.**   Yes.

4    **Q.**   You've seen L4 shift managers move racks?

5    **A.**   Rolling racks?  Yes.

6    **Q.**   You've seen L4 shift managers getting on the line.

7    **A.**   Yeah, I've seen managers participate in sorts by their

8    choice, yeah.

9    **Q.**   In fact, L4 shift managers move boxes daily.

10   **A.**   I can't say they do or they don't.  I think, obviously

11   depending on the situation in the shift, if there's a safety

12   concern, if they're jumping into the shift; I have not been in

13   all night sorts that happened.

14           **MS. VAN NOTE:**  I would like to read from the

15   transcript page 154, line 17 through 25.

16           **THE COURT:**  Any objection?

17           **MR. HAMBURGER:**  No objection.

18           **THE COURT:**  Thank you.  You may read.

19           **MS. VAN NOTE:**  (Reading)

20           "Question:  Isn't it true that shift managers pretty

21           much from your observation -- isn't it true that

22           shift managers on a daily basis move boxes for one

23           reason or another?

24           "Answer:  For one reason or another, yes."

25

1   **BY MS. VAN NOTE:**

2   **Q.**  You would agree that moving boxes is not supervising

3   people.

4   **A.**  (Zoom glitch.)

5          **THE COURT:**  We lost the beginning of what you said.

6   It sounds like you were in a fish bowl.

7      Repeat the answer.

8          **THE WITNESS:**  Can you hear me?

9          **THE COURT:**  Yes.

10          **THE WITNESS:**  Can you repeat the question?  My

11   apologies.

12   **BY MS. VAN NOTE:**

13   **Q.**  You would agree that moving boxes is not supervising

14   people.

15   **A.**  I think the reason they are moving the boxes is important

16   for understanding (Zoom glitch).

17   **Q.**  We didn't hear that answer.  I'm sorry.  Can you repeat

18   your answer again and maybe slow down?

19   **A.**  Can you hear me now?

20          **THE COURT:**  Yes.  Slow, please.

21          **THE WITNESS:**  I believe the reason they are moving

22   the boxes is important to be able to define if they are

23   supervising or not.

24   **BY MS. VAN NOTE:**

25   **Q.**  So you are saying moving boxes may be supervising people?

1    **A.**  As part of the manager's activity, if they are supervising

2    the team, witness something went wrong, a safety issue, poor

3    handling of boxes, then yes, engaging the individuals or

4    moving the error or issue is supervisory in nature.

5            **MS. VAN NOTE:**  I would like to read from the

6    deposition transcript, page 151, line 17 through 23.

7                    (Pause in the proceedings.)

8            **THE COURT:**  Any objection?

9            **MR. HAMBURGER:**  No, Your Honor.

10           **THE COURT:**  You may read.

11           **MS. VAN NOTE:**   (Reading)

12           "Question:  When they move boxes around, for example,

13           for whatever reason, would you classify that as

14           supervising other employees?

15           "Answer:  No."

16           **MS. VAN NOTE:**  I have no further questions, Your

17    Honor.

18           **THE COURT:**  Thank you.  Any redirect?

19       Proceed.

20           **MR. HAMBURGER:**  Thank you, Your Honor.

21                    **REDIRECT EXAMINATION**

22    BY MR. HAMBURGER:

23    **Q.**  Mr. Nevado, you mentioned power hours.  How often in a

24    typical shift would there be a power hour?

25           **MS. VAN NOTE:**  Objection.

1          THE COURT:  Overruled.

2          THE WITNESS:  The power hour was the discretion of

3    the manager to do as they felt necessary for the delivery.  So

4    there was no standard quantity or time that these (Zoom

5    glitch).

6          COURT REPORTER:  That these were what?

7    BY MR. HAMBURGER:

8    Q.  Can you repeat the end of your last answer?  I don't think

9    we caught that.

10   A.  Yeah.  There was no standard expected quantity per shift

11   or per week or anything.  It was the discretion of the

12   manager.

13   Q.  Would shift managers always participate in power hours?

14          MS. VAN NOTE:  Objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  No, not necessarily.  It was normally

17   team leaders or managers but, again, it was up to their choice

18   if they wanted to participate or not.

19   BY MR. HAMBURGER:

20   Q.  You testified that completing the sort was an expectation.

21   In your experience what could shift managers do to meet that

22   expectation?

23   A.  Yes.  So as I mentioned, power hour is one of them to

24   engage the whole team to improve their rates and throughput,

25   requesting overtime.  I mentioned yesterday there is clear

1    water in the shift to be able to complete it.  Essentially

2    moving team members around in key roles.  So it's really

3    important the manager knows the people's rate performance to

4    optimally fill the building as well as possible.

5    Q.  You mentioned that sometimes managers would move boxes.

6    Could you tell us what some of the reasons are for why a

7    manager would move boxes?

