MICHELE L. MARYOTT, SBN 191993
  mmaryott@gibsondunn.com
MEGAN COONEY, SBN 295174
  mcooney@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone: 949.451.3800
Facsimile:  949.451.4220

JASON C. SCHWARTZ (admitted *pro hac vice*)
  jschwartz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone: 202.955.8500
Facsimile:  202.467.0539

BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

JOSEPH R. ROSE, SBN 279092
  jrose@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

Attorneys for Defendants AMAZON.COM
LLC and GOLDEN STATE FC LLC (now
known as Amazon.com Services LLC)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MICHAEL ORTIZ, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM LLC, a Delaware Limited Liability Company; GOLDEN STATE FC LLC, a Delaware Limited Liability Company, and DOES 1 through 100, inclusive,<br><br>Defendants. | CASE NO. 4:17-CV-03820-JSW<br><br>**DEFENDANTS AMAZON.COM LLC AND GOLDEN STATE FC LLC'S SEPARATE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**Phase One Trial:**<br>Date:          June 21, 2021<br>Time:         8:00 a.m.<br>Place:        Courtroom 5, 2nd Floor<br>                   1301 Clay Street<br>                   Oakland, CA 94612<br>Judge:       Hon. Jeffrey S. White |

1
2
3
4
5
6
7

Pursuant to the Court's Minutes from the Phase One Bench Trial conducted on this matter on June 21 through June 25, 2021 (Dkt. 256), Defendants Amazon.com LLC and Golden State FC LLC (together, "Amazon") submit the following Updated Proposed Findings of Fact and Conclusions of Law. These Updated Proposed Findings of Fact and Conclusions of Law include the facts the parties stipulated were established in their Joint Proposed Final Pretrial Order (Dkt. 221). Should the case proceed to additional phases of trial, Amazon reserves the right to submit additional proposed findings of fact and conclusions of law as appropriate.

8

### THE PARTIES' STIPULATED FINDINGS OF FACT

9
10

1.     Plaintiff was employed by Golden State FC LLC as a Level 4 Shift Manager, Logistics from February 1, 2016 to December 11, 2016. Dkt. 221 at 12.

11
12

2.     Plaintiff worked at the South San Francisco delivery station (DSF5) from February 1, 2016 to May 2016. Dkt. 221 at 12.

13
14

3.     Plaintiff worked at the San Leandro delivery station (DSF4) from May 2016 to August 2016. Dkt. 221 at 12.

15
16

4.     Plaintiff worked at the Richmond delivery station (DSF6) from August 2016 until his termination on December 11, 2016. Dkt. 221 at 12.

17
18

5.     At each of the three delivery stations where Plaintiff worked, he was the Shift Manager during the night shift, also referred to as the Night Sort. Dkt. 221 at 12.

19
20
21

6.     Plaintiff's duties and responsibilities as a Shift Manager of the Night Sort at his delivery stations involved management of a customarily recognized department or division of Amazon's business. Dkt. 221 at 13.

22
23

7.     As a Shift Manager, Plaintiff earned a salary of $68,500 annually, which is in excess of two times California's minimum wage for a full-time employee in 2016. Dkt. 221 at 13.

24
25

8.     As a Shift Manager, Plaintiff was classified by Defendants as an exempt employee. Dkt. 221 at 13.

26
27
28

## AMAZON'S SEPARATE PROPOSED FINDINGS OF FACT

### I.  Golden State Operated Amazon Delivery Stations

9.      At all times relevant to this phase one trial, Golden State FC LLC ("Golden State") operated Amazon delivery stations in California.  *See* Ex. 177 at 44:18–21; 45:5–15 (Vaidya).

10.     Delivery stations are the final step of a highly complex and intricate distribution network.  *See* Ex. 19.  Delivery stations receive and sort packages for outbound routes in order to enable last mile delivery to customers.  *See* Tr. 30:7–18 (Ortiz); Tr. 299:8–23 (Lopez); Exs. 19, 143.

11.     The employees working at delivery stations have job titles organized by Level or Tier. Ex. 177 at 49:11–50:18 (Vaidya); *see* Tr. 95:24–96:3; 101:11–21 (Ortiz).  Tier 1 covers entry level, non-exempt employees.   Tr. 95:24–96:3 (Ortiz).   Level 4 positions are typically manager level positions. Tr. 347:22–348:1 (Lopez); Tr. 489:2–4 (Martin); Ex. 18.  Shift Manager is one of many jobs that has a Level 4 job code.  Tr. 295:9–11 (Lopez); Tr. 489:2–4 (Martin).  There are also intermediate levels, including Tier 3.  *See* Tr. 297:1–2 (Lopez).  One Tier 3 role at a delivery station is the "Shift Assistant" position, also known as a process assistant, whose "job is to assist the Shift Manager."  Tr. 297:11–14 (Lopez).

### II.  Michael Ortiz's Employment As A Level 4 Shift Manager

#### A.  Mr. Ortiz Was Hired As A Level 4 Shift Manager

12.     Plaintiff Michael Ortiz holds a Bachelor of Science degree in Business Administration from the University of California, Berkeley.  Tr. 28:24–29:4 (Ortiz); Exs. 106, 107, 119.

13.     Around May 2015, Mr. Ortiz was invited to apply for a managerial position at Amazon. Tr. 31:5–23 (Ortiz).  Mr. Ortiz was "interviewed by multiple disciplines across the business," and was asked "many behavioral questions" and "managerial-type questions," such as "[h]ow would you manage conflict?" and "[h]ow would you deal with an associate who did X, Y, Z?," and "mathematical-based questions as well."  (Tr. 35:13–20 (Ortiz); Tr. 601:13–23 (Bania).  Diego Nevado, then a Senior Regional Leader, testified that he interviewed Mr. Ortiz and other Level 4 Shift Managers, but did not participate in hiring decisions for lower level employees, like Level 3 Shift Assistants or Tier 1 associates.  Tr. 600:19–601:12 (Nevado).  After this interview process, Mr. Ortiz was hired as a Level 4 Shift Manager, Logistics.  Ex. 101; *see* Dkt. 221 (Stipulated Facts) at 12; Tr. 37:1–4 (Ortiz).

14.     In addition to his base salary of $68,500 per year plus benefits, Mr. Ortiz received a $13,500 signing bonus and 65 restricted stock units in Amazon.com, Inc., vesting over a period of four years.  Dkt. 221 (Stipulated Facts) at 13; Ex. 101; *see* Tr. 169:18–170:11 (Ortiz).  Mr. Ortiz's salary was paid to him on a biweekly basis, and he received wage statements reflecting the amounts he was paid, including itemized lines for gross wages earned, deductions, net wages, and the inclusive dates of the pay period.  Ex. 136.

15.     In 2016, Tier 1 associates working at DSF4, DSF5, and DSF6 were paid approximately $14 per hour (which equals roughly $29,120 per year for an associate working 40 hours week for 52 weeks), and did not receive signing bonuses.  Tr. 588:14–589:11 (Bania).

16.     Mr. Ortiz acknowledged that he accepted "employment with Golden State FC, LLC under the terms set forth in [his offer] letter," which stated that because his position was "exempt from overtime pay," his "salary [would] compensate [him] for all hours worked."  Ex. 101; *see* Tr. 37:5–38:8 (Ortiz).

**B.     Mr. Ortiz Received Substantial Managerial Training For His Shift Manager Role**

17.     Mr. Ortiz began his employment by attending three weeks of managerial training.  Tr. 39:5–18 (Ortiz).

18.     First, Mr. Ortiz participated in a multi-day program called the "Ops Leader Orientation," where he learned leadership skills and participated in "a lot of role playing" regarding how to handle "potential problems that [he] would see as a manager."  Tr. 571:21–572:11 (Bania); *see* Tr. 50:19–51:7 (Ortiz).  Mr. Ortiz attended the Ops Leader Orientation, also called "OLO," with other Level 4 and Level 5 managers.  Tr. 41:5–8 (Ortiz); Tr. 571:21–572:11 (Bania).

19.     After Ops Leader Orientation, Mr. Ortiz attended Associate Experience Week, a program for all new managers that "teach[es] leaders what it's like to be an associate, with the intent that those leaders can then step into their role as leaders and managers . . . and better understand how to support their associates."  Tr. 573:2–15; 575:21–576:3 (Bania); Tr. 52:22–53:8 (Ortiz) (Associate Experience Week was "in-depth training . . . working with other associates moving packages").  Associate Experience Week is designed to give new managers "an opportunity to step into the shoes of the associates for a small period of time" to get their perspectives, "because they will not have the

opportunity" to develop those perspectives once they step into their roles.  Tr. 573:2–15; 575:21–576:3 (Bania).

20.     Specifically, the Associate Experience Week training guide states that the program "is intended to open [managers'] eyes to our front-line associates' world, [managers'] impact on them and provide perspective on how you think, teach, and deliver as a leader at Amazon."  Ex. 142; *see also* Tr. 111:4–17 (Ortiz); Tr. 572:21–573:15 (Bania).  It further explains that Amazon expects that the lessons provided by Amazon Experience Week will help new managers:

- Fully appreciate what it takes to deliver to the customer, including the repetitive and physical work of our Associates.
- Have increased visibility to barriers to success that associates experience in each process, ensuring [managers] "attack process and engage people" in striving for continuous improvement.
- Work safely within a [facility]; recognize safe and unsafe behaviors; employ proper process etiquette.
- Observe things from a completely objective standpoint – recommend changes/improvements as [managers] see them.
- Build/strengthen relationships with those [the managers] will be supporting.

Ex. 142; *see also* Tr. 111:4–17 (Ortiz); Tr. 572:21–573:15 (Bania).

21.     Even Human Resources managers participate in Associate Experience Week, as do high level managers up to and including operations Vice Presidents.  Tr. 573:2–15; 575:21–576:3 (Bania).  Tier 1 associates do not participate in the Associate Experience Week training.  Tr. 575:21–576:3 (Bania).

22.     Amazon supplemented Mr. Ortiz's training with additional management training opportunities, including the "Lead, the Amazon Way" workshops.  Tr. 577:2–14, 21–23 (Bania); Ex. 149.  These workshops "focused mostly on people leadership skills, things like delegation, having difficult conversations with team members," motivating employees, innovating and improving, and other skills Amazon expected managers would need "to be successful in their roles."  Tr. 577:2–14,

21–23 (Bania); Ex. 149.  The Lead the Amazon Way workshops were not provided to Tier 1 associates.

Tr. 577:2–14, 21–23 (Bania).

23.  Specifically, Mr. Ortiz participated in Lead the Amazon Way trainings on:

a.  Building credibility, which focused on cultivating "authority" and "competence" as a leader. Exs. 111, 150 at 11; Tr. 581:15–582:13 (Bania).

b.  Communicating effectively, which focused on things like "invest[ing] in discussions that matter," "own[ing] the team's problems," and "remov[ing] barriers" to effective communication.  Exs. 111, 151 at 5; Tr. 581:15–582:13 (Bania).

c.  Motivating and engaging his team, which taught Mr. Ortiz techniques to "promote teamwork and collaboration," as well as "engage and motivate team members." Exs. 111, 152 at 2; Tr. 581:15–582:13 (Bania).

d.  Providing feedback, which focused on giving "performance-based and actionable feedback to associates," as well as "techniques that minimize [the] negative impact of difficult conversations on associate motivation." Exs. 111, 153 at 2; Tr. 581:15–582:13 (Bania).

e.  Being a leader during conflict, which trained Mr. Ortiz to resolve conflicts and identify ways to make conflicts "constructive." Exs. 111, 155 at 2; Tr. 581:15–582:13 (Bania).

f.  Being a leader during tough conversations, which focused on "[h]andling tough conversations," and "[i]dentifying ways to ensure effective communication." (Exs. 111, 156 at 2; Tr. 581:15–582:13 Bania).

g.  Engaging his associates with connections, which focused on "earn[ing] employee trust through engagement," and "predict[ing], discover[ing] and remov[ing] obstacles that hinder trust and engagement." Exs. 111, 157 at 3; Tr. 581:15–582:13 (Bania).

Gibson, Dunn &
Crutcher LLP

6

h.  Managing time and delegating, which taught Mr. Ortiz how to "[d]elegate tasks effectively in order to manage [his] workload and develop others." Exs. 111, 158 at 2; Tr. 264:13–265:1 (Ortiz); Tr. 581:15–582:13 (Bania).

i.  Resolving conflict, which trained Mr. Ortiz on identifying the "most appropriate conflict resolution style" for different situations he might encounter as a manager, and to encourage constructive "discussion and debate." Exs. 111, 159 at 31; Tr. 581:15–582:13 (Bania).

j.  Innovating and improving, which focused on identifying opportunities for improvement and "[d]emonstrat[ing] how to use improvement tools to solve real problems." Exs. 111, 160 at 2; Tr. 581:15–582:13 (Bania).

24.  At the end of his training, Mr. Ortiz expected that, as a Shift Manager, he "would oversee a team of associates and have a shift assistant to help [him] liaison with them." Tr. 62:21–63:1 (Ortiz).

### C.  Mr. Ortiz's Role As Shift Manager

#### 1.  Mr. Ortiz Oversaw The Night Sort Shift

25.  After completing his training, Mr. Ortiz stepped into his role as a Shift Manager overseeing the Night Sort shift. *See* Dkt. 221 at 12–13. Although he worked at three different delivery stations during his time at Amazon, the work he did at any one station was not "significantly different than any of the other stations" where he worked. Tr. 64:2–5 (Ortiz).

26.  The Night Sort runs overnight, and entails inducting (that is, scanning unloaded packages and placing them on conveyors), sorting, and staging thousands of inbound packages arriving at the delivery station so that they may be loaded and delivered during other shifts. Tr. 42:3–43:14 (Ortiz).

