MICHELE L. MARYOTT, SBN 191993
  mmaryott@gibsondunn.com
MEGAN COONEY, SBN 295174
  mcooney@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: 949.451.3800
Facsimile: 949.451.4220

JASON C. SCHWARTZ (admitted *pro hac vice*)
  jschwartz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

JOSEPH R. ROSE, SBN 279092
  jrose@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

Attorneys for Defendants AMAZON.COM LLC and GOLDEN STATE FC LLC (now known as Amazon.com Services LLC)

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| MICHAEL ORTIZ, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>AMAZON.COM LLC, a Delaware Limited Liability Company; GOLDEN STATE FC LLC, a Delaware Limited Liability Company; and DOES 1 through 100, inclusive,<br><br>        Defendants. | CASE NO. 4:17-CV-03820-JSW<br><br>**DEFENDANTS AMAZON.COM LLC'S AND GOLDEN STATE FC LLC'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF**<br><br>**<u>Phase One Trial:</u>**<br>Date:    June 21, 2021<br>Time:   8:00 a.m.<br>Place:   Courtroom 5, 2nd Floor<br>             1301 Clay Street<br>             Oakland, CA 94612<br>Judge:  Hon. Jeffrey S. White |

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ................................................................................................... iv

I.  INTRODUCTION ............................................................................................................ 1

II. ARGUMENT .................................................................................................................... 2

    A.    Ortiz Was Primarily Engaged In Exempt Tasks ................................................... 2

    B.    Ortiz Failed To Prove A Prima Facie Case Or Any Entitlement To Damages ........... 10

        1.    Ortiz Failed To Prove His Claims For Unpaid Overtime and Missed Breaks ................................................................................................. 10

        2.    Ortiz Also Failed To Prove His Derivative Claims ........................................ 12

III. CONCLUSION ............................................................................................................... 14

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Anderson v. Equinox Holdings, Inc.*,
  2019 WL 77139 (C.D. Cal. Jan. 2, 2019), *aff'd*, 813 F. App'x 308 (9th Cir. 2020) ......................10

*In re AutoZone, Inc., Wage & Hour Emp. Pracs. Litig.*,
  289 F.R.D. 526 (N.D. Cal. 2012) ...............................................................................................11

*Bargas v. Rite Aid Corp.*,
  245 F. Supp. 3d 1191 (C.D. Cal. 2017) ...............................................................................11, 13

*Batze v. Safeway, Inc.*,
  10 Cal. App. 5th 440 (2017) ............................................................................................ iv, 1, 4

*Brinker Rest. Corp. v. Superior Ct.*,
  53 Cal. 4th 1004 (2012) .............................................................................................................11

*Choate v. Celite Corp.*,
  215 Cal. App. 4th 1460 (2013) ..................................................................................................13

*Dang v. Sutter's Place, Inc.*,
  2013 WL 5955561 (N.D. Cal. Oct. 28, 2013) ............................................................................11

*Gibson v. Jaguar Land Rover N. Am., LLC*,
  2020 WL 5492990 (C.D. Cal. Sept. 9, 2020) .............................................................................14

*Gomez v. J. Jacobo Farm Lab. Contractor, Inc.*,
  334 F.R.D. 234 (E.D. Cal. 2019) ......................................................................................... iv, 11

*Heredia v. Sunrise Senior Living LLC*,
  2021 WL 819159 (C.D. Cal. Feb. 10, 2021) ..............................................................................14

*Jones v. Spherion Staffing, Inc.*,
  2012 WL 3264081 (C.D. Cal. Aug. 7, 2012) .............................................................................13

*Maldonado v. Epsilon Plastics, Inc.*,
  22 Cal. App. 5th 1308 (2018) ....................................................................................................12

*MKB Constructors v. Am. Zurich Ins. Co.*,
  83 F. Supp. 3d 1078 (W.D. Wash. 2015) ...................................................................................10

*Naranjo v. Spectrum Sec. Servs., Inc.*,
  40 Cal. App. 5th 444 (2019), *review granted* 455 P.3d 704 (Cal. 2020) .........................................13

*Ornelas v. Tapestry, Inc.*,
  2021 WL 2778538 (N.D. Cal. July 2, 2021) ..............................................................................13

*Pedroza v. PetSmart, Inc.*,
  2012 WL 9506073 (C.D. Cal. June 14. 2012) ...........................................................................13

*Pyara v. Sysco Corp.*,
  2016 WL 3916339 (E.D. Cal. July 20, 2016) ............................................................................12

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Ramirez v. C. & J. Well Serv., Inc.*,
  2020 WL 5846464 (C.D. Cal. Mar. 27, 2020) ...............................................................................12

*Ramirez v. Yosemite Water Co., Inc.*,
  20 Cal. 4th 785 (1999) ................................................................................................................ iv, 5

*Santos v. TWC Admin. LLC*,
  2014 WL 12558274 (C.D. Cal. Nov. 3, 2014) ..............................................................................10

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ........................................................................................................14

*Taylor v. United Parcel Serv., Inc.*,
  190 Cal. App. 4th 1001 (2010) ......................................................................................................4

*Wilbur v. Silgan Cont.*,
  2008 WL 3863700 (E.D. Cal. Aug. 19, 2008) ............................................................................4, 5

*Woods v. Vector Mktg. Corp.*,
  2015 WL 2453202 (N.D. Cal. May 22, 2015) ..............................................................................12