8              MS. VAN NOTE:  Objection.

9              THE COURT:  Overruled.

10              THE WITNESS:  My experience would be power hours

11    engaging the team, primarily it's designed for, you know,

12    looking at it from a safety perspective; the team is removing

13    trip hazards, blocked entryways, blocked piles, even

14    supporting team members in lifts; sometimes the bag can be

15    larger than 49 pounds.

16    Q.  And also in your experience, how often during a typical

17    shift would a shift manager move boxes?

18              MS. VAN NOTE:  Objection.

19              THE COURT:  Overruled.

20              THE WITNESS:  I think it's hard to pin a number how

21    often.  I think that it depended on the circumstances in the

22    situation.  It's a manager's discretion to make the decision

23    of this is a safety environment, or safe situation, or needs

24    to jump in to run the sort or help sort.

25              MR. HAMBURGER:  Can I have one second to confer?

1          THE COURT:  Absolutely.

2                  (Pause in the proceedings.)

3   BY MR. HAMBURGER:

4   Q.  You also testified about the handoff report.  Did the

5   handoff report only include data?

6   A.  No.  The handoff report included summaries (Zoom glitch).

7   Q.  Mr. Nevado, you broke up again.  So could you start that

8   answer?

9   A.  Yes.  Can you hear me now?

10          THE COURT:  We will let you know.  Give the answer,

11  please.

12          THE WITNESS:  The shift handoff included summaries of

13  the shift were write-ups, essentially significant occurrences,

14  as well as safety summaries would be included.

15          MR. HAMBURGER:  I have no further questions for him,

16  but I do want to -- there's a part of the deposition

17  transcript that I would like to read for completeness.

18          THE COURT:  Let's get the --

19          MR. HAMBURGER:  It is page 152, lines 21 to 24.

20                  (Pause in the proceedings.)

21          MS. VAN NOTE:  No objection.

22          THE COURT:  All right.  Proceed.

23          MR. HAMBURGER:  (Reading)

24          "Question:  Wouldn't you characterize part of

25          management as leading by example, isn't that a key

1              way to manage other people to motivate them, to

2              inspire them?

3              "Answer:  Yes."

4         **MR. HAMBURGER:**  Nothing further.

5         **THE COURT:**  Thank you.

6      Anything further, Ms. Van Note?

7         **MS. VAN NOTE:**  Nothing further for this witness.

8         **THE COURT:**  All right.  You are excused, Mr. Nevado.

9  Thank you so much.  You can log off.

10     All right.  So any further witnesses for the plaintiff or

11 further exhibits for the plaintiff?

12        **MS. VAN NOTE:**  Yes, Your Honor.  We do have an

13 exhibit which is a witness by way of deposition designation.

14 And I will identify it for the record.

15     We have marked it as Trial Exhibit 176, and it is excerpts

16 from the deposition of William Hedin.

17        **THE CLERK:**  Spell that please.

18        **MS. VAN NOTE:**  William, W-I-L-L-I-A-M, Hedin,

19 H-E-D-I-N.

20        **THE CLERK:**  Thank you.

21        **THE COURT:**  All right.  So you are offering that as

22 direct testimony on behalf of the plaintiff?

23        **MS. VAN NOTE:**  Yes, Your Honor.

24        **THE COURT:**  All right.  So, I guess the question --

25 not a guess, the question for the defendant is any objection?

```
1              MR. SCHWARTZ:  Your Honor, the only objection we have

2      is the motion we made yesterday, which the Court denied.

3              THE COURT:  That objection is noted and overruled.

4              MR. SCHWARTZ:  Understood, Your Honor.  Thank you.

5              THE COURT:  Okay.  Does that complete the plaintiff's

6      case or do you have any further exhibits?

7              MS. VAN NOTE:  Nothing further at this time, Your

8      Honor.

9              THE COURT:  So plaintiff rests?

10             MS. VAN NOTE:  Yes, Your Honor.

11             THE COURT:  All right.  Plaintiff has rested.

12     Defense, do you have any more witnesses or exhibits?

13             MR. SCHWARTZ:  We do, Your Honor.

14     First, I would first like to note that the plaintiff's

15     exhibit also contains our counterdesignations, for which I

16     thank counsel.

17        And for purposes of preserving, I understand the Court's

18     instructions yesterday, so I won't elaborate on this.  But for

19     purposes of preserving now the plaintiff has closed his case,

20     we would move for judgment pursuant to Rule 52(c).

21             THE COURT:  All right.  The Court will withhold --

22     take into abeyance that motion and decide it in the context

23     of -- later in the case.

24             MR. SCHWARTZ:  Understood, Your Honor.  Thank you.

25        At this time, the final parts of the defendants' case we
```

1    would like to move the admission of the deposition transcript

2    and I will defer to Ms. Cooney to handle that.

3            **THE COURT:**  All right.