27.  The manager of the Night Sort needed to oversee and coordinate many complex processes to accomplish this. Tr. 42:3–43:20 (Ortiz); Tr. 303:24–304:2 (Lopez). First, large semi-trucks carrying packages would arrive at the station and the packages would need to be unloaded. Tr. 42:3–43:14 (Ortiz). If packages were shipped loosely, they would go onto a conveyor belt system; if they were shrink-wrapped and on pallets, the pallets would be staged so that the shrink wrap could be

broken down and the packages could be removed.  *Id.*  The packages would then be scanned as "received," and sent to a "divert station" on a conveyor belt, where they would be picked up by an associate and diverted to another area of the station, called a "spur" or a "sort zone," based on their destination.  *Id.*; Tr. 300:5–12 (Lopez).  Additional associates in those zones would be scanning packages and putting them in bags or boxes to sort them for delivery.  Tr. 42:3–43:14 (Ortiz).  Once the packages were sorted and delivery routes were assigned, the packages would be staged for pick-up by delivery drivers.  *Id.*

28.    The delivery stations were too large for Mr. Ortiz to be able to stand in one spot and observe all the processes that were occurring during his shift.  Tr. 105:3–10 (Ortiz); Tr. 302:7–10 (Lopez); Tr. 438:9–15 (Kaczor).

29.    At the larger Richmond facility (DSF6), Mr. Ortiz supervised the work of 80 to 100 Tier 1 associates.  Tr. 164:25–165:5 (Ortiz).  At the South San Francisco (DSF5) and San Leandro facilities (DSF4), he supervised between 40 and 100 associates.  *Id.*

30.    These Tier 1 associates were hired to perform the offloading, scanning, inducting, sorting, and staging tasks, while Mr. Ortiz was hired to manage their performance and the overall operation during the course of the shift.  Tr. 297:3–25 (Lopez); Tr. 390:18–25 (Kaczor); *see also* Ex. 15; Ex. 177 at 115:7–14 (Vaidya).  Mr. Ortiz "wore a blue vest" on the floor of the delivery station to "signif[y] that [he was] a member of management," while the associates he supervised wore "yellow vests."  Tr. 60:4–10 (Ortiz).  Mr. Ortiz could tell by looking at a photograph of a delivery station operation who the "associates" were "[b]ecause they are the ones working and moving boxes."  Tr. 59:25–60:10 (Ortiz); Ex. 116.

31.    Mr. Ortiz also had a Level 3 Shift Assistant who was responsible for helping him "manage the shift" and "oversee the other associates."  Tr. 101:19–24 (Ortiz); Tr. 297:11–14 (Lopez).  Mr. Ortiz communicated directions or instructions to, and received comments from, his Shift Assistant and Ambassadors to "expand his span of control" over the operation.  Tr. 167:3–168:3 (Ortiz).

32.    Mr. Ortiz was generally the only Shift Manager on duty for the Night Sort operation.  Tr. 166:10–13 (Ortiz).  Occasionally, a Station Manager or Area Manager was at the delivery station during Mr. Ortiz's Night Sort operation, but he or she typically did not spend the entire shift with Mr.

Ortiz.  Tr. 166:21–167:2 (Ortiz); Tr. 317:19–318:2 (Lopez).  For instance, Mr. Ortiz's supervisor at DSF6, Marc Lopez, overlapped with him during each shift for 2 to 3 hours, and sometimes more during peak season, but was not the manager of the Night Sort operation.  Tr. 317:6–318:2; 376:17–25 (Lopez).

### 2. As Shift Manager, Mr. Ortiz Was Responsible For The Day-to-Day Operations Of The Delivery Station

33.     The Shift Manager job description states that "Shift Managers are responsible for the day-to-day operations of delivery stations in the Amazon network, including inbound, outbound, and sortation operations."  Ex. 14; *see also* Tr. 150:9–151:22 (Ortiz).

34.     It also outlines a Shift Manager's "Key Job Duties" as:

- Oversee the delivery of Amazon orders to customers

- Build, optimize, and assign delivery routes on your shift

- Communicate with and respond to Amazon Customer Service associates on delivery exceptions and requests

- Support Amazon operations leadership team in daily operations management of the delivery station, including route assignment, leading meetings, and communicating with internal and external suppliers

- Troubleshoot problems through to resolution, escalating as necessary

- Review and update SOPs as required

- Participate in Lean/Kaizen, Black Belt, and other Operational Excellence initiatives

- Ensure compliance throughout the site to global process standards and work on continuous improvement initiatives

Ex. 14; *see also* Tr. 150:9–151:22 (Ortiz).

35.     Mr. Ortiz testified that this job description accurately describes the work he did at Amazon.  Tr. 47:23–25; 150:24–151:1 (Ortiz).  Mr. Ortiz also stated that he performed all but one of these functions—participating in Lean/Kaizen, Black Belt, and other Operational Excellence initiatives—while working as a Night Sort Shift Manager.  Tr. 150:14–151:18 (Ortiz).

36.     In addition to these "Key Job Duties," the Shift Manager job description also lists "Additional Job Elements," which require prospective employees to be able to "lift up to 49 pounds

with or without reasonable accommodation," "frequently push, pull, squat, bend, and reach," "stand/walk for up to 10/12 hours," and the like. Ex. 14; *see also* Tr. 47:23–25; 150:9–151:1 (Ortiz). In contrast to the "Key Job Duties," which are the "core competencies" of the Shift Manager's job and what Amazon expected him to "spend most of [his] time doing," the "Additional Job Elements" are "auxiliary" functions that a Shift Manager would need to be able to perform in order to safely work and supervise associates in a delivery station. Tr. 584:12–586:23 (Bania). Amanda Bania, a Senior Human Resources Manager, testified that Amazon "believe[s] that safety is everybody's responsibility," so the company "make[s] sure everybody" in the delivery station is capable of performing those Additional Job Elements "at all times." Tr. 584:24–585:18 (Bania). In fact, these job elements are even included in "Level 7 senior manager job descriptions." *Id.*

### a.   Mr. Ortiz Performed Primarily Managerial Tasks Before The Bulk Of The Tier 1 Associates Arrived

37.   As a Shift Manager, it was up to Mr. Ortiz when to arrive for his shift, but he typically arrived at the delivery station between 10 and 11 p.m. each evening. Tr. 237:1–5 (Ortiz); Tr. 388:2–4 (Kaczor). The bulk of the Tier 1 associates working on the Night Sort would arrive roughly 1 to 2 hours later to begin their shifts. Tr. 237:1–5 (Ortiz). At each facility where Mr. Ortiz worked, there were at least a few associates who arrived earlier to assist with the process of readying the facility for the Night Sort operation. Tr. 306:9–307:19; 318:17–23 (Lopez); Tr. 388:10–15; 458:2–8 (Kaczor). Mr. Ortiz's Shift Assistant also arrived early, typically two hours before the bulk of the Tier 1 associates. Tr. 306:4–8 (Lopez).

38.   At the beginning of his shift, Mr. Ortiz sometimes received handoff material from the prior shift detailing how the day had progressed, challenges encountered, and things his team might need to address during his shift. Tr. 242:22–243:4; 285:25–286:2 (Ortiz).

39.   Before the bulk of the Tier 1 associates arrived, Mr. Ortiz also needed to "verify[] what trailers were on-site, what trailers were scheduled to be arriving on-site," and create the operating plans for the shift—a shift plan and a staffing plan. Tr. 307:20–25 (Lopez).

40.   The shift plan "was a roadmap" for the shift, and was based on the planned incoming volume of packages for the shift, the "total labor hours," and "total time for the shift," which Mr. Ortiz

would use to calculate a target "outflow" of processed packages per hour. Tr. 308:4–13 (Lopez). Mr. Ortiz had to create this plan each night, because he was responsible for and "evaluated based on the performance of the entire shift under [his] management." Tr. 161:5–13 (Ortiz).

41.     Based on the shift plan, the total labor hours, and the number of associates who arrived for the shift, Mr. Ortiz built a staffing plan by considering "the roles that [the scheduled associates] were trained in, their skill level, and then assign[ing] specific associates to specific roles" to best execute his shift plan. Tr. 308:14–20 (Lopez). He would assign and reassign the Tier 1 associates to these roles throughout the shift, "based upon [his] assessment of their skills and abilities," "feedback [he] received from other managers," whether he wanted associates to gain experience in new areas, or "the business needs" of the operation. Tr. 201:7–10; 247:1–15 (Ortiz).

42.     The more Mr. Ortiz learned about the associates on his shift, the better he got at putting the right people in the right positions to ensure the success of his shift. Tr. 248:14–19 (Ortiz). But creating this staffing plan alone could take an hour to an hour and a half at the large facilities where Mr. Ortiz worked. Tr. 309:8–10; 319:11–13 (Lopez).

43.     Mr. Ortiz testified that, in addition to planning for his shift, he sometimes chose to complete various tasks before associates arrived for work to set up his team for success. *See, e.g.*, Tr. 107:15–108:10; 131:11–23; 255:13–256:5 (Ortiz). Mr. Ortiz testified that, during the one to two hours before the majority of the Tier 1 associates arrived, he spent some time unloading truck pallets, staging pallets and bread racks alongside the conveyance system, breaking down the plastic on packaging, setting up computers, replacing batteries on handheld scanning devices, and walking the delivery station floor to ensure everything was ready to go when the bulk of the Tier 1 associates arrived and the shift began. Tr. 66:14–17; 106:24–108:10 (Ortiz).

44.     Mr. Ortiz always had the ability to, and often did, delegate these tasks to his Shift Assistant or the other associates who arrived on-site early, as he saw fit. Tr. 264:22–265:1 (Ortiz); Tr. 306:9–307:19; 318:17–23 (Lopez); Tr. 388:10–15 (Kaczor); Tr. 581:2–7 (Bania). At each facility where he worked, there were associates on-site early who were specifically tasked with performing these functions so that the facility would be ready for a fast start to the shift. Tr. 306:9–307:19; 318:17–23 (Lopez); Tr. 388:10–15; 458:2–8 (Kaczor). Mr. Lopez testified that at DSF4 and DSF6, Mr. Ortiz

specifically chose the associates who would be on-site early to assist with the site preparation and provided Mr. Lopez with guidance on how to select associates for that role.   Tr. 306:14–307:19 (Lopez).  Mr. Ortiz agreed that Amazon's training "emphasized" "that one of the things [he] should do to make [himself] effective as a manager was to delegate lower level tasks to the associates under [his] supervision."  Tr. 264:22–265:1 (Ortiz); *see also* Tr. 265:9–13 (Ortiz).

### b.   Mr. Ortiz Performed Primarily Managerial Tasks During The Course Of The Associates' Shift

45.   When the remainder of Mr. Ortiz's associates arrived for work, Mr. Ortiz conducted "stand-up" meetings during which he discussed opportunities and challenges, "what was going on that day," any "special initiatives," answered associate questions, and sometimes provided coaching.  Tr. 62:3–11; 81:20–82:21; 129:6–11; 251:24–252:5 (Ortiz).  If he did not have anything specific to discuss during the stand-up meeting, Mr. Ortiz chose to "use it as a pep talk" to get his associates "pumped up and get them ready to go."  Tr. 82:11–21 (Ortiz).  At the end of the meeting, Mr. Ortiz would lead stretches for one to two minutes before the sortation process began.  Tr. 62:3–11; 81:20–83:3 (Ortiz).

46.   Throughout the shift, Mr. Ortiz's duties centered around managing his team of 40 to 100 associates by strategically allocating labor, evaluating associates' performance, and ensuring compliance with wage and hour laws.  Tr. 98:2–99:8; 170:24–171:20; 201:7–10; 247:1–15; 248:5–13; 256:6–257:1 (Ortiz); Tr. 298:3–5 (Lopez).  Mr. Ortiz assigned specific jobs to each of the up to 100 associates each night based on associates' strengths and weaknesses, team productivity, labor shortfalls, whether he wanted associates to gain skills, and the needs of the operation.  Tr. 248:5–13; 298:3–5; 201:7–10; 247:1–15 (Ortiz).  Mr. Ortiz also needed to reassign associates to new tasks throughout the shifts.  For example, if one part of the operation was behind or moving more slowly, he reallocated labor to support that process.   Tr. 326:15–327:13 (Lopez); Tr. 404:9–17 (Kaczor); Tr. 634:20–635:4 (Nevado).  Additionally, when the shift was done unloading packages from trucks, Mr. Ortiz moved the associates who were performing that function to tasks that were not yet complete, such as scanning or stowing.  *See* Tr. 391:22–392:2 (Kaczor).

47.   Mr. Ortiz was "responsible for taking account of when the associates arrived, when they left for their meal break, when they came back from their meal break, and when they left at the end of

their shift" to maintain compliance with wage and hour requirements.  Tr. 170:24–171:20; 261:19–23 (Ortiz).  Mr. Ortiz also decided whether to order overtime, and if so, how much.  Tr. 106:15–18; 261:24–262:5 (Ortiz); Tr. 325:24–326:6 (Lopez); Tr. 450:7–14 (Kaczor).  And for a period of time at the San Leandro and Richmond facilities when associates did not have name badges, Mr. Ortiz had to manually track and report associates' time at work.  Tr. 98:2–99:8 (Ortiz).

48.     Throughout his shift, Mr. Ortiz was also responsible for overseeing the different processes occurring in the delivery station, analyzing data, and updating the "Gemba board" to help keep his shift on track.  Tr. 68:3–14 (Ortiz).

49.     The Gemba board allowed Mr. Ortiz to track various important metrics, including "labor hours, throughput, the number of packages" sorted, as well as "half hour or hourly update[s]" so Mr. Ortiz could monitor how his team was performing in comparison to his shift plan.  Tr. 68:3–14 (Ortiz).  Mr. Ortiz was expected to and did pull and analyze data for the Gemba board every 30 minutes.  Tr. 70:5–8 (Ortiz); Tr. 311:19–21 (Lopez).

50.     Mr. Ortiz pulled the refreshed data on the shift's progress by accessing a tool called the "Comp system."  Tr. 111:24–112:10 (Ortiz).  The data on the tool was not retained, so it had to be pulled at 30 minute intervals and saved before it was lost.  *See* Tr. 112:11–16; 70:5–8 (Ortiz); Tr. 513:19–514:5 (Martin).