**STATUTES**

8 Cal. Code Regs. § 11070 ....................................................................................................................3

Cal. Lab. Code § 203 ...........................................................................................................................13

Cal. Lab. Code § 226 ...........................................................................................................................12

Cal. Lab. Code § 2699 .........................................................................................................................13

**RULES**

Fed. R. Civ. P. 56 ..................................................................................................................................2

**REGULATIONS**

29 C.F.R. § 541.102 ..........................................................................................................................3, 5

29 C.F.R. § 541.108 ..............................................................................................................................5

## SUMMARY OF ARGUMENT

Plaintiff Michael Ortiz's post-trial brief confirms that the evidence presented at trial shows he was properly classified as an exempt employee under California law. While Ortiz repeats the allegations he has made throughout this case, the actual evidence does not support his theories. Instead, the record at trial overwhelmingly supports the conclusion that Ortiz—a highly educated, highly compensated manager of up to 100 Tier 1 associates—was correctly classified as exempt.

Ortiz's primary offering is an underinclusive and self-serving list of his supposed typical work tasks. Dkt. 264 ("Pl. Br.") at 5. This list actually shows that many of the tasks he claims to have performed on a daily basis were exempt in character. In addition to indisputably exempt tasks like "preparing for sort shift" and "holding standup meetings" (*id.*), Ortiz's own testimony confirmed that tasks on his list that would otherwise be non-exempt were done for managerial purposes and thus were exempt under California law. *See Batze v. Safeway, Inc.*, 10 Cal. App. 5th 440, 480–81 (2017) ("[I]dentical tasks may be 'exempt' or 'nonexempt' based on the purpose they serve within the organization[.]"). For example, Ortiz admitted he worked alongside associates to motivate, for quality control, and to engage his large team. Tr. 84:16–85:16, 109:21–110:1, 168:21–169:17 (Ortiz).

In any event, there is no question that Amazon *expected* Ortiz to focus his day on managerial (as opposed to manual) tasks, and Ortiz cites nothing to the contrary in the record. Everything from Ortiz's training, his manager's observations, and the experiences of Ortiz's witnesses points in the same direction: Shift Managers like Ortiz were not expected to perform manual tasks for any "significant amount of time" (Tr. 322:24–323:6 (Lopez)), and "certainly not all night" (Tr. 495:2–495:16 (Martin)). *See, e.g.*, Tr. 50:19–51:7 (Ortiz); Tr. 571:21–576:3, 581:13–582:13 (Bania); Exs. 111, 150–160. And even if the Court were to believe that Ortiz actually spent the majority of his shifts engaged in manual labor, he cannot "evade" a "valid exemption" by performing his job contrary to Amazon's reasonable expectations. *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 802 (1999).

Ortiz's post-trial submissions also fail to show that Ortiz has proven any of his claims. He has not identified a single date on which he is owed overtime or missed a break, nor has he tried to calculate the damages he believes he is owed. *See Gomez v. J. Jacobo Farm Lab. Contractor, Inc.*, 334 F.R.D. 234, 260 (E.D. Cal. 2019). Judgment should be entered against him and in Amazon's favor.

## I. INTRODUCTION

Ortiz's post-trial submissions rest on his unproven and illogical narrative that Amazon supposedly paid him nearly $70,000 a year plus benefits, stock awards, and bonuses—as opposed to the $14 per hour that hourly Tier 1 associates were paid at the time—because it wanted "to maximize profitability by avoiding [its] obligations." Dkt. 264 ("Pl. Br.") at 1.  Nothing in the evidence supports Ortiz's argument that Amazon expected or wanted him to operate in the same way as one of the 80 to 100 Tier 1 associates that he was responsible for supervising.  To the contrary, everyone from Ortiz's own witnesses to his former managers and high-ranking executives testified that as a Level 4 Shift Manager, Ortiz *needed* to be focused on the operation as a whole and "certainly not" performing manual, associate-level tasks "all night."  Tr. 495:2–25 (Martin).  Likewise, nothing in the evidence except for Ortiz's falsehoods supports his contention that he did in fact spend his time primarily on associate work.  Witnesses who directly observed Ortiz testified that he never spent more than half of his day on manual work and that he was actually "one of the last managers to jump in and do Tier 1 work" at all (Tr. 322:4–23 (Lopez)), because he spent the overwhelming majority of his day "at the leadership desk monitoring" shift metrics, as well as "walking the floor engaging with associates."  Tr. 310:25–311:6, 322:1–13 (Lopez); *see also* Tr. 466:9–20 (Abdelaziz).  There is no reason to believe Ortiz—a proven and admitted liar—over the other witnesses at trial who undermined his facially implausible story that he did not actually operate as a managerial employee because the difference between a successful sort and an unsuccessful sort was just one more set of hands doing manual labor.