4            **MS. COONEY:**  Good morning, Your Honor.

5            **THE COURT:**  Good morning.

6            **MS. COONEY:**  Defendants would move for admission of

7    the deposition testimony, excerpted deposition testimony of

8    Nityanath Vaidya.  N-I-T-Y-A-N-A-T-H.  Vaidya, V-A-I-D-Y-A,

9    which has been marked as Trial Exhibit 177.  This includes

10   both defendants' designations and plaintiff's

11   counterdesignations.

12           **THE COURT:**  Any objection?

13           **MS. VAN NOTE:**  No, Your Honor.

14           **THE COURT:**  All right.  It's admitted.

15              (Trial Exhibit 177 received in evidence)

16           **MS. COONEY:**  Thank you, Your Honor.

17           **THE COURT:**  Any further witnesses or evidence?

18           **MR. SCHWARTZ:**  Nothing further for the defendant.

19           **THE COURT:**  So the defense rests?

20           **MR. SCHWARTZ:**  The defense rests.

21           **THE COURT:**  All right.

22       And I assume you have the same motion with respect to the

23   defense?

24           **MS. VAN NOTE:**  Yes, Your Honor.

25           **THE COURT:**  So I will again take that under

```
 1    advisement.

 2        So the evidence -- I assume there's no rebuttal; is that

 3    correct?

 4            MS. VAN NOTE:  That's correct, Your Honor.

 5            THE COURT:  So with that said, so the receipt of

 6    evidence is completed.

 7        As I mentioned yesterday, I don't need or want oral

 8    argument, but I would like -- have you talked about a briefing

 9    schedule for proposed final findings of fact, conclusions of

10    law, and post-trial briefs?

11            MS. VAN NOTE:  We have, Your Honor.  Defendants'

12    counsel proposed submission of trial briefs 30 days after the

13    transcript is complete, and plaintiff would agree with that

14    schedule.

15            THE COURT:  And then the rebuttal -- response and

16    reply would be on the same schedule?

17            MS. VAN NOTE:  Yes, Your Honor, simultaneous --

18            THE COURT:  I'm sorry, the normal court schedule?

19            MS. VAN NOTE:  We had discussed simultaneous

20    submissions.  If the Court thinks that rebuttal would be more

21    helpful, certainly we would take that into account.

22            THE COURT:  Well, if there is going to be joint

23    submissions, I certainly want to get -- I'm not inviting more

24    paper.  We get enough paper God knows -- to get a response

25    from the opposite side, one response; is that what you had in
```

1    mind?

2                **MS. VAN NOTE:**  I think that would be appropriate,

3    yes.

4                **THE COURT:**  So 30 days after the completion and

5    certification of the transcript, both sides will file

6    simultaneous post-trial briefing, and then 30 days thereafter,

7    each side will have to respond -- reply to the other parties'

8    submissions.

9        Is that acceptable?

10               **MS. VAN NOTE:**  Yes, it is for plaintiff.

11               **THE COURT:**  Is that acceptable?

12               **MR. SCHWARTZ:**  Yes, Your Honor.

13               **THE COURT:**  So anything further?

14               **MR. SCHWARTZ:**  Nothing further.

15               **THE COURT:**  Thank you very much, counsel.

16               **MS. VAN NOTE:**  Thank you, Your Honor.

17               **THE COURT:**  Both sides did a really good job.  I'm

18   glad the newer generation got to do their thing.  They did an

19   excellent job.  You did an excellent job, too.

20       I'm glad to see people of different genders than all white

21   guys like me trying cases because I think it's important for

22   the Bar, for our entire profession, and also so that we have

23   good lawyers like we have here in this trial coming down the

24   pike and not just, you know, have that dying art of trial

25   advocacy, which I have been teaching for almost 40 years now,

1    and it's a dying art because we have vanishing trials.  I'm

2    glad all of you had a chance to apply it.

3        I will say, when I assign pocket briefs, I know who is

4    going to be doing the work at night, so I apologize -- I know

5    it's you, Ms. Van Note --

6            **MS. VAN NOTE:**  That's true.

7            **THE COURT:**  -- cases of the defense firm, I know it

8    is their fallout.  I apologize to all the associates out

9    there.  I have been there and done that.  Sometimes the Court

10   needs enlightenment.

11       Thank you very much and I wish you all well.

12           **MR. SCHWARTZ:**  Thank you, Your Honor.  Good day.

13           **MS. VAN NOTE:**  Thank you.

14

15           (Proceedings concluded at 8:22 a.m.)

16

17                   <u>**CERTIFICATE OF REPORTER**</u>

18           I, Diane E. Skillman, Official Reporter for the

19   United States Court, Northern District of California, hereby

20   certify that the foregoing is a correct transcript from the

21   record of proceedings in the above-entitled matter.

22

23           _Diane E. Skillman_

24           DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

25                 Sunday, June 27, 2021

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**