51.     Every 30 minutes when Mr. Ortiz pulled the data from the Comp tool, Mr. Ortiz determined if adjustments needed to be made.  Tr. 69:20–70:3; 153:20–155:9 (Ortiz).  If the data indicated that any problems were arising—for example if packages were being unloaded at a much faster rate than they were being stowed—Mr. Ortiz investigated the cause of the problem and determined how to respond to it.  *Id.*; 311:22–312:1 (Lopez).

52.     Due to the size of the delivery stations Mr. Ortiz oversaw, he could not monitor the entire operation from one location.  Tr. 304:3–25 (Lopez).  Therefore, in order to investigate the cause of problems he identified in the data or monitor the shift, he needed to walk the entire floor—which took anywhere from 15 to 30 minutes per walk depending on the size of the facility—or communicate via walkie-talkie with ambassadors stationed around the floor.  Tr. 104:21–105:10 (Ortiz); Tr. 302:7–10; 305:4–18 (Lopez); Tr. 438:9–15 (Kaczor).

53.     If a problem area was identified, Mr. Ortiz determined how to fix the issue.  Tr. 153:23–154:2 (Ortiz).  In some cases, Mr. Ortiz diverted associates from one area to another to rebalance the shift.  Tr. 69:20–70:3; 153:20–155:9 (Ortiz).  In other cases, Mr. Ortiz worked to motivate associates to "step it up" or delegated specific issues to associates working in a "problem solver" role.  Tr. 69:20–70:3; 153:20–155:9 (Ortiz); 311:22–312:1 (Lopez).

54.     Occasionally, Mr. Ortiz chose to step in and help the associates in the path directly.  Mr. Ortiz testified that he thought it "was a good thing that managers would move packages" because "it showed that they were all a team and it motivated the associates as well."  Tr. 109:21–110:1 (Ortiz).  Mr. Ortiz performed these tasks for motivational purposes and to show he was engaged with his team, which was consistent with Amazon's expectations of him in the Shift Manager role.  Tr. 109:21–110:1 (Ortiz); Tr. 322:24–323:3 (Lopez); Tr. 399:18–22 (Kaczor).

55.     Mr. Ortiz set up "power hour" competitions during some of his shifts, in which different groups of associates would compete to see who could process the most packages in an hour.  Tr. 71:15–25; 110:16–111:2 (Ortiz).  Mr. Ortiz explained that the purpose for the "power hour" was to motivate associates.  Tr. 71:15–25; 110:16–111:2 (Ortiz); Tr. 605:8–21 (Nevado).

56.     Mr. Ortiz also tried to motivate his Tier 1 associates by awarding stickers to high-performing associates.  Tr. 71:15–25; 110:16–111:2 (Ortiz).

57.     As "manager of the Night Sort," Mr. Ortiz was "constantly responsible for the safety of that operation."  Tr. 152:18–153:10 (Ortiz).  In fact, safety was "one of the primary metrics by which [the shift's] success was measured."  Tr. 153:8–10 (Ortiz); Ex. 125.  As a result, Mr. Ortiz was always on the lookout for whether associates were being unsafe, and it was his responsibility to address any safety issues that arose.  Tr. 260:21–25 (Ortiz).  In his view, he "never really had an opportunity to be fully on break because [he] was always responsible for the facility."  Tr. 186:17–25 (Ortiz).

58.     Mr. Ortiz was also responsible for coaching associates.  Mr. Ortiz coached associates on performance issues if, for example, they were "scanning the wrong bar code" or lifting packages incorrectly.  Tr. 132:20–133:8 (Ortiz).  Generally, Mr. Ortiz made "judgment call[s]" as to whether any performance issues required immediate coaching or whether he should coach them at the end of the shift.  Tr. 257:4–12; 288:25–289:3 (Ortiz).

59.     Mr. Ortiz also checked and responded to emails "throughout" his shift.  Tr. 243:5–14 (Ortiz).  These emails sometimes contained important information about tasks or issues that he needed to address during the night sort.  *Id.*

60.     Mr. Ortiz was provided with a leadership desk and a laptop at each delivery station where he predominately spent his time during the shift monitoring the data and flow of the shift, reviewing and responding to emails, and working on reports.  Tr. 304:3–25 (Lopez); Tr. 402:14–19; 400:18–25; 410:19–20 (Kaczor); Tr. 604:15–18 (Nevado).  Tier 1 associates working for Ortiz at DSF4, DSF5, and DSF6 were not provided with desk space or a computer.  Tr. 604:17–19 (Nevado).

### c.     Mr. Ortiz Performed Primarily Managerial End Of Shift Activities

61.     In the morning, once the sort was completed, Mr. Ortiz conducted audits to make sure that all packages were accounted for and part of the sortation and delivery plans.  Tr. 134:2–14 (Ortiz).

62.     At the end of his shift, Mr. Ortiz reviewed operations data and prepared a handoff report that tracked the shift's sortation productivity, attendance, arrival and departure times of trucks, and other information.  Tr. 119:12–24 (Ortiz); Tr. 315:8–15 (Lopez); Tr. 402:20–403:19 (Kaczor).

63.     Preparing the handoff reports required Mr. Ortiz to interpret data from multiple sources and determine what the information indicated about different aspects of the operation.  Tr. 119:12–24 (Ortiz); Tr. 315:8–15 (Lopez); Tr. 402:20–403:19 (Kaczor).

64.     Mr. Ortiz was expected to and did use his discretion to decide what information to include in "callout" sections of the handoff report so that the next shift would have "a good understanding of any challenges" and successes that had occurred on Mr. Ortiz's shift.  Tr. 119:12–24; 263:7–12 (Ortiz).

65.     Mr. Ortiz also completed "Gemba walks" at the end of his shift, during which he reported on metrics and identified issues that arose during his shift, among other things, in order to maintain continuity of operations and watch for process improvement opportunities.  Tr. 80:5–11; 263:17–22 (Ortiz).

66.     At the end of his shift, Mr. Ortiz would also coach associates on any performance, quality, or safety issues that he elected not to address during the shift.  Tr. 261:10–18 (Ortiz).

### 3.   Amazon Expected Mr. Ortiz To Perform Primarily Managerial Tasks

67.   Amazon did not expect Mr. Ortiz to perform the tasks Tier 1 associates performed—such as scanning, inducting, and sorting—but afforded him the discretion to use his time as he saw fit. Tr. 395:22–396:1; 396:12–22; 400:4–6 (Kaczor); Tr. 605:8–21 (Nevado).

68.   Mr. Ortiz's managers expected that Shift Managers would perform the tasks Tier 1 associates performed only for short periods of time and only to train associates, demonstrate leadership, or motivate the team.  Tr. 322:24–323:6 (Lopez); Tr. 395:22–396:1; 396:12–22; 400:4–6 (Kaczor); Tr. 605:8–21 (Nevado).  Mr. Lopez, Mr. Ortiz's supervisor at DSF6, specifically expected that Mr. Ortiz would not spend a "significant amount of time"—which he defined as "more than 45 minutes"—on associate tasks.  Tr. 322:23–323:6 (Lopez).

69.   While training a new manager, Mr. Ortiz advised his trainee that if he was working in the path (that is, performing associate-type work out on the floor), it was "for training" or "for morale and engagement."  Tr. 324:16–25 (Lopez).

70.   If a Shift Manager were to primarily perform the work of Tier 1 associates, it would have been inconsistent with Amazon's expectations and reflect poor management and performance.  *See* Tr. 404:23–405:7 (Kaczor).

71.   Instead, Amazon expected that a Shift Manager would spend most of his or her time "track[ing] and monitor[ing] the incoming volume" of packages to be processed during the shift, "build[ing] a plan for the shift, allocat[ing] staffing to positions that are built in that shift plan, monitor[ing] the shift," and "engag[ing] with associates."  Tr. at 297:3–10 (Lopez).

72.   This required the Shift Manager to regularly monitor shift metrics on his or her computer to detect and diagnose any problem areas, as well as walking around the delivery station floor to observe the Tier 1 associates he or she supervised, monitor the quality of their work, and look for things that could be improved or things that were wrong with the operation. Tr. 84:16–85:16; 168:21–169:17; 256:7–22 (Ortiz); Tr. 393:1–394:25 (Kaczor).

73.   Multiple Amazon managers, including one of Mr. Ortiz's witnesses, testified that if a Shift Manager spent too much time working in the path, he or she would "lose track of the operation,"

the shift's performance would suffer, and it would have come to the attention of his supervisors.  Tr. 323:4–11 (Lopez); Tr. 404:23–405:7 (Kaczor); 497:21–498:6 (Martin).

74.      As the sole manager of the Night Sort on his shifts, Amazon expected Mr. Ortiz to focus his time and energy on managing his large team of associates and the complex sort process.  *See* Tr. 318:3–12 (Lopez).

75.      During the periods of time when Mr. Ortiz's managers were on-site with him, they did not observe him spending any significant amount of time performing the same work as Tier 1 associates.  Tr. 321:17–20; 322:4–13; 314:16–19; 318:3–12 (Lopez).  To the contrary, Mr. Ortiz was typically at the leadership desk, walking the floor, engaging with associates, or working on his computer.  Tr. 314:20–315:4 (Lopez).

### 4.      Mr. Ortiz Had Many Managerial Tools At His Disposal For Handling Excess Package Volume

76.      Mr. Ortiz testified that he often felt his Night Sort shifts were understaffed or had too many packages to sort.  Tr. 113:19–114:13 (Ortiz).  But Amazon's staffing model included a "10 percent buffer" so that Shift Managers would have enough Tier 1 associates, even if some did not show up for work.  Tr. 446:1–8 (Kaczor).

77.      Additionally, multiple witnesses, including some of Mr. Ortiz's case-in-chief witnesses, identified several managerial tools Mr. Ortiz could use to account for extra volume.  Tr. 113:19–114:13 (Ortiz); Tr. 325:24–326:6 (Lopez); Tr. 450:7–14 (Kaczor); Tr. 634:20–635:4 (Nevado).

78.      Mr. Ortiz was allowed to authorize associates to stay overtime without seeking higher approval.  Tr. 106:15–18; 261:24–262:5 (Ortiz); Tr. 325:24–326:6 (Lopez); Tr. 450:7–14 (Kaczor).

79.      Mr. Ortiz could also offer voluntary extra time, allowing associates who were not scheduled to work that shift to come in and earn extra hours.  Tr. 325:15–23 (Lopez).

80.      Mr. Ortiz could also adjust his staffing plan, and in fact was expected to reallocate labor throughout the night by "mov[ing] strong workers to areas that were busier, and constantly mak[ing] changes . . . as different challenges came up."  Tr. 404:9–17 (Kaczor); Tr. 634:20–635:4 (Nevado).

81.      Finally, if Mr. Ortiz's shift would not be able to safely sort all the incoming packages on time, he could roll volume over to the next shift.  Tr. 610:12–611:1 (Nevado).

82.     It was never Amazon's expectation that Shift Managers would work in the path as another Tier 1 associate to process extra volume, because if Shift Managers were "in path" and "focusing on one specific item or one specific part of the operation, they [would] lose sight of the entire operation."  Tr. 326:7–14 (Lopez); *see also* Tr. 404:23–405:7 (Kaczor); Tr. 611:3–15 (Nevado); Tr. 497:21–498:6 (Martin, one of Mr. Ortiz's witnesses, testifying that as a Shift Manager you could not "be in one role in the sense of offloading pallets or scanning for the entire shift" because "you'd lose track of your operation").

83.     Even if a Shift Manager chose to work in the path, it is unlikely that it would have made the difference between not finishing on time and a successful sort.  Tr. 326:15–24 (Lopez).  As an initial matter, Mr. Ortiz was not the fastest package mover on his shifts, and some of his associates were better sorters than he was.  Tr. 156:10–20 (Ortiz).  But more importantly, as Mr. Martin, a Shift Manager called as a witness by Mr. Ortiz, testified, if his shift was struggling, it would not "become all of a sudden stellar because" he and his Shift Assistant—just two more people—decided to work in the path.  Tr. 499:22–500:10 (Martin); *see also* Tr. 326:15–24 (Lopez).

### 5.     Mr. Ortiz Identified Process Improvements That Were Implemented Network-Wide And Helped Amazon Launch New Facilities

84.     Part of Mr. Ortiz's job as Shift Manager was to actively engage with site and regional operations leadership to implement new operational improvements and new services.  Tr. 49:9–13; 196:14–199:2 (Ortiz); Ex. 14.

85.     Amazon expected its managers to continually identify ways to improve its operations, and Mr. Ortiz testified that he did in fact "improve[] some processes."  Tr. 49:9–13 (Ortiz); Ex. 149.

86.     Mr. Ortiz devised new ways he thought would improve the induction process at delivery stations, including by creating multiple induction points and separate sortation areas for large and small packages to reduce jams.  Tr. 196:14–22 (Ortiz).

87.     He also enhanced the Excel spreadsheet the managers at his delivery station used to pull and track shift performance data from the Comp tool, which made that process more efficient.  Tr. 313:19–22; 368:4–14 (Lopez).

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' SEPARATE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 4:17-CV-03820-JSW

88.     As documented on résumés he provided to employers following his termination from Amazon, confirmed to be accurate by Mr. Ortiz during his testimony, Mr. Ortiz created a new process for preloading delivery vans that was implemented network-wide, and that he developed all training content and utilized feedback to make informed process changes to that system.  Tr. 198:10–21 (Ortiz); Exs. 106, 107, 119.

89.     Under Mr. Ortiz's management, his delivery station increased induction rates from 60–150% while driving down quality errors.  Tr. 195:16–19 (Ortiz).

90.     Mr. Ortiz expressed pride in his managerial contributions on social media too, posting that "[m]any of the changes and processes [he] created and implemented" helped his delivery station earn the second place sortation quality score in Amazon's Bay Area network.  Tr. 232:15–233:16 (Ortiz); Ex. 108.