Ortiz's submissions ignore most of the evidence presented at trial, and instead focus on cataloging Ortiz's daily tasks without bothering to explain why each listed task was non-exempt in nature.  It is beyond dispute that many of these tasks are quintessentially exempt activities—from holding standup meetings and preparing for the shift to analyzing data and creating reports.  And the evidence, including Ortiz's own testimony, shows that the remainder were done for exempt reasons. While Ortiz claims it "strains logic" to think that he could perform a seemingly manual task for an exempt purpose (Pl. Br. at 1), it is well-established that "[i]dentical tasks may be 'exempt' or 'nonexempt' based on the purpose they serve within the organization or department." *Batze v. Safeway, Inc.*, 10 Cal. App. 5th 440, 480–81 (2017).  Even if the Court were to believe that Ortiz performed

manual tasks for more than half of his shifts, his own testimony established—and the testimony of other witnesses confirmed—that Ortiz performed those tasks because "it showed that they were all a team and it motivated the associates" (Tr. 109:21–110:1 (Ortiz)), let him "see some of the problems [his associates] were running into" (Tr. 84:16–85:16 (Ortiz)), and allowed him to monitor the safety and quality of work (Tr. 256:7–22(Ortiz))—all exempt purposes. *See* Tr. 322:24–323:3 (Lopez); Tr. 399:18–22 (Kaczor); Tr. 605:8–21 (Nevado).

While Amazon carried its burden to prove that Ortiz was properly classified as exempt with overwhelming evidence, Ortiz's post-trial submissions highlight his failure to proffer evidence to meet even his prima facie burden to prove his claims. Ortiz's brief does not identify a single date on which he is owed overtime or a premium payment for a missed meal period or rest break, let alone calculate the damages and penalties he believes the evidence supports. Absent proving these elements of his overtime, meal period, and rest break claims, Ortiz is not entitled to any relief and is not an aggrieved employee who can pursue an action under PAGA.

In short, Ortiz asks the Court to make factual findings and legal conclusions that are unsupported by the evidence, and to credit his unpersuasive and not credible testimony. The Court should instead find that Ortiz is exempt for all the reasons outlined in Amazon's post-trial submissions, and enter judgment in Amazon's favor on all of Ortiz's claims.

## II.   ARGUMENT

### A.   Ortiz Was Primarily Engaged In Exempt Tasks

There is only one element of California's executive exemption at issue at this trial: whether Ortiz was primarily engaged in exempt tasks as a Level 4 Shift Manager. Ortiz's trial brief, however, focuses on what he believes to be a lack of "discretion" in his role. Pl. Br. at 6–8. The fact that Ortiz regularly and customarily exercised independent judgment and discretion in his role was established at summary judgment and not open for relitigation at trial. *See* Dkt. 232 ("[T]he Court did not intend those elements to be relitigated at trial."); *see also* Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the [summary judgment] motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."). Instead, the Court's role as fact finder is to determine whether the

evidence showed that Ortiz spent the majority of his time on exempt tasks, tasks done for exempt purposes, or tasks closely and directly related to exempt work. 8 Cal. Code Regs. § 11070(1)(A)(1)(e). The overwhelming evidence establishes that Amazon has again met its burden and established this final element of the exemption test.

The evidence at trial showed that Ortiz primarily performed exempt tasks. *See* Dkt. 262 at 7–15. Ortiz's post-trial brief repeatedly lists the tasks he performed each shift, but says nothing about whether or why these tasks should be classified as exempt or non-exempt. In other words, Ortiz just assumes that all (or the majority) of tasks on his list were non-exempt. In reality, each of the tasks that Ortiz identified—and those he did not—was an exempt task.

***First***, a number of the tasks Ortiz's brief admits he performed on a daily basis are indisputably exempt in character. Holding standup meetings, making safety observations, preparing for the shift, tracking associate time, coaching associates, assessing shift data, and creating handoff reports are all quintessentially exempt. *See* 29 C.F.R. § 541.102 (stating that "management" includes "training of employees," "setting and adjusting their rates of pay and hours of work," "maintain[ing] production or sales records," "planning the work," "providing for the safety and security of the employees," and "monitoring or implementing legal compliance measures"); 8 Cal. Code Regs. § 11070(A)(1)(a)(e) (adopting by reference the definition of management from the federal regulation).[1] For example, although Ortiz's brief fails to discuss it, preparing for the shift involved significant exempt work. To prepare for the shift, Ortiz had to create a shift plan based on the incoming volume and number of associates working, assign the up to 100 associates to different functions based on their skills, training, and areas of needed development, and supervise associates and his Shift Assistant in the physical setup of the site. Tr. 307:20–310:16, 319:11–13 (Lopez); Tr. 248:5–13, 254:6–256:25 (Ortiz).

Considering just these seven tasks as exempt puts a minimum of 3.5 hours of daily time on the "exempt" side of the ledger based on Ortiz's underinclusive and self-serving time estimates. *See* Pl. Br. at 5. In reality, the time Ortiz spent on these exempt tasks was much higher than he claimed. For

---

[1] Ortiz's brief incorrectly says that the list of exempt tasks in 29 C.F.R. § 541.102 is "exhaustive." Pl. Br. at 9–10. The text of the regulation itself makes clear that this is not so. 29 C.F.R. § 541.102 ("Generally, 'management' includes, *but is not limited to*, activities such as . . . ." (emphasis added)).

instance, Ortiz assigns only six minutes to "safety observations" based on his testimony that he performed two dedicated observations for each shift's handoff report that lasted three minutes each. Pl. Br. at 5 (citing Tr. 119:25–120:16 (Ortiz)). On cross-examination, however, Ortiz readily conceded that his safety responsibilities were not this isolated and that he was "***constantly*** responsible for the safety of the operation." Tr. 153:8–10 (Ortiz) (emphasis added); *see also* Ex. 125.