91.     In recognition of the skill that Mr. Ortiz brought to the Shift Manager position, Amazon asked him to help launch two delivery stations and assist a struggling third delivery station.  Tr. 198:22–24 (Ortiz); Tr. 602:6–17 (Nevado).

92.     As a result of his delivery station's success, Mr. Ortiz was also selected to help onboard a new third-in-command company Vice President, which he noted was a "big opportunity" and an "incredible honor."  Tr. 225:2–25 (Ortiz); Ex. 108.

**6.      Mr. Ortiz Had Discretion To Take Meal And Rest Breaks**

93.     As a Shift Manager, Mr. Ortiz had discretion to schedule his shift as he saw fit.  Tr. 328:11–13 (Lopez); Tr. 388:2–4 (Kaczor).  The length of Mr. Ortiz's shifts varied from day to day and he was free to leave the delivery station whenever his work was complete.  *See* Tr. 359:1–5 (Lopez). Mr. Ortiz did not punch in and out, Amazon did not track his time, and Mr. Ortiz did not keep any records of the hours he worked.  Tr. 265:14–19 (Ortiz); Tr. 359:1–9 (Lopez); Tr. 438:19–20 (Kaczor); Tr. 627:5–8 (Nevado).

94.     Amazon expected that a Shift Manager's shift would include a meal period, and it was up to Mr. Ortiz to decide when to take that break.  Tr. 328:11–13 (Lopez); Tr. 518:1–7 (Martin); Tr. 587:7–12 (Bania).  It was also up to Mr. Ortiz to decide when to take rest periods during the course of his shifts.  Tr. 328:11–13 (Lopez); Tr. 518:1–7 (Martin); Tr. 587:7–12 (Bania).

95.     Mr. Ortiz was responsible for directing Tier 1 associates when to take their breaks, and associates typically took their meal and rest periods all at the same time.  Tr. 457:2–14 (Kaczor).  Mr. Ortiz had discretion to take his breaks at that time as well.  *Id.*  Shift Managers were not required to stay at the delivery station during their breaks, and Mr. Ortiz sometimes left to purchase food at nearby restaurants.  Tr. 145:25–146:3 (Ortiz); Tr. 587:13–17 (Bania).

96.     During his employment as a Shift Manager, Mr. Ortiz also had a side job as a disc jockey ("DJ") (Tr. 185:22–186:7 (Ortiz)), which caused him to be fatigued at work at times (*see* Tr. 328:17–329:7 (Lopez)).

97.     One of Mr. Ortiz's supervisors, Mr. Lopez, personally observed Mr. Ortiz taking breaks off the delivery station floor, and on one occasion, Mr. Ortiz was found sleeping in one of the delivery vans during the Night Sort.  Tr. 328:17–22 (Lopez).  After this occurrence, Mr. Lopez had a conversation with Mr. Ortiz to check in and advise him to take breaks as needed, but to do so in one of the office spaces designated for Shift Manager use, or in his personal car, rather than on the floor.  Tr. 329:1–7 (Lopez).

98.     Mr. Ortiz did not complain to his supervisors or his Human Resources partners that he was not able to take meal or rest breaks.  Tr. 587:24–588:4 (Bania).

**D.     Mr. Ortiz Was Terminated For Violating A Safety Policy And After Sending An Inappropriate Email**

99.     On or about December 11, 2016, Mr. Ortiz was terminated because he walked on a conveyor belt in violation of a safety policy (which resulted in him falling and injuring himself) and asked his supervisor to "do him a solid" and lie to Amazon about the cause of his injury to cover up his safety policy violation.  Tr. 221:18–25 (Ortiz); Tr. 331:2–6 (Lopez).  Shortly before that, Mr. Ortiz had also sent an inappropriate email to colleagues containing a sexually explicit joke regarding the suspension of an associate caught engaging in inappropriate conduct at work.  Tr. 189:13–18; 191:24–192:11 (Ortiz); Ex. 137.

100.     At the time of his termination, Mr. Ortiz thought his career was on the rise, and that he was in line for a promotion.  Tr. 224:1–7 (Ortiz).

101.     After his termination, Mr. Ortiz sent several communications to various Amazon executives seeking to get his job back.  In an email to a company Vice President, Ed Feitzinger, Mr. Ortiz reminded him of his various accomplishments as a Shift Manager, including that he was "the sort manager who helped create the Small Sort Process, the first van preload process in AMZL, helped run the #2 sort in the network, and the manager who helped on-board you personally."  Tr. 228:25–229:22; 231:7–14 (Ortiz); Ex. 128 at 3.

102.     Mr. Ortiz highlighted those achievements, rather than the time he now contends he spent sorting packages, because he thought they were more important to Amazon.  Tr. 228:25–229:22; 230:19–24; 231:7–14 (Ortiz).

**E.     Mr. Ortiz's Testimony Regarding How Much Time He Spent on Tasks Is Not Credible**

**1.     The Circumstances Surrounding Mr. Ortiz's Termination Demonstrate That He Is Not A Truthful Person**

103.     Mr. Ortiz conceded that he asked Mr. Lopez to lie about the fact that he violated an Amazon safety policy by climbing onto a conveyor belt.  Tr. 221:18–25 (Ortiz).

104.     Mr. Lopez does not believe Mr. Ortiz is a truthful person as a result of this incident.  Tr. 330:16–24 (Lopez).

105.     Mr. Ortiz then made numerous misrepresentations regarding his termination from Amazon in job applications and résumés he submitted to prospective employers:

106.     In a résumé Mr. Ortiz sent to Vino Volo on December 13, 2016 (two days after his termination), Mr. Ortiz listed that he was still employed at Amazon.  Tr. 202:14–203:15 (Ortiz); Ex. 106.

107.     On his application for a position at The Century Group, Mr. Ortiz indicated he was employed at Amazon until February 2017—three months after he was fired from Amazon.  Tr. 206:2–20 (Ortiz); Ex. 119.

108.     On The Century Group application, Mr. Ortiz stated that he was "terminated by Amazon for filing a whistleblower complaint with OSHA," and also that his "reason for leaving" Amazon was that he "wanted to finish his CPA."  Tr. 219:23–220:3; 220:22–221:4 (Ortiz); Ex. 119.  Neither of these

statements was true: Mr. Ortiz was terminated for committing a safety violation and asking his supervisor to lie about it.  Tr. 221:18–25 (Ortiz); Tr. 331:2–6 (Lopez).

### 2. Amazon's Impeachment Witness Contradicted Mr. Ortiz's Testimony On Several Topics

109.    On cross-examination, Mr. Ortiz denied that he had a Shift Assistant at DSF4 named Mahmoud Abdelaziz.  Tr. 173:24–174:6 (Ortiz).  Amazon called Mr. Abdelaziz as an impeachment witness, and he directly contradicted Mr. Ortiz's testimony on multiple topics.  *See* Tr. 462–472 (Abdelaziz).

110.    First, Mr. Abdelaziz impeached Mr. Ortiz by establishing that he was in fact Mr. Ortiz's Shift Assistant at DSF4 for "two to three months" (Tr. 464:2–18 (Abdelaziz)), contrary to Mr. Ortiz's testimony that his Shift Assistant "was another gentleman, but it wasn't that Mahmoud person" (Tr. 173:14–23 (Ortiz)).

111.    Second, although Mr. Ortiz testified that he spent two to three hours performing manual work setting up for each shift because there were no associates or ambassador associates on-site to do that work, Mr. Abdelaziz testified that some associates or ambassadors would arrive early each day to perform these specific tasks.  *Compare* Tr. 132:10–19; 253:8–19 (Ortiz), *with* Tr. 465:15–466:7 (Abdelaziz).

112.    Third, although Mr. Ortiz testified that he kept his laptop on a "rolling cart" so he could monitor the shift metrics while he was working in the path, Mr. Abdelaziz testified that he *never* saw Mr. Ortiz work from the rolling laptop cart.  *Compare* Tr. 92:17–24 (Ortiz), *with* Tr. 466:9–20 (Abdelaziz).  Instead, Mr. Abdelaziz said that during his roughly two to three months of working with Mr. Ortiz as his Shift Assistant, he observed Mr. Ortiz spending "70 to 80 percent" of his time working from the leadership desk.  Tr. 466:9–20 (Abdelaziz).

113.    And contrary to Mr. Ortiz's testimony that he played music from a small speaker "the size of an apple," which fit on his rolling cart, Mr. Abdelaziz testified that Mr. Ortiz could only play music from the leadership desk because the speakers, which were 36 to 38 inches tall (so that they could play music for the entire delivery station), had to be connected to Mr. Ortiz's laptop and could not fit on the rolling cart.  *Compare*  Tr. 175:21–176:7 (Ortiz), *with* Tr. 468:2–469:20 (Abdelaziz).

Gibson, Dunn & Crutcher LLP

DEFENDANTS' SEPARATE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 4:17-CV-03820-JSW

114.    Finally, while Mr. Ortiz claims he never used his company laptop for personal reasons during his shift, Mr. Abdelaziz testified that he did, and on one occasion, Mr. Ortiz showed Mr. Abdelaziz (a then-recent immigrant from Egypt) the results of a Google image search for "sexy Egyptian female." *Compare* Tr. 176:8–12 (Ortiz), *with* Tr. 470:6–471:19 (Abdelaziz).

### 3.    Mr. Ortiz's Testimony About How Much Time He Spent Doing Manual Tasks Contradicted What Others Observed

115.    Mr. Ortiz testified that he spent two to three hours performing manual work setting up for each shift because there were no associates on-site to whom he could delegate these tasks.  Tr. 132:10–19; 253:8–19 (Ortiz).

116.    However, Mr. Lopez (who shadowed Mr. Ortiz for two weeks at DSF4 and was Mr. Ortiz's supervisor at DSF6) testified that at DSF4, two or three Tier 1 associates would arrive early to help with set up work, and at DSF6, three to five associates arrived early for the same reason.  Tr. 306:9–307:19; 318:17–23 (Lopez).  Mr. Lopez testified that Mr. Ortiz spent the one and a half to two hours that he was at the station before the bulk of the Tier 1 associates "verifying what trailers were on-site, what trailers were scheduled to be arriving on-site, when, building a shift plan, [and] building a staffing plan."  Tr. 307:20–25 (Lopez).

117.    Similarly, Mr. Kaczor (a Level 5 Shift Manager at DSF5) testified that at DSF5, five to seven Tier 1s arrived early to help with physical set up tasks.  Tr. 388:10–15; 458:2–8 (Kaczor).

118.    Mr. Ortiz also testified that he performed physical work like moving boxes and bread racks for two to three hours throughout the shift, and that he kept his laptop on a rolling cart so he could monitor metrics while he was working in the path.  Tr. 92:17–24; 133:13–134:1 (Ortiz).

119.    Mr. Lopez testified that at DSF4, he saw Mr. Ortiz work in the path for a total of 30 minutes per shift, and that Mr. Ortiz spent most of his time "at the leadership desk monitoring some of the digital tools" that tracked shift metrics, as well as "walking the floor engaging with associates."  Tr. 310:25–311:6; 322:1–13 (Lopez).

120.    Although Mr. Ortiz's activities varied "day-to-day," Mr. Lopez generally saw him "welcoming the associates in to the building, having conversations with them, assisting them with any questions they had" for the first 15 to 30 minutes after the majority of the associates arrived at the

station.  Tr. 310:5–16 (Lopez).  Once the sort processes began, Mr. Lopez saw Mr. Ortiz typically at the leadership desk monitoring data, which he needed to review "[e]very 30 minutes to an hour" and "make adjustments to the operation."  Tr. 310:25–312:1 (Lopez).  He also saw Mr. Ortiz walking the delivery station floor to visually inspect the operation. Tr. 313:23–314:7 (Lopez).  At DSF4, these took about 15 minutes per walk, and he completed an average of four or five walks per shift.  *Id.*  At the end of the shift, Mr. Ortiz would spend about 30 minutes creating a handoff report and confirming associate timecards were correct.  Tr. 316:3–7 (Lopez).

121.   During his time as Mr. Ortiz's supervisor at DSF6, Mr. Lopez observed Mr. Ortiz spending his time primarily at the leadership desk or in the unload area engaging the associates by having conversations with them about the shift and their work or motivating them by playing music. Tr. 310:25–311:6; 314:16–19; 320:9–321:22; 322:1–13 (Lopez).  Mr. Lopez expected that Mr. Ortiz would spend his time the same way at DSF6 as he did at DSF4.  Tr. 318:8–12 (Lopez).  During his time with Mr. Ortiz at DSF4 and DSF6, Mr. Lopez never saw Mr. Ortiz spend more than half of his workday doing Tier 1 associate work and noted that Mr. Ortiz was "one of the last managers to jump in and do Tier 1 work."  Tr. 322:4–23 (Lopez).

### 4.   Mr. Ortiz's Testimony About How He Spent His Time Is Not Consistent With How He Represented His Role

122.   On various résumés and cover letters submitted to prospective employers, Mr. Ortiz represented his role with Amazon as purely managerial.  Exs. 105–107, 119; Tr. 197:3–15; 203:24–205:16; 206:1–208:22 (Ortiz).

123.   None of Mr. Ortiz's résumés or applications note that Mr. Ortiz spent time performing manual work.  Exs. 105–107, 119; Tr. 197:3–15; 203:24–205:16; 206:1–208:22 (Ortiz).  Instead, they highlight his managerial role and accomplishments.  *Id.*

124.   For example, on the résumé Mr. Ortiz sent to the Resource Corner, he touted that he "[i]ncreas[ed] induction rates from 60-150% while driving down quality errors;" "[c]reat[ed] Small & Large Sort Areas and multiple induction points;" "[c]reat[ed] a new process for preloading delivery vans [and] [d]evelop[ed] all training content and utiliz[ed] feedback to make informed process changes;" "[f]oster[ed] employee growth and manag[ed] a sortation team of 80-100;" [e]mpower[ed]

associates through the creation of an ambassador program;" "[a]ssisted a struggling site with a routing systems change resulting in it becoming a top performer in the DSF node for Prime Day '16." Ex. 105; Tr. 207:10–17 (Ortiz).