Pulling data from the Comp tool likewise involved far more time than the twelve minutes Ortiz assigns to it. *See* Pl. Br. at 5. Ortiz claims that the act of pulling the data took him one minute, and that he did that twelve times during the shift—but Ortiz's work with the data did not stop once he pulled it. Tr. 68:3–14, 70:5–8 (Ortiz). Once the data was pulled, Ortiz reviewed it, analyzed it, and made adjustments to the shift to ensure it was operating in the most effective and efficient way possible. Tr. 153:23–154:2 (Ortiz). As Ortiz explained, there were many different things he might do depending on what the data showed: he might ask associates to "step it up," "send a couple people to [a] section" that needed help, or "go over to a section" to evaluate the situation himself. Tr. 69:20–70:3, 153:20–155:9 (Ortiz). This process took far longer than one minute to complete each time, and, based on Ortiz's own testimony as well as those of others, occupied the majority of his time while associates were on-site. *See* Tr. 302:7–10; 305:4–18 (Lopez) (walking the floor at DSF6 to investigate issues took 15 to 30 minutes each time); Tr. 104:21–105:10 (Ortiz); Tr. 438:9–15 (Kaczor).

***Second***, the seemingly non-exempt tasks on Ortiz's list were done for exempt reasons. "Working in the path," which Ortiz defined as "moving boxes" and "working alongside" associates, was—by Ortiz's own admission—done because "it showed that they were all a team and it motivated the associates as well" and because it allowed him to ensure that the associates were doing their work safely and correctly. Tr. 109:21–110:1, 256:7–22 (Ortiz). Other witnesses confirmed not only that Ortiz did these tasks for supervision, "engagement, for training, and even morale boosting," but that the expectation was that any time he spent performing Tier 1 associate tasks would be for those managerial purposes. Tr. 322:4–323:3 (Lopez); *see also* Tr. 399:18–22 (Kaczor). That is a textbook example of an otherwise non-exempt task that should be considered an exempt task. *See Batze*, 10 Cal. App. 5th at 481; *Wilbur v. Silgan Cont.*, 2008 WL 3863700, at *12 (E.D. Cal. Aug. 19, 2008); *Taylor v. United Parcel Serv., Inc.*, 190 Cal. App. 4th 1001, 1018–20 (2010) (finding that non-exempt tasks

done to facilitate "supervising the employees" and motivation were exempt). Ortiz also explained that spending some time working "alongside" associates—whether it was moving boxes, cleaning, or loading vans—also helped him "to see some of the problems they were running into," which allowed him to identify process improvements. Tr. 84:16–85:16, 168:21–169:17 (Ortiz); 29 C.F.R. § 541.102 ("management" includes "determining the techniques to be used"). In particular, this allowed Ortiz to develop and implement a "new process for preloading delivery vans" that became "network standard in all stations," as well as add separate small and large sort areas to his stations to reduce jams and improve package flow. Exs. 106, 107, 119; Tr. 198:10–21 (Ortiz).

Many of Ortiz's other seemingly manual tasks were done for exempt reasons. For instance, auditing bins, clearing jams, and repacking boxes were all quality control functions that Ortiz performed and therefore are properly considered exempt. As Ortiz admitted, he completed these tasks "at the end of the sortation" to identify whether any of the packages sorted by his team were "missed, dropped, or whatnot." Tr. 134:2–14 (Ortiz). "[A] supervisor who spot checks and examines the work of his subordinates to determine whether they are performing their duties properly, and whether the product is satisfactory, is performing work which is directly and closely related to his managerial and supervisory functions." 29 C.F.R. § 541.108(e); *Wilbur v. Silgan Containers Corp.*, 2008 WL 3863700, at *11–12 (finding that manager's work doing "routine inspection of cans" was an exempt function).

**Third**, a number of the tasks that Ortiz claims to have done every day—including spending 2 to 3 hours "moving boxes" and 30 to 45 minutes "loading vans"—were contrary to Amazon's expectations and therefore cannot defeat Amazon's valid exemption. *See Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 802 (1999). Ortiz's brief contends that his purported focus on manual work was consistent with Amazon's expectations, but the evidence he cites does not support his conclusion.

Much of Ortiz's cited evidence is testimony from Ortiz and other managers noting that they saw exempt managers at many different levels performing manual tasks "at certain times," but, as one of Ortiz's own witnesses explained, "***certainly not all night***." Tr. 495:2–25 (Martin) (emphasis added); *see also* 66:18–67:20 (Ortiz) (discussing that he saw certain managers move packages). Multiple witnesses—both called by Amazon *and* Ortiz—agreed that Amazon *did not* expect a Shift Manager to

spend significant time on manual work because if a Shift Manager was "in one role in the sense of offloading pallets or scanning for the entire shift" he would "lose track of [the] operation." Tr. 497:21–498:6 (Martin); *see also* Tr. 323:4–11, 326:7–14 (Lopez); Tr. 404:23–405:7 (Kaczor); Tr. 611:3–15 (Nevado); Tr. 545:21–546:2 (Merid) (one of Ortiz's witnesses, explaining that he spent "maybe 30 percent of the shift, a quarter of the shift" on "manual labor").