125.    He highlighted those same managerial accomplishments in the résumé he submitted to Vino Volo. Ex. 106 at 1; Tr. 202:14–20 (Ortiz).  In his accompanying cover letter, he explains that he "helped launch 2 delivery stations, a[s] well as being sent to improve a struggling 3rd." Ex. 106 at 3; *see* Tr. 203:24–205:16. (Ortiz).  He also notes that "[o]f 43 delivery stations in the network, [one he supervised] was ranked 2nd in sortation quality, which [he] was directly responsible for." Ex. 106 at 1; *see* Tr. 202:14–20 (Ortiz).  Mr. Ortiz also highlighted the new preloading process he created, including that the training materials he created "are now network-standard in all stations." Ex. 106 at 1; *see* Tr. 202:14–20 (Ortiz).

126.    In the résumé he submitted to The Honest Company, Mr. Ortiz noted that he was responsible for "[i]ncreasing induction rates from 60-150% while driving down quality errors;" "[c]reating Small & Large Sort Areas with multiple induction points;" "[c]reating a new process preloading delivery vans;" and "[d]eveloping all training content and utilizing feedback to make informed process changes." Ex. 107 at 1; Tr. 208:2–4; 208:20–22 (Ortiz).

127.    And in his application to The Century Group, Mr. Ortiz explained he "[i]ncreased induction rates from 60-150% while driving down quality errors;" "[c]reated Small & Large Sort Areas and multiple induction points; "[c]reated a new process for preloading delivery vans;" and "[d]eveloped all training contend and utilized feedback to make informed process changes." Ex. 119 at 6; Tr. 205:17–207:2 (Ortiz).  He also highlighted as "[a]chievements" that his station had the "#2 Sortation quality in the entire network" and "[b]roke the all-time induction record for a delivery station at 10,600 in one hour." Ex. 119 at 6; Tr. 205:17–207:2 (Ortiz).

128.    Mr. Ortiz represented his role with Amazon as purely managerial on social media. *See, e.g.*, Ex. 108; Tr. 224:18–225:14; 232:9–233:16 (Ortiz).

129.    On August 16, 2016, Mr. Ortiz posted on Facebook that he was selected to receive the "incredible honor" of "helping to on-board a new VP (3rd in command)" because his delivery station was "so new, yet already out-performing other sites." Ex. 108 at 2; Tr. 224:21–225:14 (Ortiz).

130.    On November 16, 2016, Mr. Ortiz posted on Facebook that his "delivery station's sortation quality score is #2 in the entire [A]mazon network!"  Ex. 108 at 2; Tr. 232:9–233:16 (Ortiz). He also shared that while it was "[d]efinitely a team effort," "the fact is many of the changes and processes [Mr. Ortiz] created helped get us there.  Hours and hours of hard work, experimentation, and process improvements finally materialize[d] into success and recognition."  Ex. 108 at 2; Tr. 232:9–233:16 (Ortiz).

131.    The next day, he posted that his team "inducted 10,636 packages in one hour last night," a record for Amazon delivery stations.  Ex. 108 at 1; Tr. 232:9–10. (Ortiz).

132.    Mr. Ortiz represented his role with Amazon as purely managerial when attempting to appeal his termination and get his job back.  Ex. 128; Tr. 227:13–20; 229:12–230:6 (Ortiz).

133.    Mr. Ortiz wrote on December 15, 2016 to Ed Feitzinger, an Amazon VP, and Jeff Bezos, Amazon's CEO, that he was "the sort manager who helped create the Small Sort Process, the first van preload process in AMZL, helped run the #2 sort in the network, and the manager who helped on-board [Mr. Feitzinger] personally."  Ex. 128 at 2–3; Tr. 231:7–14 (Ortiz).

134.    Mr. Ortiz continues to market himself as an Operations Professional by including in his personal email signature block that he is a "Finance/Ops Professional."  Ex. 128 at 3; Tr. 227:7–21 (Ortiz).

> **5.    Mr. Ortiz's Testimony About How He Spent His Time Is Not Consistent With What His Case-In-Chief Witnesses—Other Level 4 Shift Managers—Testified To**

135.    Mr. Martin testified that he spent roughly two hours (out of a 10 to 13 hour shift) moving or staging equipment.  Tr. 514:17–515:1; 517:16–18 (Martin).  He testified that while there was "a physical element" to the job, a shift manager could not "be in one role in the sense of offloading pallets or scanning for the entire shift" because he or she would "lose track of [the] operation."  Tr. 497:21–498:6 (Martin).  And although he chose to spend about 20 minutes each shift offloading pallets, he did so because he "was pretty quick at it," and it was a task he could easily stop and start while performing his more important managerial duties such as troubleshooting issues and answering associate questions.  Tr. 500:23–501:16 (Martin).  Rather than performing manual labor for most of his shift, Martin

regularly focused his time on "labor moves, watching the metrics, . . ., moving [his] labor force accordingly, checking emails, following up with carriers if trucks were late, different aspects like that." Tr. 514:6–16 (Martin).

136. Mr. Merid, another prior Shift Manager called by Mr. Ortiz, testified that he spent approximately 25 to 30 percent of his shift performing manual work. Tr. 545:21–546:2 (Merid). He spent the rest of his shift analyzing the volume of packages to be sorted and planning for the shift, "monitoring the flow of the volume of packages . . . to ensure that [they] would complete the shift on time," "monitoring some of the employees to make sure they were doing their job," and preparing handoff reports, and "ensuring that all the packages went out with [the] drivers in the morning." Tr. 526:24–527:14; 537:2–8; 537:24–538:18; 540:11–23 (Merid).

137. Mr. Hedin, who testified by deposition, had a wholly different experience as a Shift Manager than Mr. Ortiz. Mr. Hedin worked at Amazon during an earlier time period than Mr. Ortiz, from February 2014 until September 2015. Ex. 176 at 16:6–11. During that time he worked primarily as a Shift Manager at an outdoor delivery station that operated out of a "football-sized field portion of the 49ers parking lot." Ex. 176 at 23:3-22 (Hedin). Unlike the delivery stations where Mr. Ortiz worked, which were indoor facilities designed specifically for the intricate and complex receiving, sorting, and delivery process, the delivery station where Mr. Hedin worked had a "makeshift loading dock made out of an old 18-wheeler trailer, with a mobile push staircase thing" and a "gas generator to run all the lights and such." *Id.* Moreover, while Mr. Ortiz testified that he was generally the only Shift Manager on duty during the Night Sort operation and managed anywhere from 40 to 100 Tier 1 associates, Mr. Hedin was one of two Shift Managers who generally oversaw "between six and eight" Tier 1 associates. *Compare* Tr. 166:10–13 (Ortiz), *with* Ex. 176 at 19:10-17 (Hedin); *compare* Tr. 164:25-165:5 (Ortiz), *with* Ex. 176 at 20:2-6 (Hedin).

### 6. It Is Not Plausible That Mr. Ortiz Spent A Significant Amount of Time Performing Manual Work

138. Mr. Ortiz was in charge of managing 40 to 100 associates each night. It is not plausible that Mr. Ortiz's working in the path—as just one additional Tier 1 associate—would have made the

1  difference between a successful and unsuccessful sort.  Tr. 499:22–500:10 (Martin); *see also* Tr.

2  326:15–24 (Lopez).

3       139.    Given Mr. Ortiz's representations on his résumés, his testimony, the testimony of every

4  other witness called in this case, and the general success of Mr. Ortiz's shift, it is simply not credible

5  that Mr. Ortiz spent a majority or even a significant amount of time performing non-exempt work.

6  Rather, Mr. Ortiz spent more than 50 percent of his time performing exempt tasks.

7         **7.**    **Mr. Ortiz's Testimony That He Was Too Busy To Take Breaks Is Not**

8                 **Credible**

9       140.    Mr. Ortiz contends he "never really had an opportunity to be fully on break because [he]

10  was always responsible for the facility."  Tr. 186:17–25 (Ortiz).  However, the evidence shows he was

11  not too busy to take breaks, as he claims.

12       141.    For example, he testified that he would sometimes leave the delivery station to get food

13  during the associates' meal period.  Tr. 146:13–147:4; 145:25–146:3 (Ortiz).

14       142.    His supervisor, Mr. Lopez, personally observed Mr. Ortiz taking breaks off the delivery

15  station floor, and on one occasion, Mr. Ortiz was found sleeping by his Tier 1 associates in one of the

16  delivery vans during the Night Sort.  Tr. 328:17–22 (Lopez).

17       143.    Furthermore, while Mr. Ortiz claims he never used his company laptop for personal

18  reasons during his shift, Mr. Abdelaziz testified that he did.  On one occasion, Mr. Ortiz showed Mr.

19  Abdelaziz (a then-recent immigrant from Egypt) the results of a Google image search for "sexy

20  Egyptian female."  Tr. 176:8–12 (Ortiz); 470:6–471:19 (Abdelaziz).

21                        **AMAZON'S PROPOSED CONCLUSIONS OF LAW**

22       1.    Mr. Ortiz alleges that Amazon misclassified him as an exempt employee under

23  California law.  As a result, Mr. Ortiz alleges that Amazon failed to pay him overtime, failed to provide

24  him with meal and rest breaks, failed to provide him accurate itemized wage statements, and failed to

25  timely pay him wages upon termination.  Amazon has shown that Mr. Ortiz was properly classified as

26  exempt under California's executive exemption, and his claims fail as a result.

27

28

**I.      Mr. Ortiz Was Properly Classified As Exempt Under California's Executive Exemption**

2.      To establish that Mr. Ortiz was properly classified as exempt under California's executive exemption, Amazon must show that Mr. Ortiz (1) managed "a customarily recognized department or subdivision;" (2) directed "the work of two or more other employees;" (3) had "the authority to hire or fire other employees" or make recommendations regarding hiring, firing, promotion, or any other change of status of other employees that were given particular weight; (4) "customarily and regularly exercise[d] discretion and independent judgment;" (5) was "primarily engaged in" exempt duties; and (6) earned a salary equal to twice the state minimum wage.  8 Cal. Code Regs. § 11070; *Bargas v. Rite Aid Corp.*, 245 F. Supp. 3d 1191, 1210 (C.D. Cal. 2017) (employer bears burden of proving executive exemption defense).

3.      For the reasons stated below, and based on the evidence adduced at trial and the Court's previous holdings, Amazon satisfied each of the elements of the executive exemption test.  Mr. Ortiz was properly classified as an exempt employee under California law.

**A.      Five Of The Six Executive Exemption Elements Were Decided In Amazon's Favor On Summary Judgment**

4.      In ruling on Amazon's Motion for Summary Judgment, the Court determined that there was no genuine dispute of material fact as to whether Mr. Ortiz (1) managed "a customarily recognized department or subdivision;" (2) directed "the work of two or more other employees;" (3) had "the authority to hire or fire other employees" or make recommendations regarding hiring, firing, promotion, or any other change of status of other employees; (4) "customarily and regularly exercise[d] discretion and independent judgment;" or (5) earned a salary equal to twice the state minimum wage. Dkt. 133.  Accordingly, these elements have already been decided in Amazon's favor and the Court need not revisit them.  *See* Dkt. 232 ("the Court did not intend those elements to be relitigated at trial"); *see also* Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the [summary judgment] motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."); *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir. 1991) (noting that partial summary judgment "streamline[s] litigation by narrowing the issues for trial" and "approv[ing]" of district court's grant of

partial summary judgment through which "certain theories of recovery were eliminated, limiting the issues to be tried below"); *Griffin v. Sachs Elec. Co.*, 390 F. Supp. 3d 1070, 1078 (N.D. Cal. 2019) (explaining partial summary judgment is "authorized by Rule 56 in order to limit the issues to be tried").

### B.    Mr. Ortiz Was Primarily Engaged In Exempt Duties

5.      The only remaining issue with respect to Amazon's executive exemption defense is whether Mr. Ortiz was "primarily engaged in duties which meet the test of the exemption."  8 Cal. Code Regs. § 11070(1)(A)(1)(e).  The term "primarily" means "more than one-half the employee's work time."  *Id.* § 11070(2)(K); *see also Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 798 n.4 (1999).  This requires an analysis of the "work actually performed by the employee during the course of the workweek," as well as "the employer's realistic expectations and the realistic requirements of the job."  *Batze v. Safeway, Inc.*, 10 Cal. App. 5th 440, 473 (2017).

6.      Exempt work includes the following activities, among others:

> Interviewing, selecting, and training of employees; . . . directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the types of materials, supplies, machinery or tools to be used . . . ; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the [employees] and the property.

*Id.* at 472–73; 29 C.F.R. § 541.102; 8 Cal. Code Regs. § 11070(1)(A)(1)(e) (noting exempt and non-exempt work "shall be construed in the same manner as such items are construed in" 29 C.F.R. § 541.102).  Exempt work also includes "all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions."  8 Cal. Code Regs. § 11070(1)(A)(1)(e).

7.      "Although the significant period for determining exempt status is the work week, and employees' exempt or non-exempt status can vary on a week by week basis, this rule does not" prevent the Court from "mak[ing] reasonable inferences about a party's activities" during one period based on his duties during another period where, as here, "there is nothing to suggest the employee's duties and responsibilities changed significantly."  *Batze*, 10 Cal. App. 5th at 478–79 (citing *Dunbar v.*

1    *Albertson's, Inc.*, 141 Cal. App. 4th 1422, 1426 (2006) and *Leatherbury v. C&H Sugar Co.*, 911 F.

2    Supp. 2d 872, 883–84 (N.D. Cal. 2012)).  Because Mr. Ortiz testified that his duties did not change

3    significantly among the three delivery stations where he worked (Tr. 64:2–5 (Ortiz)), the Court

4    concludes that a workweek by workweek analysis of Mr. Ortiz's duties is not necessary.