Ortiz also relies on various testimony from higher-ranking managers who said that they each felt Ortiz was performing the job as they expected. But for that testimony to help, rather than hinder, Ortiz, the Court would have to conclude that each of those managers understood that Ortiz was performing primarily manual work and felt that doing so was consistent with their expectations of the Shift Manager role. Ortiz does not have evidence to support either assumption.

To start, Ortiz cannot point to any evidence that any of these managers—Marc Lopez, Edward Kaczor, or Diego Nevado—believed that Ortiz was performing primarily manual work. And Ortiz's claim that he was primarily performing manual labor is not credible and should not be credited by this Court. Setting aside the myriad times when Ortiz's credibility was impeached generally (*see* Dkt. 261 at 7–11; Dkt. 262 at 21–28), Ortiz's testimony regarding how he spent his time was specifically rebutted by multiple witnesses, including those who he claims expected him to do manual work. Lopez consistently observed Ortiz spending not more than 30 minutes doing Tier 1 associate tasks, and instead saw Ortiz spend most of his time "at the leadership desk monitoring some of the digital tools" that tracked shift metrics and "walking the floor engaging with associates." Tr. 310:25–311:6 (Lopez). Lopez went so far as to say that Ortiz was "one of the last managers to jump in and do Tier 1 work." Tr. 322:4–23 (Lopez). This was consistent with the testimony from Mahmoud Abdelaziz, who impeached Ortiz's claim that he worked mainly alongside associates using a rolling cart by explaining that he observed Ortiz at the "leadership desk" 70 to 80 percent of the time, which allowed Ortiz to connect his laptop to 36-inch speakers and play music for the associates. *Compare* Tr. 175:21–176:7 (Ortiz), *with* Tr. 468:2–469:25 (Abdelaziz).

Additionally, Lopez, Kaczor, and Nevado each testified that Amazon did not expect any Shift Manager to spend any "significant amount of time" on Tier 1 associate work, let alone more than 50 percent of their day. Tr. 322:23–323:6 (Lopez) (defining "significant" as "more than 45 minutes"); *see*

*also* Tr. 404:23–405:7 (Kaczor); Tr. 605:8–21 (Nevado). Lopez's testimony was particularly compelling in this regard: Lopez joined Amazon in the summer of 2016 and Ortiz "taught [Lopez] how to run the shift – sort shift" by letting Lopez shadow him carefully for two weeks. Tr. 318:8–12 (Lopez); *see also* Tr. 306:9–307:19 (Lopez). In the course of that shadowing, and based on how Ortiz explained the role to him, Lopez developed his expectation for how a Night Sort Shift Manager should operate, based in large part on Ortiz's performance. Tr. 318:8–12 (Lopez); *see also* Tr. 306:9–307:19, 310:25–311:6, 322:1–13 (Lopez). Lopez only saw Ortiz focus on analyzing the operation and supervising the associates, which confirmed for Lopez that a Night Sort manager can and should spend the overwhelming majority of his time on managerial work. Tr. 318:8–12 (Lopez); *see also* Tr. 310:25–311:6, 322:1–13 (Lopez). The fact that Lopez, as well as Kaczor and Nevado, felt Ortiz was performing in line with that expectation confirms that Ortiz was performing predominately managerial work, not (as Ortiz claims) that Amazon's expectations were that he would relegate those tasks in favor of manual ones.

Ortiz points to his training as somehow enforcing that Amazon expected him to be a "cog[] in the machine," but the overwhelming evidence was to the contrary. *See* Pl. Br. at 7. The first training Ortiz attended, Ops Leader Orientation, was focused on leadership skills and by Ortiz's own admission involved "a lot of role playing" regarding how to handle "potential problems that [he] would see as a manager." Tr. 50:19–51:7 (Ortiz); *see also* 571:21–572:11 (Bania). Ortiz also attended Associate Experience Week, which is only for managers to "teach [them] what it's like to be an associate, with the intent that those leaders can then step into their role as leaders . . . and better understand how to support their associates." Tr. 573:2–15, 575:21–576:3 (Bania). This was "an opportunity to step into the shoes of the associates for a small period of time" to get their perspectives, because managers like Ortiz "will *not* have th[at] opportunity" once they begin working in their leadership roles. Tr. 573:2–15, 575:21–576:3 (Bania) (emphasis added); *see also* Ex. 142. The other trainings that Ortiz completed further demonstrate that Amazon expected him to focus on people management—"build credibility," "motivate and engage [his] team," "provide feedback," and "be a leader during conflict"—and "innovate and improve" the operation. Exs. 111, 150–160; Tr. 581:15–585:13 (Bania). Any doubt as to whether Amazon expected Ortiz to perform "routine" and manual tasks is dispelled by the training

he received on "[d]elegat[ing] tasks effectively in order to manage [his] workload," coupled with the fact that he had a designated Shift Assistant and as many as 100 associates he could delegate to each day. Exs. 111, 158 at 2; Tr. 581:15–582:13 (Bania).