### 1.    Mr. Ortiz Performed Many Exempt Duties

6        8.    As a Night Sort Shift Manager, Mr. Ortiz was expected to spend most, if not all, of his

7    time overseeing and managing the performance of the shift and of the 40 to 100 Tier 1 associates for

8    whom he was responsible for.  *See* Tr. 318:3–12 (Lopez).  Based on the evidence adduced at trial, the

9    Court concludes that Mr. Ortiz did spend the majority of his time performing those exempt functions

10   and functions "directly and closely related to" his exempt work.   8 Cal. Code Regs.

11   § 11070(1)(A)(1)(e).

### a.    Mr. Ortiz Spent Significant Time Planning For And Managing Shift Performance

14       9.    Mr. Ortiz performed a variety of exempt tasks related to planning for and managing the

15   shift performance.

16       10.    Mr. Ortiz developed shift plans that assessed the volume that would need to be

17   processed at the delivery station for that shift.  Tr. 307:20–25 (Lopez).  This encompassed both a "shift

18   plan" and a "staffing plan."  Tr. 307:20–25 (Lopez).  For the shift plan, Mr. Ortiz had to calculate how

19   many packages were incoming and when, determine how many associates were expected (factoring in

20   that there was an assumption built into staffing numbers that assumed around 10% of scheduled

21   associates would not report to work), and use those numbers to determine how many packages needed

22   to be processed every 30-60 minutes in order to complete the sort operation on time  Tr. 308:4–13

23   (Lopez).

24       11.    The staffing plan required Mr. Ortiz to assign his anywhere from 40 to 100 Tier 1

25   associates to the roles in which they would begin the night working in, and he did that based on their

26   strengths, training, and any needs for improvement or additional experience.  Tr. 308:14–20 (Lopez);

27   Tr. 201:7–10; 247:1–15 (Ortiz).  The process of developing the shift and staffing plan took anywhere

28   from 60 minutes to 90 minutes each shift depending on the number of associates Mr. Ortiz had working

for him, according to Mr. Ortiz's supervisor at DSF6. Tr. 309:8–10; 319:11–13 (Lopez). (Mr. Ortiz did not offer his own estimate of how long this process took him, so Mr. Lopez's testimony is unrefuted.)

12.     Mr. Ortiz was also responsible for receiving and sending emails regarding end of day reports, summaries of the operations, and particular issues or items that arose during a shift. Tr. 119:13–24 (Ortiz); Tr. 315:8–15 (Lopez); Tr. 402:20–403:19 (Kaczor). Mr. Ortiz reviewed emails before the bulk of the Tier 1 associates arrived for the night, throughout the shift, and at the conclusion of the shift. Tr. 243:5–14 (Ortiz). There was no testimony regarding how much time Mr. Ortiz spent reviewing and sending emails, but the Court concludes that it was not de minimis based on the evidence.

13.     Mr. Ortiz pulled and analyzed data every 30 minutes using the Comp tool to determine which changes needed to be made to the shift and then executed those changes. Tr. 69:11–70:3; 153:20–155:9 (Ortiz); Tr. 311:22–312:1 (Lopez). While Mr. Ortiz testified that it took him "less than a minute" to do these data pulls—which he admitted he did about twelve times in a shift—the Court does not find that credible. As Mr. Ortiz readily agreed during cross examination, the process of pulling the Comp data is not simply taking a snapshot of data. It also required him to analyze the numbers and make adjustments to the operation which varied from data pull to data pull. Mr. Ortiz had to do this by not only reviewing the data, but by doing his diligence to understand what was happening on the floor through observation or by communicating with his Shift Assistant or the Ambassadors. Tr. 310:25–312:1; 313:23–314:7 (Lopez). There is little doubt that this entire process took far longer than one minute each time. In fact, as other witnesses explained, "monitoring the flow" of packages and making adjustments to the shift based on the data is the primary and near-constant function of the Shift Manager while the Tier 1 associates are on-site. Even Mr. Ortiz's witnesses agreed with this statement. *See* Tr. 526:24–527:14; 537:2–8; 537:24–538:18; 540:11–23 (Merid).

14.     Using the data Mr. Ortiz compiled throughout the shift, Mr. Ortiz prepared handoff reports that enabled other management personnel to maintain continuity of operations across shifts. Mr. Ortiz testified that he spent roughly 30 minutes preparing the handoff report—which included his time doing the pulls of the Comp tool data. Tr. 123:11–18 (Ortiz). Mr. Lopez testified that it took Mr.

Ortiz 30 minutes to prepare the handoff report alone, which the Court finds more credible given the problems with Mr. Ortiz's testimony regarding his use of the Comp tool.  Tr. 316:3–7 (Lopez).

15.     All of these duties are properly considered exempt.  *See Taylor v. United Parcel Serv., Inc.*, 190 Cal. App. 4th 1001, 1019–20 (2010) (listing "reviewing daily operational reports to manage productivity and performance," "analyzing information and reports to identify trends and create business improvement plans," and "coordinating with district management to troubleshoot operational and service inefficiencies" as examples of exempt duties); *Leatherbury*, 911 F. Supp. 2d at 884 (finding "much of the shift reports, inventory reports, managerial meetings, checking over the plant, and troubleshooting various problems were 'directly and closely' related to [plaintiff's] management").

### b.     Mr. Ortiz Spent Significant Time Managing Tier 1 Associates

16.     Mr. Ortiz's daily duties centered around personnel management.  Mr. Ortiz was the direct manager of 40 to 100 Tier 1 associates each night, as well as a Tier 3 Shift Assistant.  In addition to creating the initial staffing plan discussed above, Mr. Ortiz managed his team through a variety of duties.

17.     Mr. Ortiz was continuously observing the associates' performance for a variety of reasons, including because he was always responsible for the safety of his team.  Tr. 84:16–85:16; 152:18–153:10; 168:21–169:17; 256:7–22 (Ortiz); Tr. 393:1–394:16 (Kaczor).  He was also always responsible for the performance of the shift as a whole.  Mr. Ortiz observed associates throughout the shift to see that they were doing things safely, correctly, and efficiently, and he provided them feedback and coaching when they were not.  Tr. 132:20–133:8 (Ortiz).  As part of evaluating the shift's performance using the Comp tool data, Mr. Ortiz often had to reassign associates to new roles in order to impact the shift's performance.  Tr. 201:7–10; 247:1–15 (Ortiz).

18.     In addition to these duties Mr. Ortiz performed continuously, Mr. Ortiz also directed employees when to take their breaks and determined whether (and how much) overtime was required of the team and assigning it.  Tr. 106:15–18; 261:24–262:5 (Ortiz); Tr. 325:24–25; 326:1–6 (Lopez); Tr. 450:7–16; 457:2–14 (Kaczor).  Mr. Ortiz even helped to onboard a new third-in-command company Vice President in addition to training various associates regarding how to perform their duties safely and efficiently.  Tr. 225:2–25 (Ortiz); Ex. 108.  During each shift, Mr. Ortiz also led one to two 5-

minute stand-up meetings, during which he answered associate questions and gave associates a "pep talk" for the shift. Tr. 82:11–21 (Ortiz). To motivate his associates, Mr. Ortiz also awarded stickers to associates who were performing well, played music, and set up "power hour" competitions during which different groups of Tier 1 associates would compete to see who could process the most packages in an hour. Tr. 71:15–25; 110:16–111:2 (Ortiz); Tr. 605:8–21 (Nevado).

19.     These tasks are quintessentially managerial in nature as they reflect not only supervising a team, but also "managing day-to-day [delivery station] operations." *See, e.g.*, 29 C.F.R. § 541.102; *Taylor*, 190 Cal. App. 4th at 1019–20 (also listing "determining if modifications to work flow were necessary," motivating personnel, and "providing feedback" as exempt tasks).

### c.     Mr. Ortiz's Representations Regarding His Role Focused On These Managerial Tasks

20.     On résumés and job applications created outside of this litigation, Mr. Ortiz described his own duties and accomplishments at Amazon as primarily launching two delivery stations, managing routing system changes to dramatically improve a facility, refining the sortation process to reduce jams, and creating new processes for preloading delivery vans—a process for which he created all the training content and then implemented. Tr. 198:10–18 (Ortiz); Exs. 106, 107, 119. During and after his employment with Amazon, Mr. Ortiz expressed pride in his management to potential employers and on social media, noting that many of the changes and processes he created and implemented helped his delivery station earn the second place sortation quality score in the Amazon network. Tr. 232:15–233:16 (Ortiz); Ex. 108. These statements underscore that Mr. Ortiz was performing managerial work. *Taylor*, 190 Cal. App. 4th at 1025 (describing "developing and implementing 'strategic plans' or 'action plans' . . . to improve unit efficiency" as exempt work); *see Combs v. Skyriver Commc'ns, Inc.*, 159 Cal. App. 4th 1242, 1264 (2008) (finding that managerial job descriptions on résumé demonstrated that the plaintiff was engaged in exempt work).

21.     Thus, the weight of the evidence shows Mr. Ortiz was primarily engaged in exempt work.

2.      **Mr. Ortiz Did Not Spend The Majority of His Time Performing Non-Exempt Tasks, And To The Extent He Spent Time Doing Such Work, He Did So For Exempt Purposes**

22.     Mr. Ortiz contended at trial that he performed tasks such as unloading trucks, breaking down packages, setting up conveyors and computers, sorting packages, moving bread racks, staging orders, assisting drivers with loading trucks, repacking broken packages, and searching for missing packages.  Amazon disputed Mr. Ortiz's time estimates and introduced significant evidence to rebut them.  The evidence also showed that Mr. Ortiz was performing certain Tier 1 associate tasks for exempt purposes.  The Court therefore finds Amazon's evidence to be more credible than Mr. Ortiz's testimony.

a.      **Mr. Ortiz's Statements Regarding How He Spent His Time Are Not Credible**

23.     The Court finds Mr. Ortiz's claim that he performed non-exempt tasks for non-managerial purposes unpersuasive in light of his own characterization of his work before he filed this lawsuit.  Mr. Ortiz boasted that his effective management led to vast improvements at his delivery stations (and network-wide) both in social media posts made during the course of his employment and even following his termination in communications to former coworkers and on résumés and cover letters to potential employers.  *See Musgraves v. Sears Holding Mgmt. Corp.*, No. CV-11-0625 GAF (JEMx), 2012 WL 3222905, at *15 (C.D. Cal. July 19, 2012) (noting plaintiff's testimony was "somewhat contradictory" where, "[o]n the one hand, he testified that, through his effective management, he implemented vast improvements" at two stores, but on "the other hand, [p]laintiff testified that, on a daily basis, he spent more than half, and often nearly 90 percent of his time engaged in non-exempt tasks").  It is "difficult … to fathom how the operation of [delivery stations] employing [80] to 100 employees could drastically improve while their [Shift Manager] occupied himself by performing the tasks of the lowest-level employees."  *Id.* (discounting plaintiff testimony with respect to whether he was primarily engaged in exempt work).

24.     Further, not a single witness corroborated Mr. Ortiz's claims that he spent the majority of his time performing Tier 1 type tasks.  For example, Mr. Lopez—who learned the Night Shift

Gibson, Dunn &
Crutcher LLP

operation from Mr. Ortiz and then became his supervisor—testified that he saw Mr. Ortiz help with physical set up work only "occasionally," and that, on average, Mr. Ortiz worked in the path for a total of 30 minutes per shift.  Tr. 310:25–311:6; 314:8–13; 322:1–23 (Lopez).  He further testified that he never observed Mr. Ortiz spend more than half of his day doing Tier 1 associate-type work.  Tr. 322:4–7 (Lopez).  Mr. Abdelaziz, Mr. Ortiz's Shift Assistant at DSF4, testified that Tier 1 associates performed the set up work, and Mr. Ortiz spent 70 to 80 percent of his shift working from the manager's desk—in direct conflict with how Mr. Ortiz described his experience.  *Compare* Tr. 92:17–24; 133:13–134:1 (Ortiz), *with* Tr. 466:9–20 (Abdelaziz).  And the two other Shift Managers Mr. Ortiz called in an attempt to buttress his claims testified that they performed physical work for far less time than Mr. Ortiz claims he did—just 2 to 3 hours of Mr. Martin's shift, and approximately 25 to 30 percent of Mr. Merid's.  Tr. 514:17–515:1; 517:16–18 (Martin); Tr. 545:21–546:2 (Merid).  Finally, Mr. Hedin, who testified by deposition, revealed that his Shift Manager experience was entirely different from that of Mr. Ortiz:  Mr. Hedin ran an outdoor operation of six to eight associates using rudimentary materials and a "makeshift loading dock," in comparison to Mr. Ortiz's state-of-the-art facilities with up to 100 associates and equipment specifically designed for the Night Sort operation.  *Compare* Ex. 176 at 19:10–17; 20:2–6; 23:3–22 (Hedin) *with* Tr. 164:25–165:5; 166:10–13 (Ortiz).

25.    Also relevant to Mr. Ortiz's credibility are the facts surrounding his termination.  Mr. Ortiz not only violated a safety policy which resulted in his own injury, but he sought to conceal the facts of that policy violation by asking his supervisor to cover up his safety violation so he could keep his job, causing his supervisor to believe that Ortiz is not a truthful person.  Tr. 221:18-25 (Ortiz); Tr. 330:16-24 (Lopez).  He also lied on numerous résumés and job applications regarding the date of and reason for his termination.  Moreover, the testimony of Mr. Abdelaziz, Mr. Ortiz's Shift Assistant at DSF4, showed that Mr. Ortiz was willing to be untruthful about a wide array of topics, including the size of the speaker he used to play music for the Tier 1 associates and whether he ever browsed the internet for personal reasons during work hours.  *Compare*  Tr. 175:21–176:7 (Ortiz), *with* Tr. 468:2–469:20 (Abdelaziz); *compare* Tr. 176:8–12 (Ortiz), *with* Tr. 470:6–471:19 (Abdelaziz).  This behavior casts further doubt on Mr. Ortiz's credibility.  *See United States v. Clevenger*, 733 F.2d 1356, 1359 (9th Cir. 1984) ("The trier of fact has a wide latitude in which to decide which witnesses to believe or

1    disbelieve."); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (past dishonest

2    conduct and inconsistent statements relevant to determination of plaintiff's credibility).