Ortiz also points to the Shift Manager job description as evidence of an expectation that he would perform primarily manual work. Ortiz focuses on the job description's section on "Additional Job Elements," which requires that Shift Managers be physically able to "lift up to 49 pounds with or without reasonable accommodation," "frequently push, pull, squat, bend, and reach," and "stand/walk for up to 10/12 hours," to the exclusion of all other aspects of the job description. Pl. Br. at 8; Ex. 14. But it is the "Key Job Duties" section, which Ortiz ignores, that outlines the "core competencies" of the Shift Manager's job and what Amazon expected him to "spend most of [his] time doing," including to "[e]nsure compliance throughout the site to global process standards and work on continuous improvement initiatives," "troubleshoot[] problems through to resolution," and "[o]versee the delivery of Amazon orders to customers." Tr. 584:12–23 (Bania); Ex. 14. The "Additional Job Elements" he relies on, by contrast, are "auxiliary" functions that a Shift Manager needs to be able to perform in order to safely work and supervise associates in a Delivery Station. Tr. 584:12–586:23 (Bania). Amazon "believe[s] that safety is everybody's responsibility," so the company "make[s] sure everybody" in the Delivery Station is capable of performing those Additional Job Elements "at all times"—even "Level 7 senior managers," who also have these requirements in their job descriptions. Tr. 584:24–585:18 (Bania).

Additionally, the Court need not—and should not—accept Ortiz's list as a complete one. As discussed at length in Amazon's brief, Ortiz performed tasks beyond these every day to fulfill his core responsibility: **manage the team of up to 100 associates working on his shift.** *See* Tr. 98:2–99:8, 170:24–171:20, 201:7–10, 247:1–15, 248:5–13, 256:6–257:1 (Ortiz); Tr. 298:3–5 (Lopez). Viewing Ortiz's list alone, it would appear that all he did was arrive to work, send the associates to do their tasks without supervision, and then focus on his own. The reality, however, was—and had to be—very different. Ortiz knew that keeping his large team motivated was critical to the smooth functioning of the operation, so he created different incentives for associates to work harder, including competitions and giving out awards that he purchased for them. Tr. 71:15–25; 110:16–111:2 (Ortiz); Tr. 605:8–21

(Nevado). Ortiz also had to "constantly" observe his associates' performance, not just to ensure the safety of the operation, but also that the quality of his team's work was up to his and Amazon's standards. Tr. 152:18–153:10 (Ortiz); *see also* Tr. 84:16–85:16, 168:21–169:17, 256:7–22 (Ortiz); Tr. 393:1–394:25 (Kaczor). Because the facilities were too large for Ortiz to see the whole floor from one vantage point (Tr. 105:3–10 (Ortiz); Tr. 302:7–10 (Lopez); Tr. 438:9–15 (Kaczor)), he had to utilize the data, walk around the facilities, and "expand his span of control" by assigning his Shift Assistant and "ambassadors" to supervise certain sections of the building and report back to him using their walkie-talkies (Tr. 167:3–168:3 (Ortiz)). Ortiz had to make sure his associates were taking their legally required meal periods and rest breaks, and had to determine whether he needed to ask any associates to work overtime to make sure the work was complete. Tr. 106:15–18, 170:24–171:20, 261:19–262:5 (Ortiz); Tr. 325:24–326:6 (Lopez); Tr. 450:7–14 (Kaczor). Focusing his day on these tasks, as he did, was critical to Ortiz's success as a manager, which was measured based on the performance of the *entire* shift, not his own ability to move boxes. Tr. 157:23–159:2 (Ortiz); Ex. 125.

But even taking Ortiz's flawed list as the starting point, it is clear that Ortiz predominately performed exempt tasks, as seen below. In other words, Ortiz's brief simply confirms that he was properly classified as exempt.

| Task | Ortiz's Claimed Time | Exempt | Contrary to Expectation |
|---|---|---|---|
| Holding Stand Up Meetings | 10 minutes | X | |
| Pulling Data from Comp System | 12 minutes | X | |
| Entering Time Punches | 30 minutes | X | |
| Moving/Sorting Boxes in the Path | 2-3 hours | X | X |
| Safety Observations | 6 minutes | X | |
| Preparing for Sort Shift | 2-3 hours | X | |
| Coaching Associates | 3-12 minutes | X | |
| Auditing Bins | 15-30 minutes | X | |
| Running Handoff Reports | 30 minutes | X | |
| Repacking Boxes | 12-20 minutes | X | X |

| Task | Ortiz's Claimed Time | Exempt | Contrary to Expectation |
|---|---|---|---|
| Disassembling Work after Sort | 30 minutes | | X |
| Loading Vans | 30-45 minutes | X | X |
| Clearing Jams | 5 minutes | X | |

**B.    Ortiz Failed To Prove A Prima Facie Case Or Any Entitlement To Damages**

Although the Court need not reach the merits of Ortiz's underlying claims because he was properly classified as exempt, Ortiz's brief demonstrates that he has not carried his burden to show that he would be entitled to relief on any of his claims or that he can establish the unknown amount of damages he seeks are supported by any evidence.

**1.    Ortiz Failed To Prove His Claims For Unpaid Overtime and Missed Breaks**

Ortiz has failed to meet his prima facie burden to prove his three primary claims on which the rest of his theories depend: that he was not paid for all overtime hours worked or provided with meal periods and rest breaks. For each claim, Ortiz has not made any attempt to show when or how often he suffered these supposed harms and what damages he contends he is entitled to, which dooms his case.