3                         **b.      Even Accepting Mr. Ortiz's Time Estimates, He Performed Non-**

4                                   **Exempt Tasks For Exempt Purposes**

5            26.      Even if Mr. Ortiz's estimates of how much time he spent performing manual tasks were

6    credible, that would not end the analysis. Non-exempt work may be considered exempt if it is "directly

7    and closely related to exempt work," or performed "as a means for carrying out exempt functions."

8    8 Cal. Code Regs. § 11070(1)(A)(1)(e). This is because management includes tasks "performed by

9    supervisors because they are helpful in supervising the employees or contribute to the smooth

10   functioning of the department for which they are responsible." *Taylor*, 190 Cal. App. 4th at 1018

11   (quoting 29 C.F.R. § 541.108(a)). Thus, "[i]dentical tasks may be 'exempt' or 'nonexempt' based on

12   the purpose they serve within the organization or department." *Batze*, 10 Cal. App. 5th at 480. This

13   assessment does not require the Court to "peer into" an employee's mind, but rather to "determine the

14   objective purpose" of the employee's actions. *Heyen v. Safeway Inc.*, 216 Cal. App. 4th 795, 827

15   (2013).

16           27.      The evidence confirms that the Tier 1 associate tasks Mr. Ortiz contends he performed

17   were done for exempt purposes—namely, to facilitate "supervising the employees," "contribute to the

18   smooth functioning of the department," and to motivate employees—and are therefore exempt. *Id.* at

19   819; *Taylor*, 190 Cal. App. 4th at 1018–19. As a Shift Manager, Mr. Ortiz was encouraged to find ways

20   to motivate his team, including by being visible. As Mr. Ortiz testified, he and other managers "would

21   move packages" themselves because "it showed that [they] were all a team and it motivated the

22   associates." Tr. 109:21–110:1 (Ortiz). Mr. Ortiz also motivated his associates by setting up and

23   participating in "power hour" competitions to see which group of associates could process the most

24   packages in an hour. Tr. 71:15–25; 110:16–111:2 (Ortiz); Tr. 605:8–21 (Nevado). Thus, as Mr. Ortiz

25   testified that he moved boxes and participated in the power hour competitions to motivate associates,

26   those tasks—which Mr. Ortiz suggested took up to 2 to 3 hours of his day—are properly considered

27   exempt. *See Taylor*, 190 Cal. App. 4th at 1019 (motivating personnel is exempt function).

28

28.     Further, Shift Managers were expected to spend most of their time managing associates and the sort process.  Mr. Ortiz admitted that while on the floor, he was observing the Tier 1 associates he supervised in order to monitor the quality of their work, look for things that could be improved or things that were wrong, and ensure the safety of the 40 to 100 associates he was supervising any given night.  These observations allowed Mr. Ortiz to make decisions designed to maximize the performance of his shift, such as labor allocations, job assignments, coaching, additional training, and process improvement opportunities.  These are the same managerial purposes that courts have held make tasks exempt.  *See Batze*, 10 Cal. App. 5th at 481; *Wilbur v. Silgan Containers Corp.*, No. 06-cv-02181-MCE-EFB, 2008 WL 3863700, at *12 (E.D. Cal. Aug. 19, 2008).

29.     In *Batze*, for example, the court found that the plaintiffs were "primarily engaged" in exempt duties, even though some of those tasks might be considered non-exempt.  The court upheld the trial court's conclusion that when the plaintiffs went on "store walks," they did so because it was "the chief method a manager uses to determine what is going in the store and where (and with whom) he needs to devote attention."  10 Cal. App. 5th at 481.  The court also found that "walking the aisles and scanning out-of-stock" items was exempt work because it allowed an employee "to fulfill his or her managerial responsibility for determining when and where out-of-stocks occur and minimizing them"—that is, the store walks and scanning were determined to be "work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions."  *Id.* at 480.  As in *Batze*, Mr. Ortiz's continuous observation of his associates out on the delivery station floor was "'the chief method [Mr. Ortiz] use[d] to determine what [was] going on in the [delivery station] and where (and with whom) he need[ed] to devote attention,'" and was done for the purpose of "assessing the condition of [his delivery stations] and determining the problems that needed to be addressed."  *Id.* at 481.

30.     Similarly, in *Wilbur*, the court found that the plaintiff's time inspecting cans was exempt because it amounted to quality control and he was "consistently watching [his] surroundings and observing" the operation during the inspections.  2008 WL 3863700, at *12 (noting that a manager's "keep[ing] an eye out for trouble" is work "directly and closely related to his managerial responsibilities").  Likewise here, Mr. Ortiz worked "in the path" so that he could ensure the efficiency,

effectiveness, and safety of the Night Sort operation by "continual[ly]" "observing" the team he directed. His time spent "in the path" monitoring performance throughout the shift was thus exempt.

31. The time Mr. Ortiz spent at the beginning of his shift unloading truck pallets, staging pallets and bread racks alongside the conveyance system, breaking down plastic, setting up computers, replacing scan gun batteries, and walking the delivery station floor—to the extent he actually performed those tasks—was also exempt because it was done for the purpose of setting his associates up for success and ensuring the operation ran smoothly. *See Batze*, 10 Cal. App. 5th at 481 (performing tasks that "contribute to smooth functioning of the department" is exempt work). Further, Mr. Ortiz had discretion to delegate these tasks to his Shift Assistant or other associates, even if he chose not to do so. *See Wilbur*, 2008 WL 3863700, at *11 (delegating is a managerial function).

32. Similarly, the time Mr. Ortiz spent towards the end of his shift auditing bins and resolving issues related to damaged and missing packages was managerial because he performed these tasks for quality control—an undoubtedly exempt purpose. *See id.* at *12 (time spent inspecting cans exempt because it amounted to quality control).

33. In short, even though Mr. Ortiz contends he spent a significant amount of time doing non-exempt tasks, his own testimony and the evidence offered by Amazon demonstrate that he did them for managerial purposes. As such, Mr. Ortiz's time spent performing these tasks was exempt.

### 3. Amazon Expected That Mr. Ortiz Would Be Primarily Engaged In Exempt Work

34. Even if Mr. Ortiz did perform some tasks for non-exempt purposes, that is still not enough. The Court must also look to whether Mr. Ortiz's "practice diverge[d] from the employer's realistic expectations" of him, including evidence of "expression of employer displeasure" over his performance. *Ramirez*, 20 Cal. 4th at 802. An employee "should not . . . be able to evade a valid exemption" because of his own substandard performance. *Id.*

35. The key duties set forth in the Shift Manager job description do not include the types of manual labor Mr. Ortiz now contends he performed. Ex. 14; Tr. 150:24–151:8 (Ortiz). This demonstrates that Amazon did not expect Mr. Ortiz to be primarily engaged in those non-exempt tasks.

36.     To the contrary, Shift Managers were expected to take ownership of their shifts by managing their Tier 1 associate teams and overseeing the process.  And as Mr. Ortiz previously admitted, Amazon expected Mr. Ortiz to be responsible for the day-to-day operations of delivery stations, and this was consistent with his understanding of the job. Ex. 14; Tr. 47:23–25; 150:24–151:1 (Ortiz).

37.     Amazon provided Mr. Ortiz with substantial leadership training, including a multi-day managerial orientation, as well as trainings on giving feedback to associates, leading a team, observing and diagnosing performance issues, and delegating.  Amazon expected Mr. Ortiz to utilize the leadership skills he was trained in, rather than perform associate tasks himself, while managing his shift.  *See Batze*, 10 Cal. App. 5th at 479 (citing "extensive and costly management training" as evidence employer expected plaintiff to be "engaged primarily in managerial activities").  Similarly, Amazon provided Mr. Ortiz with a desk and laptop at each delivery station where he worked, which he was expected to use to perform some of his exempt duties, like analyzing metrics, preparing handoff materials, or counseling associates.  Tr. 304:3–25 (Lopez); Tr. 402:14–19; 400:18–25; 410:19–20 (Kaczor); Tr. 604:15–18 (Nevado).

38.     While Shift Managers were encouraged to lead by example, they were expected to perform associate-type tasks only rarely.  A Shift Manager's time was spent out on the floor with associates to manage associates' performance, not to do their work.  Multiple Amazon managers testified that if Shift Managers spent too much time on manual tasks, it would affect the shift's performance and raise concerns with higher managers.  Tr. 323:4–11 (Lopez); Tr. 404:23–405:7 (Kaczor); 497:21–498:6 (Martin).  Spending too much time performing associate-type tasks would reflect poor management.  The fact that Mr. Ortiz performed satisfactorily in his role—and well enough to be invited to launch two new delivery stations—indicates to the Court that Mr. Ortiz did in fact spend his time in line with Amazon's expectations.  Had Mr. Ortiz spent significant time on non-exempt tasks for non-exempt reasons, Mr. Ortiz "diverge[d] from [Amazon's] realistic expectations," which is not a reason to "evade a valid exemption." *Ramirez*, 20 Cal. 4th at 802.

39.     Mr. Ortiz, as a salaried employee, had no set working hours.  He was generally expected to work ten hours, but could leave early if work was finished.  Mr. Ortiz had a side job as a DJ, and

DEFENDANTS' SEPARATE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 4:17-CV-03820-JSW

would occasionally come to work extremely tired and try to go home early.  On one occasion, Mr. Ortiz was even found sleeping in one of the delivery vans during the operation.  Mr. Ortiz's testimony that he did not have any time for breaks because he had to perform so much manual labor is simply not credible in light of these facts.  To the extent he was performing associate tasks to rush through the operation, that was of his own volition and indicative of poor management, rather than the expectations of the company. *See Musgraves*, 2012 WL 3222905, at *15 (stating that, had plaintiff "more effectively managed his employees, he would not have found it necessary to do their work himself").

40.     Contrary to Mr. Ortiz's assumption, several witnesses explained that it was not Amazon's expectation that Shift Managers would spend significant portions of their day working alongside associates in the path to complete the sort on time.  Tr. 326:7–14 (Lopez); *see also* Tr. 404:23–405:7 (Kaczor); Tr. 611:3–15 (Nevado).  If Mr. Ortiz's shifts were short-staffed, he had managerial powers at his disposal to help alleviate those staffing issues.  He could use offer voluntary extra time to request more associates if a shift was short-staffed.  Tr. 325:15–23 (Lopez).  Furthermore, Mr. Ortiz had the discretion to order overtime if associates needed to stay beyond the end of the shift to complete their work.  Tr. 106:15–18; 261:24–262:5 (Ortiz); Tr. 325:24–25; 326:1–6 (Lopez); Tr. 450:7–14 (Kaczor).   Thus, had Mr. Ortiz performed these exempt functions of calling in additional associates or ordering overtime, he would not have needed to perform any non-exempt tasks on account of short-staffing. *See Ramirez*, 20 Cal. 4th at 802.

41.     Mr. Ortiz's compensation as compared to that of his team also reveals Amazon's expectation that he would serve in a different—managerial—role.  Mr. Ortiz was paid nearly $70,000 per year plus benefits, a signing bonus, and stock options (as opposed to the roughly $14 per hour the associates he supervised earned) to spend the majority of his time performing managerial tasks, not manual labor. *See In re Family Dollar FLSA Litig.*, 637 F.3d 508, 517–18 (4th Cir. 2011) (stating that store manager's significant compensation relative to her staff evidenced the value of her managerial duties).  Nonetheless, the evidence shows Mr. Ortiz was not working "in the path" alongside Tier 1 associates because he was expected to; he was working alongside them because he was expected to run an effective sortation operation, and this was his chosen method for doing so.  Mr. Ortiz was therefore primarily engaged in exempt functions.  8 Cal. Code Regs. § 11070(1)(A)(1)(e).

1
2

**II.      Even If Mr. Ortiz Was Not Properly Classified As Exempt, Amazon Did Not Fail To Pay Overtime Wages**

3
4
5
6

42.      Because Amazon properly classified Mr. Ortiz as exempt, his claim that Amazon did not pay overtime wages also fails.  *Ramirez*, 20 Cal. 4th at 798 n.4 (executive employees exempt from overtime compensation).  But even if Mr. Ortiz was not properly classified as exempt, he has not carried his burden to show that Amazon failed to pay overtime wages.

7
8
9
10
11
12
13
14
15

43.      To succeed on this claim, Mr. Ortiz must show (1) he performed compensable work for Amazon; (2) the worked overtime hours; (3) Amazon knew or should have known that he had worked overtime hours; (4) he was not paid for the full overtime rate for the overtime hours worked, and (5) the amount of overtime pay owed.  Cal. Lab. Code § 1194; 8 Cal. Code Regs. § 11070(3); *see Amiri v. Cox Commc'ns California, LLC*, 272 F. Supp. 3d 1187, 1197 (C.D. Cal. 2017).  Overtime can include any work in excess of eight hours in one workday or forty hours in one workweek, the first eight hours worked on the seventh day of work in any one workweek, any work in excess of twelve hours a day, or any work in excess of eight hours on the seventh day of a workweek.  Cal. Lab. Code § 510; *Flowers v. Los Angeles Cty. Metropolitan Transp. Auth.*, 243 Cal. App. 4th 66, 83 (2015).

16
17
18
19
20
21
22
23
24
25

44.      Mr. Ortiz contends that he worked ten to twelve hours a day, four to six days a week.  However, Mr. Ortiz has not proven how many overtime hours he actually worked.  Mr. Ortiz did not keep any records of the hours that he worked at Amazon, and conceded that he did not consult any records in compiling a document for purposes of this litigation which he claimed reflected his best recollection of the hours he worked.  Tr. 266:1–21 (Ortiz); *see MKB Constructors v. Am. Zurich Ins. Co.*, 83 F. Supp. 3d 1078, 1089 (W.D. Wash. 2015) (finding "lack of contemporaneous recording and after the fact reconstruction" of time records "concern[ing]").  And that document proved during trial to be inaccurate in a number of places, calling into question the reliability of the document as a whole.  Tr. 267:14–272:24 (Ortiz).  Mr. Ortiz has therefore not proven how many days or weeks he worked the threshold number of hours for overtime eligibility.