"Damages are an essential element of [an] overtime claim" and Ortiz "therefore[] has the ultimate burden of persuasion on this issue at trial." *Santos v. TWC Admin. LLC*, 2014 WL 12558274, at *7 (C.D. Cal. Nov. 3, 2014); *see also Anderson v. Equinox Holdings, Inc.*, 2019 WL 77139, at *3 (C.D. Cal. Jan. 2, 2019) (proving "the amount of overtime pay owed" is an element of any overtime claim that the plaintiff must establish), *aff'd*, 813 F. App'x 308 (9th Cir. 2020). Ortiz's post-trial brief is devoid of any facts regarding the alleged overtime compensation he asks the Court to award him, and instead only makes a passing reference to a calendar that Ortiz created during this litigation and which proved to be inaccurate in multiple places. Tr. 266:1–21, 267:14–272:24 (Ortiz); *see MKB Constructors v. Am. Zurich Ins. Co.*, 83 F. Supp. 3d 1078, 1089 (W.D. Wash. 2015) (finding "lack of contemporaneous recording and after the fact reconstruction" of time records "concern[ing]"). Ortiz's brief offers no method for taking that calendar and converting it into damages, particularly in light of the inconsistency between Ortiz's calendar and his brief, which estimates he worked seven to nine

hours daily.  *Compare* Ex. 133 (claiming 10 to 14 hours each day), *with* Pl. Br. at 5 (summarizing Ortiz's testimony regarding how he spent his time, which totaled 7 to 9.8 hours).  Ortiz has fallen far short of "prov[ing] the amount of adequate compensation [he seeks] with reasonable certainty." *Bargas v. Rite Aid Corp.*, 245 F. Supp. 3d 1191, 1209 (C.D. Cal. 2017).

Damages are also an essential element Ortiz must prove to recover on his claims for missed meal periods and rest breaks.  *See Brinker Rest. Corp. v. Superior Ct.*, 53 Cal. 4th 1004, 1022 (2012) (stating that employees seeking meal period and rest break premiums must "individually prove their damages"); *In re AutoZone, Inc., Wage & Hour Emp. Pracs. Litig.*, 289 F.R.D. 526, 535 (N.D. Cal. 2012) (same).  Ortiz has the burden of establishing "how many unpaid [meal and] rest breaks [he] took," or, "how many [meal and] rest breaks [he] worked through." *Gomez v. J. Jacobo Farm Lab. Contractor, Inc.*, 334 F.R.D. 234, 260 (E.D. Cal. 2019); *see also Dang v. Sutter's Place, Inc.*, 2013 WL 5955561, at *2 (N.D. Cal. Oct. 28, 2013) (calculating meal period and rest break damages based on the specific number of days breaks were not provided).

Ortiz has not attempted to identify *any* specific day he was not provided meal or rest breaks, claiming that he "never really had an opportunity to be fully on break because [he] was always responsible for the facility."  Tr. 186:17–25 (Ortiz).  While that confirms that Ortiz was properly classified as exempt, it does not show that he never was provided with the opportunity to take meal periods and rest breaks.  The evidence demonstrated that Ortiz was encouraged to take meal periods and rest breaks in his discretion as a manager, and that he sometimes did so.  *See* Tr. 328:11–13 (Lopez) (explaining that Shift Managers had discretion to take breaks when they wanted to); Tr. 518:1–7 (Martin) (same); Tr. 587:7–12 (Bania) (same).

In fact, Ortiz's supervisor, Lopez, once found that Ortiz was sleeping in a delivery van during his shift, and encouraged him to use the break room (as opposed to delivery vans) to take breaks as he needed and wanted to.  Tr. 328:17–22 (Lopez).  Ortiz also admitted that he did sometimes leave the facility to get food at local restaurants.  Tr. 145:25–146:3 (Ortiz).  Moreover, Ortiz had the opportunity, had he wished to use it, to take a meal period or rest break while the associates under his supervision took their breaks—something Ortiz was responsible for ensuring happened consistent with Amazon's policies and California law each and every time he worked.  Tr. 170:24–171:20, 261:19–23 (Ortiz); Tr.

457:2–14 (Kaczor).  Plainly, Ortiz's blanket statement that he *never* took a break is not credible.  And without making any effort to provide the specific instances when he was not provided meal or rest breaks, Ortiz has failed to prove that he is owed anything for meal periods and rest breaks that were allegedly not provided.

### 2. Ortiz Also Failed To Prove His Derivative Claims

Because Ortiz has not proven his overtime, meal period, or rest break claims, he is not entitled to any relief whatsoever, as his remaining claims are entirely derivative of those theories.  Ortiz has also failed to establish that he could pursue those claims in any event, because of Amazon's significant defenses.

*Wage Statements*.  Ortiz has made no effort to prove that there was anything deficient about the wage statements he received from Amazon, except that they would have looked differently had he been classified as non-exempt.  *See* Ex. 136 (wage statements); Pl. Br. at 13 (not identifying any supposed deficiencies with the wage statements issued).  Under California law, however, a derivative claim for inaccurate wage statements is not viable unless the plaintiff can show that his "wage statements *inaccurately* reflected the wages he was paid at the time" because the statute's purpose is to "document the paid wages to ensure that the employee is fully informed regarding the calculation of those wages." *Ramirez v. C. & J. Well Serv., Inc.*, 2020 WL 5846464, at *6–7 (C.D. Cal. Mar. 27, 2020) (emphasis added); *see also Maldonado v. Epsilon Plastics, Inc.*, 22 Cal. App. 5th 1308, 1335–37 (2018) (same); *Pyara v. Sysco Corp.*, 2016 WL 3916339, at *7 (E.D. Cal. July 20, 2016) ("permitting a plaintiff to use violations of meal and rest period regulations to form the basis of a Section 226 claim . . . would be directly contrary to the purpose of Section 226").