26
27
28

### III.    Amazon Did Not Fail To Provide Rest Periods

45.    Because Mr. Ortiz was properly classified as exempt, his claim that Amazon failed to provide rest periods fails.  In any event, Mr. Ortiz has not carried his burden to show that Amazon failed to provide rest periods in accordance with California law.

46.    To succeed on this claim, Mr. Ortiz must prove (1) Mr. Ortiz performed compensable work for Amazon in California; (2) that Amazon did not provide or actually prevented Mr. Ortiz from taking a paid rest period of ten minutes every four hours worked or major fraction thereof; and (3) the wages owed to Mr. Ortiz.  8 Cal. Code Regs. § 11070(12).  The evidence demonstrates otherwise.

47.    To satisfy its obligation to provide rest periods, Amazon need only "authorize and permit all employees to take rest periods" of ten minutes per four hours worked or major fraction thereof.  *Brinker Restaurant Corp. v. Super. Ct.*, 53 Cal. 4th 1004, 1028 (2012).  The Labor Code requires that employers *provide* rest periods; it does not require them "to ensure that employees actually take their rest periods."  *Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924, 953 (N.D. Cal. 2016); *Amiri*, 272 F. Supp. 3d at 1194–95; *cf. Donohue v. AMN Servs., LLC*, 11 Cal. 5th 58, 67 (2021) ("[T]he employer is not obligated to police meal breaks and ensure no work thereafter is performed.").  Therefore, Amazon cannot be liable for failure to provide rest periods if rest periods were authorized but Mr. Ortiz chose not to take them.  *Cleveland*, 200 F. Supp. 3d at 953; *see also White v. Starbucks Corp.*, 497 F. Supp. 2d 1080, 1086–87 (N.D. Cal. 2007).

48.    The evidence at trial demonstrated that employees, including Shift Managers like Mr. Ortiz, were provided rest periods.  Shift Managers had discretion to take breaks whenever breaks fit best into their schedule. Tr. 328:11–13 (Lopez); Tr. 518:1–7 (Martin); Tr. 587:7–12 (Bania).  Mr. Ortiz had the opportunity to take rest periods during the same time that his Tier 1 associates took rest periods—something he was responsible for managing.

49.    Mr. Ortiz, on the other hand, provides only his own testimony claiming that he was unable to take rest periods.  His testimony in this regard is not credible.  Mr. Ortiz could not identify a single instance in which anyone told him he could not take a rest period.  And on one occasion, Mr. Ortiz was found sleeping in a delivery van during his shift, suggesting that he felt comfortable taking rest periods whenever he wanted or needed to do so.  Tr. 328:17–22 (Lopez).  After this event, Mr.

Ortiz's supervisor, Mr. Lopez, had a conversation with Mr. Ortiz to check in on him and encouraged Mr. Ortiz to take breaks as needed.

50.     Mr. Ortiz was responsible for managing his own schedule, and no evidence suggests that he was prevented from taking breaks.  Thus, if Mr. Ortiz did not take breaks, it was a result of his own decisionmaking, rather than Amazon's actions.  Accordingly, his claim for failure to provide rest periods fails.  *See Cleveland*, 200 F. Supp. 3d at 953.

## IV.    Amazon Did Not Fail To Provide Meal Periods

51.     Because Amazon properly classified Mr. Ortiz as exempt, his claim that Amazon failed to provide meal periods fails.  In any event, the evidence does not demonstrate that Amazon failed to provide meal periods in accordance with California law.

52.     To succeed on this claim, Mr. Ortiz must prove that (1) he performed compensable work for Amazon in California; (2) that Amazon did not provide or actually prevented Mr. Ortiz from taking a meal period of thirty minutes for every five hours worked; and (3) the wages owed to Mr. Ortiz.  Cal. Lab. Code § 512(a); 8 Cal. Code Regs. § 11070(11); *see also Hernandez v. Sysco Corp.*, 2020 WL 533005, at *6 (N.D. Cal. Feb. 3, 2020).  Although "an employer must relieve the employee of all duty" for the meal period, it "need not ensure that the employee does no work."  *Amiri*, 272 F. Supp. 3d at 1194 (quoting *Brinker Rest. Corp.*, 53 Cal. 4th at 1034); *see also Hernandez*, 2020 WL 533005, at *6. Mr. Ortiz has not carried this burden.

53.     As with the rest period claim, Amazon has proffered significant evidence that Shift Managers, including Mr. Ortiz, could and did take meal periods, which Mr. Ortiz has failed to rebut. A Shift Manager's shift includes a meal period, and it is up to the Shift Manager to decide when they take that break.  Tr. 328:11–13 (Lopez); Tr. 518:1–7 (Martin); Tr. 587:7–12 (Bania).  Mr. Ortiz was responsible for ensuring that his Tier 1 associates were provided with a meal period under California law, and he too could have taken a meal period at that time.  Tr. 457:2–14 (Kaczor).  No one from the company discouraged Mr. Ortiz from doing so or from otherwise taking a meal period during each shift.  *See* Tr. 328:14–329:7 (Lopez).  Additionally, the evidence shows that Mr. Ortiz did in fact sometimes leave the delivery station to purchase food from nearby restaurants during his shifts.  Tr.

145:25–147:4 (Ortiz).  This belies his claim that he was not provided an opportunity to take meal periods.  Accordingly, Mr. Ortiz has not shown that he was prevented from taking meal periods.

## V.    Amazon Did Not Fail To Provide Itemized Wage Statements

54.    To succeed on this claim, Mr. Ortiz must prove (1) he performed compensable work for Amazon; (2) Amazon failed to furnish to Mr. Ortiz for each pay period an accurate itemized statement showing the information required by California Labor Code section 226(a); and (3) that Amazon's failure to furnish accurate wage statements was knowing and intentional.  Cal. Lab. Code § 226.

55.    Mr. Ortiz's Second Amended Complaint vaguely alleges that "Defendants have failed to provide timely, accurate itemized wage statements" to Mr. Ortiz because "none of the statements provided by Defendants accurately reflected actual gross wages earned, net wages earned, or the appropriate deductions." Dkt. 30 at ¶ 76.  It is not clear whether Mr. Ortiz claims his wage statements were inadequate because they did not include the requisite itemized lines, or if they were inaccurate because he should have been paid overtime compensation or meal and rest period premiums.  But under either theory, his claim fails.

56.    To the extent Mr. Ortiz claims Amazon failed to provide itemized wage statements by not including the required itemized information on his wage statements, he is simply incorrect.  Mr. Ortiz's wage statements do in fact contain itemized lines for gross wages earned, deductions, net wages, the inclusive dates of the pay period, and all other information required by section 226(a).  Ex. 136.

57.    If Mr. Ortiz's section 226 claim is instead based on the alleged failure to pay overtime and meal and rest period premiums, his claim fails because Amazon properly classified Mr. Ortiz as exempt, and because he did not prove he was entitled to overtime compensation or meal and rest premiums, in any event.  *See Culp v. Konica Minolta Bus. Sols. U.S.A., Inc.*, No. 17-CV-4274-JFW-JEMx, 2018 WL 5928185, at *7 (C.D. Cal. Feb. 28, 2018) ("As multiple courts have held, where a claim for an itemized wage statement violation depends on an overtime claim that has been denied, the itemized wage statement claim should also be denied"); *Haralson v. United Airlines, Inc.*, 224 F. Supp. 3d 928, 943 (N.D. Cal. 2016) (explaining where underlying wage and hour claims fail, derivative claim for inaccurate wage statements also fails); *Pedroza v. PetSmart, Inc.*, No. ED CV 11-298-GHK

1    (DTBx), 2012 WL 9506073, at *4 (C.D. Cal. June 14, 2012) (plaintiff's "wage statements were

2    accurate if she was properly classified as exempt").

3         58.    Furthermore, Mr. Ortiz cannot show that any purported violation was "knowing and

4    intentional," based on Amazon's good faith belief that Mr. Ortiz was properly classified as exempt.

5    *Woods v. Vector Mktg. Corp.*, No. 14-C-0264-EMC, 2015 WL 2453202, at *3 (N.D. Cal. May 22,

6    2015).

7         59.    Finally, because Mr. Ortiz's wage statements accurately reported what he was actually

8    paid, his section 226 claim fails. *Ramirez v. C. & J. Well Serv., Inc.*, No. 20-CV-535-PSG-SSx, 2020

9    WL 5846464, at *6–7 (C.D. Cal. Mar. 27, 2020) (stating that a section 226 claim requires that plaintiff

10   show his "wage statements *inaccurately* reflected the wages [employee] was paid at the time" because

11   the statute's purpose is to "document the paid wages to ensure that the employee is fully informed

12   regarding the calculation of those wages") (emphasis added); *see also Maldonado v. Epsilon Plastics,*

13   *Inc.*, 22 Cal. App. 5th 1308, 1335–37 (2018) (same).

14        60.    Accordingly, Mr. Ortiz did not satisfy his burden to show Amazon failed to provide

15   itemized wage statements.

16   **VI.    Mr. Ortiz Is Not Entitled To Waiting Time Penalties**

17        61.    As previously discussed, because Amazon properly classified Mr. Ortiz as exempt, his

18   claim that Amazon failed to pay overtime wages fails. *See supra* part II. Because Mr. Ortiz's claim

19   for waiting time penalties for failure to pay wages upon termination is dependent on his overtime wage

20   claim, this claim also fails. *See* Dkt. 30 ¶¶ 78–82 (alleging Mr. Ortiz was "not paid all premium

21   (overtime) wages due upon said termination").

22        62.    To succeed on this claim, Mr. Ortiz must prove (1) his employment with Amazon ended;

23   (2) Amazon failed to pay Mr. Ortiz all wages when due; and (3) Amazon willfully failed to pay these

24   wages. Cal. Lab. Code § 203. "[A]n employer's reasonable, good faith belief that wages are not owed

25   may negate a finding of willfulness." *Choate v. Celite Corp.*, 215 Cal. App. 4th 1460, 1468 (2013).

26   Even a defense that is "ultimately unsuccessful will not preclude a finding that a good faith dispute did

27   exist" so long as it is not "unreasonable" or "unsupported by any evidence." *Pedroza*, 2012 WL

28   9506073, at *5.

63.     Mr. Ortiz's claim fails on two fronts.  First, because Mr. Ortiz has not shown he was entitled to overtime pay, he has not shown that Amazon failed to pay him all wages upon termination. *Culp*, 2018 WL 5928185, at *8 (granting summary judgment on waiting time penalties claim because it was "wholly derivative of" plaintiffs' unsuccessful overtime claim); *Wilbur*, 2008 WL 3863700, at *12 (explaining employer "not liable for waiting time penalties" because exempt employee was not entitled to overtime compensation); *Pedroza*, 2012 WL 9506073, at *4 (plaintiff "was paid all of the wages she was owed upon termination if she was properly classified as exempt").

64.     Second, even had Mr. Ortiz succeeded on his overtime claim, Amazon has demonstrated a reasonable, good faith belief that overtime was not owed based on his classification as an exempt employee—a defense that required litigation through trial.  *Bargas v. Rite Aid Corp.*, 245 F. Supp. 3d 1191, 1215 (C.D. Cal. 2017) (holding that waiting time penalties precluded where employer disputed in good faith whether plaintiff was properly classified as exempt and was partially successful); *Pedroza*, 2012 WL 9506073, at *5 (noting fact that employer did not meet "the high burden on summary judgment in demonstrating that the exemption applies to [p]laintiff does not mean that the parties' dispute about [p]laintiff's exempt status is not a 'good faith dispute'").

65.     To the extent Mr. Ortiz now contends that his waiting time penalties claim is derivative of his meal and rest period claims, he is not entitled to penalties.  As with his overtime claim, his meal and rest period claims failed and therefore cannot support a section 203 claim.  *See Haralson*, 224 F. Supp. 3d at 943.  Additionally, the California Court of Appeal has concluded that an employer's failure to pay meal period premiums does not trigger derivative waiting time penalties under section 203. *Naranjo v. Spectrum Sec. Servs., Inc.*, 40 Cal. App. 5th 444, 473–74 (2019); *see also Jones v. Spherion Staffing, Inc.*, No. 11-CV-6462-JAK-JCx, 2012 WL 3264081, at *7–9 (C.D. Cal. Aug. 7, 2012) (holding that § 226 cannot be used to penalize an employer who failed to include disputed meal period premiums on a wage statement).

66.     Accordingly, Mr. Ortiz is not entitled to waiting time penalties.

## VII.     Mr. Ortiz Is Not An Aggrieved Employee With Standing To Pursue A PAGA Action

67.     Because Mr. Ortiz has not shown that he has suffered any violation of the California Labor Code, he is not an "aggrieved employee" with standing to bring a PAGA action.  Cal. Lab. Code

§ 2699(a), (c) ("'aggrieved employee' means any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed").  Accordingly, he is not entitled to any PAGA penalties for himself, and he does not have standing to pursue penalties for any other purportedly aggrieved employee.  *See Cabrera v. CVS Rx Servs., Inc.*, 2018 WL 4585678, at *2 (N.D. Cal. Sept. 25, 2018); *Snap! Mobile, Inc. v. Croghan*, 2019 WL 3503071, at *5 (N.D. Cal. Aug. 1, 2019).


Dated: July 28, 2021

JASON C. SCHWARTZ
MICHELE L. MARYOTT
BRADLEY J. HAMBURGER
JOSEPH R. ROSE
MEGAN COONEY
GIBSON, DUNN & CRUTCHER LLP


By:  */s/ Jason C. Schwartz*
          Jason C. Schwartz

Attorneys for Defendants AMAZON.COM LLC and GOLDEN STATE FC LLC (now known as Amazon.com Services LLC)

DEFENDANTS' SEPARATE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 4:17-CV-03820-JSW