Even if that were not so, Ortiz has made no effort to show that any purported violations stemming from Ortiz's classification as exempt were "knowing and intentional" and therefore give rise to penalties under Labor Code section 226.  Cal. Lab. Code § 226(e) (requiring that violation be "knowing and intentional" to recover statutory penalties).  To the contrary, Amazon plainly had a good faith belief that Ortiz was properly classified, as demonstrated by the substantial evidence of his managerial functions.  *See Woods v. Vector Mktg. Corp.*, 2015 WL 2453202, at *3 (N.D. Cal. May 22, 2015) ("The 'good faith dispute' rule has been extended by courts to apply to California Labor Code

Section 226 wage statement penalties, even though Section 226 contains a 'knowing and intentional' standard[.]"); *Ornelas v. Tapestry, Inc.*, 2021 WL 2778538, at *7 (N.D. Cal. July 2, 2021) ("A majority of courts find that an employer's good faith belief that it is not violating Section 226 precludes a finding of a knowing and intentional violation.").

*Waiting Time Penalties*.  Without proving his overtime or break-related claims, Ortiz has no basis to receive waiting time penalties under Labor Code section 203.  There are several additional problems as well.  To start, Ortiz cannot even seek waiting time penalties for any alleged failure to pay him meal period or rest break premiums, as the California Court of Appeal has held that such unpaid premiums do not trigger penalties under section 203.  *Naranjo v. Spectrum Sec. Servs., Inc.*, 40 Cal. App. 5th 444, 473–74 (2019), *review granted* 455 P.3d 704 (Cal. 2020); *see also Jones v. Spherion Staffing, Inc.*, 2012 WL 3264081, at *7–9 (C.D. Cal. Aug. 7, 2012) (holding that § 226 cannot be used to penalize an employer who failed to include disputed meal period premiums on a wage statement).

Even if that theory were viable (it is not), it is beyond dispute that Amazon had a good faith belief that Ortiz was properly classified and therefore cannot be subject to waiting time penalties for any damages this Court determines are owed.  Cal. Lab. Code § 203.  "[A]n employer's reasonable, good faith belief that wages are not owed may negate a finding of willfulness" that is required to impose these penalties, *Choate v. Celite Corp.*, 215 Cal. App. 4th 1460, 1468 (2013), even if the defense is "ultimately unsuccessful" so long as it was not "unreasonable" or "unsupported by any evidence," *Pedroza v. PetSmart, Inc.*, 2012 WL 9506073, at *5 (C.D. Cal. June 14. 2012).  Because significant evidence supports Amazon's classification of Ortiz as exempt, waiting time penalties are improper. *Bargas v. Rite Aid Corp.*, 245 F. Supp. 3d 1191, 1215 (C.D. Cal. 2017) (waiting time penalties precluded where employer disputed in good faith whether plaintiff was properly classified as exempt and was partially successful).

*PAGA and UCL*.  Without proving that he suffered a meal period or rest period violation, Ortiz also cannot show that he is an "aggrieved employee" with standing to pursue a claim under PAGA. Cal. Lab. Code § 2699(a), (c) ("'[A]ggrieved employee' means any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed.").  As the Court previously determined, Ortiz's PAGA notice does not allow him to pursue penalties for unpaid

1  "overtime separate and apart from the[] alleged failure to provide rest and meal breaks." Dkt. 29 at 13. Without a proven claim for meal period or rest break violations, Ortiz cannot pursue PAGA penalties under any of his derivative theories.

Likewise, without a claim for relief, Ortiz cannot pursue equitable remedies under California's Unfair Competition Law. His UCL claim independently fails because he has made no effort to show that he "lacks an adequate remedy at law" to address his alleged harms. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). As his various claims plainly provide him legal remedies for the harms he contends he has suffered, he has no standing to pursue additional recovery under the UCL. *See Heredia v. Sunrise Senior Living LLC*, 2021 WL 819159, at *4 (C.D. Cal. Feb. 10, 2021) (*Sonner* "made clear that a plaintiff's failure to plead inadequate remedies at law dooms the claim for equitable relief at any stage"); *Gibson v. Jaguar Land Rover N. Am., LLC*, 2020 WL 5492990, at *3 (C.D. Cal. Sept. 9, 2020) ("The Ninth Circuit has very recently made clear" that "[a] plaintiff seeking equitable relief in California [under the UCL] must establish that there is no adequate remedy at law available[.]").

### III.   CONCLUSION

The Court should reject Plaintiff's conclusory Proposed Findings of Fact and Conclusions of Law and enter judgment for Amazon on each and every one of Plaintiff's claims.

Dated: August 27, 2021

                JASON C. SCHWARTZ
                MICHELE L. MARYOTT
                BRADLEY J. HAMBURGER
                JOSEPH R. ROSE
                MEGAN COONEY
                GIBSON, DUNN & CRUTCHER LLP

By:   */s/ Jason C. Schwartz*
                Jason C. Schwartz

Attorneys for Defendants AMAZON.COM LLC and GOLDEN STATE FC LLC (now known as Amazon.com Services LLC)

104722610.13