UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ORTIZ,

        Plaintiff,

    v.

AMAZON.COM LLC, et al.,

        Defendants.

Case No.  17-cv-03820-JSW

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter came before the Court on June 21, 2021, and June 23, 2021 through June 25, 2021 for the first phase of a bifurcated trial.[1]  (*See* Dkt. No. 205.)  In this phase, the Court considered Plaintiff Michael Ortiz's ("Mr. Ortiz") individual claims against Defendants Amazon.com LLC ("Amazon") and Golden State FC, LLC ("Golden State") (collectively "Amazon").[2]

Mr. Ortiz alleges that Amazon failed to pay him overtime and failed to provide rest and meal breaks in violation of California's Labor Code and of Wage Order 7-2001, 8 California Code of Regulations section 10070 ("Wage Order 7-2001" or "Section 10070").  Mr. Ortiz also asserts a claim pursuant to the Labor Code's Private Attorneys General Act (the "PAGA Claim").  Cal. Lab. Code §§ 2698, *et seq.*

---

[1]    The trial transcripts for each day of trial are located at docket numbers 250 (June 21, 2021, ("Tr. I"), 258 (June 23, 2021, ("Tr. II"), 259 (June 24, 2021, ("Tr. III"), and 260 (June 25, 2021, ("Tr. IV").)

[2]    Effective January 1, 2018, Amazon.com LLC merged with Amazon Fulfillment Services, Inc., and changed its name to Amazon.com Services, Inc.  Effective January 1, 2019, Golden State merged with Amazon.com Services, Inc, and effective December 30, 2019, Amazon.com Services, Inc. changed its name to Amazon.com Services LLC.  (*See* Dkt. No. 179.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Amazon asserts that Mr. Ortiz cannot prevail on his individual claims because he is subject

2    to the executive exemption set forth in Labor Code section 515(a) and Wage Order 7-2001.  A

3    finding in Amazon's favor on that issue would preclude a finding that Mr. Ortiz is an aggrieved

4    employee for purposes of his PAGA claim.

5        On May 24, 2019, the Court granted, in part, and denied, in part Amazon's motion for

6    summary judgment, which addressed the issue of whether Mr. Ortiz was an exempt employee.

7    (Dkt. No. 133 ("Order on MSJ").)  The Court concluded there were no material disputes of fact on

8    five of the six elements of that exemption.  However, it concluded that there were disputed issues

9    of fact about whether Ortiz was "primarily engaged in duties which meet the test of the

10   exemption." (Order on MSJ at 13:28-17:20.)  On March 24, 2021, the Court issued an Order

11   advising the parties that it would treat its findings on summary judgment as binding for purposes

12   of trial.  (Dkt. No. 232.)

13       Ortiz and Amazon each moved for judgment on partial findings, at the conclusion of the

14   opposing party's presentation of evidence, pursuant to Federal Rule of Civil Procedure 52(c).[3]

15   The Court reserved ruling on those motions.  (Tr. IV at 638:14-23, 639:19-640:1.)

16   Fed. R. Civ. P. 52(c).  On a motion for partial judgment, the Court "is not required to draw any

17   inferences in favor of the non-moving party; rather the [Court] may make findings in accordance

18   with its own view of the evidence." *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006).

19   That does not preclude the Court from drawing inferences in a party's favor where the evidence

20   warrants; it simply is not required to do so.  *See Mother v. Hawaii*, 283 Fed. Appx. 514, 515 (9th

21   Cir. 2008).

22       Although Mr. Ortiz did not calculate the amount of damages he seeks, he did submit an

23   exhibit that purports to show the total number of overtime hours he worked.  The Court concludes

24   _____

25   [3]    "If a party has been fully heard on an issue during a nonjury trial and the court finds
     against the party on that issue, the court may enter judgment against the party on a claim or
26   defense that, under the controlling law, can be maintained or defeated only with a favorable
     finding on that issue.  The court may, however, decline to render any judgment until the close of
27   the evidence.  A judgment on partial findings must be supported by findings of fact and
     conclusions of law as required by Rule 52(a)."

28                                                    2

that, at the conclusion of his case in chief, there was sufficient evidence to preclude a finding in Amazon's favor.  For the reasons articulated in this Order, the Court concludes that Amazon subsequently met its burden to prove its affirmative defense.  Accordingly, the Court DENIES both parties' motions for judgment on partial findings.

The Court begins with a summary of each party's witnesses' testimony, the Court's view of their credibility, and the weight it gives that testimony.

**MR. ORTIZ'S WITNESSES**

Mr. Ortiz testified and called Michael Martin and Senai Merid as witnesses on his behalf. He also presented testimony from William Hedin, via deposition designations (Trial Exhibit ("TX") 176 ("Hedin Depo.").)

**Michael Ortiz:**  Mr. Ortiz testified about his background, his training with Amazon, and the nature of the tasks he performed while at Amazon.  Mr. Ortiz did not appear evasive or defensive while testifying.  However, the Court finds Mr. Ortiz less credible than other witnesses on key aspects of his testimony, discussed in more detail below.

**Michael Martin:**  Mr. Martin was a Level 4 Shift Manager at Amazon facilities in Southern California and Nevada and testified about his experiences at those facilities.  The Court finds that Mr. Martin was credible but found his testimony less probative than witnesses who worked with Mr. Ortiz.

**Senai Merid**:  Mr. Merid also was a Level 4 Shift Manager at delivery stations in Southern California.  Mr. Merid testified about his experience as a Level 4 Shift Manager at those facilities. The Court found Mr. Martin was a credible witness but found his testimony less probative than witnesses who worked with Mr. Ortiz.

**William Hedin**:  Mr. Hedin worked as a Level 4 Shift Manager at one of Amazon's first delivery stations in San Francisco.  The Court has not given significant weight to his testimony because the Court concludes his circumstances were markedly different from Mr. Ortiz's circumstances.

//

//

3

United States District Court
Northern District of California

**AMAZON'S WITNESSES**

Amazon called Marc Lopez, Edward Kazcor, Mahmoud Abdelaziz, Amanda Bania, and Diego Nevado as witnesses on its behalf and presented testimony from Nityanath Vaidya via deposition designations (TX 177 ("Vaidya Depo.")).[4]

**Marc Lopez**: Mr. Lopez began working for Amazon in June 2016. Mr. Lopez testified about his observations of the work Mr. Ortiz performed and Amazon's general expectations for Level 4 Shift Managers. Mr. Lopez also testified that Mr. Ortiz asked him to lie about the incident that resulted in Amazon terminating Mr. Ortiz's employment.[5] The Court finds that Mr. Lopez provided probative and credible testimony about his own experiences and about the type of work Mr. Ortiz actually performed.

**Edward Kazcor**: Mr. Kazcor worked at Amazon from March 2015 through November 2020. Mr. Kazcor testified, based on his experience as a Level 4 Shift Manager, about Amazon's expectations for that position and his own experiences. The Court finds that Mr. Kazcor was a credible witness and that his testimony was probative on Amazon's realistic expectations for Level 4 Shift Managers.

**Mahmoud Abdelaziz**: Mr. Abdelaziz was Mr. Ortiz's shift assistant. He testified about the tasks he observed Mr. Ortiz perform. The Court finds Mr. Abdelaziz was a credible witness and that he provided probative testimony.

**Amanda Bania**: Ms. Bania was a senior member of Amazon's Human Resources department and provided testimony relevant to Amazon's general expectations of Level 4 Shift Managers. She did not recall meeting Mr. Ortiz and did not recall observing him during her visits to the delivery stations where Mr. Ortiz worked. The Court finds Ms. Bania's testimony was credible. It also finds her testimony was generally probative on Amazon's realistic expectations for the Level 4 Shift Manager position but marginally probative as to whether Mr. Ortiz met those

---

[4]     Amazon called Mr. Lopez and Mr. Kazcor out of order to account for the hybrid procedure the Court used with live witnesses and witnesses who testified via Zoom webinar. The Court advised the parties that it would not consider them to have waived any arguments on the opposing party's burden of proof by making this accommodation. (See Tr. II at 290:14-291:8.)

[5]     Mr. Lopez also testified that, in his view, Mr. Ortiz was not a truthful person.

United States District Court
Northern District of California

1   expectations.

2       **Diego Nevado:**  Mr. Nevado joined Amazon in 2013 as a Shift Manager and in 2016 was a

3   Level 7 Senior Regional Leader, whose territory included at least one delivery station where Mr.

4   Ortiz worked.  Mr. Nevado testified that he did not directly supervise Mr. Ortiz but was familiar

5   with Mr. Ortiz's overall performance.  Mr. Nevado also testified about Amazon's general

6   expectations for the Level 4 Shift Manager position.  The Court finds Mr. Nevado was a credible

7   witness and more probative than Ms. Bania on whether Mr. Ortiz's performance met Amazon's

8   realistic expectations for Level 4 Shift Managers.

9       **Nityanath Vaidya:**  Mr. Vaidya was a senior regional manager for Amazon and his

10  territory included the delivery stations where Mr. Ortiz worked.  Mr. Vaidya testified about the

11  general duties of a shift manager, including duties listed on the job description, but did not clearly

12  speak to the duties Mr. Ortiz performed.  His testimony about Amazon's general expectations for

13  the Level 4 Shift Manager position was cumulative of the testimony presented by Amazon's live

14  witnesses.  The Court places little weight on his testimony.

15                          **FINDINGS OF FACT[6]**

16      1.      Mr. Ortiz is a graduate of the University of California Berkeley and has degrees in

17  Business Administration and Ethnic Studies.  (Tr. I at 28:24-29:4.)  Amazon hired Mr. Ortiz as a

18  Level 4 Shift Manager, Logistics for the night shift, also known as the "Night Sort."  (*Id.* at 30:2-

19  31:23, 32:25-33:5, 38:19-39:3; TX 102, 104.)  During his interviews, Amazon representatives

20  asked Mr. Ortiz "managerial-type questions," such as how he would manage conflicts or deal with

21  associates in a given situation.  (*Id.* at 35:13-19, 36:1-9.)

22      2.      At the time Amazon hired Mr. Ortiz, it was developing the process for the delivery

23  centers.  In Mr. Ortiz's words "[i]t was fairly new.  There wasn't a set process for everything set

24  out."  (*Id.* at 35:11-12.)

25

26  ---

    [6]     To the extent that any of the Court's findings of fact are included in the Court's
27  conclusions of law, they shall be deemed findings of fact.  Similarly, to the extent that any of the
    Court's conclusions of law are included in the findings of fact, they shall be deemed conclusions
28  of law.

United States District Court
Northern District of California

3.      As part of Amazon's training, all managers participate in an "Associate Experience Week," which is designed to give managers the "opportunity to step into the shoes of the associates[.]" (Tr. III at 572:12-573:15, 575:21-576:3, TX 142.)  That aspect of Amazon's training involves moving boxes, scanning, sorting, and staging boxes for delivery.  Mr. Ortiz described that portion of his training as working in "the path", *i.e.*, in "the life cycle of a package." (Tr. I at 41:16-43:20 (describing the cycle), 44:12-22; *see also* TX 142, Tr. III at 492:3-19 (hands on training designed to give managers an idea of what Tier 1 Associates dealt with and the barriers they faced).)

4.      Mr. Ortiz's training also included role playing "between the different managers in terms of how you would deal with different solutions to potential problems that you would see as a manager." (Tr. I at 51:4-7.)

5.      At the end of his training, Mr. Ortiz understood he "would oversee a team of associates and have a shift assistant to help [him] liaison with [the associates] to make sure they did their job appropriately to the best of their ability and efficiently." (*Id.* at 62:21-63:1.)

6.      Mr. Ortiz worked for Amazon at three delivery stations, from February 1, 2016, until he was terminated on December 11, 2016: South San Francisco (DSF5, February 2016 to May 2016); San Leandro (DSF4, May 2016 to August 2016); and Richmond (DSF6, August 2016 to December 11, 2016).  (Dkt. No. 221, Joint Proposed Pretrial Order, Stipulated Facts ("SF") 1-5.)  Other than some differences in equipment, his work at all three stations was not significantly different.  (Tr. I at 64:2-5.)

7.      Each of these facilities are extremely large, *e.g.,* the length of one or two football fields and are filled with conveyor belts, storage bins, and "gaylords" (large cardboard boxes filled with packages).  (Tr. I at 102:17-104:20; TX 116; Tr. II at 299:1-7, 386:9-387:1; *see also* TX 10-12, 171-174.)

8.      There is a management hierarchy at these facilities.  In descending order, that hierarchy is as follows: a Level 8 General Manager or a Level 7 Senior Manager, a Level 6 Operations Manager, a Level 5 Area Manager, a Level 4 Shift Manager, a Level 3 Shift Assistant, a Level 2 Coach, and Level 1 Hourly Associates ("Tier 1 Associates").  (Vaidya Depo. at 49:12-

50:18).

9.      Mr. Lopez was a Level 5 Area Manager at DSF6, and Mr. Ortiz was one of his "direct reports" from July 2016 through December 2016.  During his training, Mr. Lopez shadowed Mr. Ortiz for two weeks at DSF4.  (Tr. II at 294:3-296:10.)  Mr. Kazcor, who was at Level 5 at the time, worked with Mr. Ortiz at DSF5 from approximately March 2016 to May 2016.  (*Id.* at 384:3-23, 385:9-23, 408:21-409:6.)

10.     Amazon classifies Level 4 Shift Managers as exempt employees.  (SF 8.)  As a Level 4 Shift Manager, Mr. Ortiz earned an annual salary of $68,500.  (SF 7.)  Mr. Ortiz also received a $13,500 signing bonus and 65 restricted stock units.  (TX 104.)  At DSF4, DSF5, and DSF6, a Tier 1 Associate earned $14.00 per hour and did not receive a signing bonus.  (Tr. III at 588:14-589:11.)

11.     Mr. Ortiz understood that he was accepting a salaried position, *i.e.* that he would be paid a set amount and that his position was exempt from overtime pay.  (Tr. I at 37:24-38:6; TX 104.)

12.     Because Amazon classified Mr. Ortiz as an exempt employee, it did not track his hours.  Amazon did not have a specific policy regarding rest and meal breaks for exempt employees.  (Tr. I at 70:18-71:3; Tr. III at 591:23-592:18.)

13.     Amazon's Job Description for a Level 4 Shift Manager outlines the "key job duties" for the position.  (TX 14.)  Amazon uses the "key job duties" section of a job description to list what it "consider[s] to be the core competencies for that particular job" and the tasks an employee would spend most of their time doing.  (Tr. III at 584:12-19.)  Mr. Ortiz testified the "key duties" section of the job description did accurately describe the position.  (Tr. I at 47:10-25, 49:14-25, 150:14-151:22.)

14.     The "key duties" for a Level 4 Shift Manager include: overseeing the delivery of Amazon orders to customers; building, optimizing, and assigning delivery routes; communicating with and responding to Amazon Customer Service associates on delivery exceptions and requests; supporting Amazon operations leadership team in daily operations management of the delivery station, including route assignment, leading meetings, and communicating with internal and

7

United States District Court
Northern District of California

1   external suppliers; troubleshooting problems through to resolution, escalating as necessary;

2   reviewing and updating standard operating procedures; and ensuring compliance throughout the

3   site to global process standards and working on continuous improvement initiatives." (TX 14.)

4       15.    In general, a Level 4 Shift Manager's role "is to track and monitor the incoming

5   volume, build a plan for the shift, allocate staffing to positions that are built into that shift plan,

6   monitor the shift, the flow per hour, engage with associates, and then wrap up the shift at the end

7   of the day." (Tr. II at 297:3-10.)

8       16.    Mr. Nevado, who was a Level 5 Area Manager, testified that if a Level 4 Shift

9   Manager was performing Tier 1 Associate tasks, that work would be for "power hours", to support

10   the team, or to show Tier 1 Associates how to do their role: "essentially it was more of an

11   engagement like motivational tool[.]" (Tr. III at 605:8-21; *see also* Tr. IV at 622:3-11 (describing

12   a power hour).)  The Court credits this testimony as probative of Amazon's realistic expectations

13   for the position.

14       17.    Mr. Ortiz understood that the key duties, as well as additional job elements

15   discussed below, were what Amazon expected of him. (Tr. I at 151:19-22; *see also id.* at 171:9-

16   20, 172:2-9, 188:10-189:7 (describing as example that he was responsible for ensuring Tier 1

17   Associates got rest and meal breaks required under the Labor Code and that he decided when to

18   provide those breaks).)

19       18.    Mr. Ortiz performed managerial duties during his tenure at Amazon.  For example,

20   he led "stand-up" meetings at the beginning of each shift and after the lunch break.  When he

21   conducted those meetings, he would discuss what was going on that day, special initiatives, and

22   any feedback received from the previous night's shift. (Tr. I at 62:5-10, 81:17-82:21.)  Those

23   meetings lasted approximately five minutes. (*Id.* at 83:4-6.)

24       19.    Mr. Ortiz admitted he "managed a team of between 80 to 100 employees." (TX

25   170 at 2; *see also* Tr. I at 164:25-165:2.)

26       20.    Mr. Ortiz would coach Tier 1 Associates during his shifts three to four times per

27   shift and claimed that generally took about a minute. (Tr. I at 133:9-12.)

28       21.    Mr. Ortiz acknowledged that he was accountable for the safety of the operation and

so would be required to step in if he saw someone committing an unsafe act.  (*Id.* at 152:18-153:10.)

22.     Mr. Ortiz monitored information contained in what was identified as the "comp" system and would enter those statistics onto a "Gemba board."  According to Mr. Ortiz, although he had to pull the data from the system every 30 minutes over the course of six hours of his shifts, it took him less than a minute to do so.  (Tr. I at 70:6-11, 129:12-130:8)  Those metrics generally related to how many packages had been received and scanned.  (*Id.* at 112:3-10.)  The information he gathered could be used, for example, to reallocate labor in particular area if that was necessary. (*Id.* at 154:8-155:9; *see also* Tr. II at 391:1-392:4 (describing set up of labor board); *see also* Tr. II at 357:9-358:6 (Level 4 Shift Managers can make adjustments, with approval, to the set schedule as necessary to accommodate the individual needs of a Tier 1 Associate).)

23.     Mr. Ortiz also did "Gemba walks," where he would go over the board with other managers to point out areas where there were challenges and where the team did well.  (Tr. I at 67:25-70:16, 80:3-11, 153:12-154:4; TX 13.)

24.     There was a desk on the floor of each delivery station (the "leadership desk") that Mr. Ortiz could use.  He testified that "most of the time" he kept "his computer on a rolling cart going from section to section" because he needed to check metrics every 30 minutes and did not want to walk back to the desk.  (Tr. I at 92:17-24; *see also* TX 12 (showing general location of desk).)  Mr. Ortiz also was able to monitor other areas of the delivery stations by using walkie-talkies and would use them to address problems raised during his shifts.  (Tr. at 104:21-105:2, 165:14-166:9.)

25.     It would not have been possible for Mr. Ortiz to monitor all of the operations from the leadership desk, given the size of the delivery stations.  (Tr. II at 304:3-25.)  The Court credits Mr. Lopez's testimony that to do a "proper walk to see everything in the operations" at DSF6 would take at least 30 minutes and that at DSF4, a proper walk would take at least fifteen minutes.

26.     Mr. Lopez expected that Level 4 Shift Manager would be on the floor as much as possible to walk the operation, to observe "what's going on", and to engage with associates to assist with any issues they might have.  (*Id.* at 305:1-18, 352:8-16.)  Mr. Kazcor also testified that

United States District Court
Northern District of California

while Tier 1 Associates are receiving and stowing packages, which at DSF5 could take 3.5 to 4 hours, he expected a shift manager to "oversee the different processes, the different functions, as well as monitor volume." (*Id.* at 393:1-4; *see also id.* at 393:1-395:4.)

27.     As part of his duties as shift manager, Mr. Ortiz also prepared a "Handoff Form," which was used to provide the next shift with information about the challenges encountered during the shift and about things that went well. (Tr. I at 119:8-16; TX 4.) Mr. Lopez testified it should take about 30 minutes to complete. According to Mr. Ortiz, it regularly took him less than thirty minutes to prepare the form. (Tr. I at 123:11-18; Tr. II 364:21-365:10.)

28.     During his tenure at Amazon, Mr. Ortiz developed process improvements for the delivery stations and achieved superior results. For example, Mr. Ortiz testified about the "small sort." That process came about because a Tier 1 Associate told Mr. Ortiz that packages in envelopes would sometimes get stuck in the conveyor belts and asked if they could put the envelopes in bins instead. Mr. Ortiz recommended that suggestion be adopted and testified that he did not need to obtain approval to implement that process. (Tr. I at 84:16-86:7; *see also id.* at 120:17-121:10 (describing "5S" process to improve errors in scanning).)

29.     Mr. Ortiz also "increased induction rates from 60 to 150 percent while driving down quality errors," which was in part because of efficiencies gained through the "small sort." He also created a new process for pre-loading delivery vans, as well as the training materials for that process. (Tr. I at 195:16-197:11, 198:7-21, 207:6-12, 207:21, 208:1-2; *see also* TXs 105-107, 119, 170 at 3-4.)

30.     Amazon asked Mr. Ortiz to help at DSF4, which was struggling, and while he was the Level 4 Shift Manager at that station, it "became the top performer in the DSF node for Prime Day 2016." (Tr. I at 198:25-199:5, 200:3-5; TX 170 at 5.)

31.     Mr. Ortiz highlighted those accomplishments and his managerial duties at Amazon on resumes he submitted to subsequent employers. (Tr. I at 202:2-3, 205:1-16.) For example, he described his duties as "[f]ostering employee growth and managing a sortation team of 80-100 from unload to receive to stow to route planning and assignments." (TX 106.) He testified that he thought potential employers would want to see that information more than seeing he moved boxes

75% of the time.  (Tr. 204:1-8.)

32.     After Mr. Ortiz was terminated and he attempted to get reinstated, he touted his managerial accomplishments to senior Amazon personnel.  (Tr. II at 227:7-228:11, 234:18, TX 128.)[7]

33.     Mr. Ortiz also highlighted his managerial accomplishments on social media accounts.  For example, when one of the delivery stations' quality score was number 2 in the entire Amazon network, Mr. Ortiz stated that "hours and hours of hard work, experimentation, and process improvements [that he created and implemented] finally materialize into success and recognition."  (TX 108 at PLTF001703; *see also* TX 120; Tr. II at 232:5-25.)

34.     Mr. Ortiz completed leadership workshops during his tenure at Amazon, which included topics such as delegation and time management.  Those workshops were not available to Tier 1 Associates.  (Tr. III at 576:18-577:23, 578:3-582:13; TX 111, 149, 158.)

35.     Amazon included "additional job elements" in the job description for Level 4 Shift Managers.  Those elements include, but are not limited to, the ability to lift up to 49 pounds without reasonable accommodation, the willingness and ability to "frequently push, pull, squat, bend, and reach," and the ability to "stand/walk for up to 10-12 hours."  (TX 14.)

36.     Amazon has included those requirements on job descriptions for Level 7 managers. The Court credits Ms. Bania's testimony that Amazon includes these requirements for safety purposes, *i.e.* to "make sure everybody in the building" can safely lift, push, and pull if needed. (Tr. III at 585:2-586:23.)

37.     The Court credits Mr. Ortiz's testimony that he did some physical tasks during his shifts, but as will be discussed below, it does not credit his testimony about the amount of time spent on those tasks.

38.     According to Mr. Ortiz, he spent two to three hours in the path "[t]o help clear the workload and be able to achieve the numbers that we needed to achieve."  (Tr. I at 105:24-106:5,

---

[7]     In the letter admitted as TX 128, Mr. Ortiz also complained of other alleged safety violations but has not relied on those allegations as a basis to show why he purportedly engaged in nonexempt tasks.

United States District Court
Northern District of California

133:13-134:1.)  Mr. Ortiz acknowledged that one of the reasons he was in the path was to look for obstacles, to see if there were ways to fix those obstacles, and to improve efficiency, which Amazon expected him to do as a member of the management team.  (*Id.* at 168:21-169:17.)

39.     Mr. Ortiz testified that he would arrive at 10:00 p.m. and would spend approximately two to three hours doing "prep work," which he testified included unloading trucks, setting up conveyor belts, getting scanners ready, and staging to get ready for the shift.  According to Mr. Ortiz he did this to save time and build efficiency.  (*Id.* at 107:6-108:10, 131:11-132:19.)  Mr. Ortiz also testified that he would repair packages that had fallen apart, rather than pulling an associate out of the path to do that work, because the latter would have negatively impacted the efficiency of the shift.  (*Id.* at 135:2-136:2.)

40.     Mr. Ortiz testified that he saw other Level 4 Managers performing these tasks and had no reason to believe they were not spending the same amount of time that he was on those tasks.  (*Id.* at 138:17-139:17.)

41.     By his own testimony, Mr. Ortiz worked in the path to motivate the Tier 1 Associates.  (Tr. I at 109:21-110:1, 111:1-2.)  For example, he testified about he conducted power hours when he would go into the path and compete with individuals or groups to see who could, for example, "scan the most packages."  (*Id.* at 71:15-25, 155:15-156:2.)

42.     Mr. Martin, who worked as a Level 4 Shift Manager at delivery stations in Southern California and Nevada, testified that Amazon told him the position mainly involved labor management, *e.g.,* "shifting how many individuals you would use for what task and a lot of deciding how much labor" was needed.  (*Id.* at 488:16-489:6, 490:12-21.)

43.     Mr. Martin also testified that he unloaded trucks on almost every shift.  He also testified that before Tier 1 Associates arrived, he spent 45 minutes to an hour setting up, which included moving conveyor belts.  According to Mr. Martin, he could have used Tier 1 Associates to unload the trucks; he chose to do it himself because could do it quickly and could easily leave it to address other issues that might arise during the shift.  (*Id.* at 500:11-503:17.)  In his words, "[t]here was always a manual element to the job," but that manual element could not encompass the entire shift because "you'd lose track of your operation."  (*Id.* at 498:2-6; *see also id.* at

12

United States District Court
Northern District of California

514:20-24 (two hours spent on manual labor).)  The Court credits this testimony.

44.    Like Mr. Ortiz and Mr. Martin, Mr. Merid testified that he helped set up his facility prior to the sort and would spend some time sorting packages.  Mr. Merid also testified that his facility was a "lean operation" and "essentially had just enough people to run the operation."  (*Id.* at 528:17-530:17, 533:1-535:9, 537:24-539:9.)  Mr. Merid estimated that 25 to 30 percent of his shift consisted of manual labor.  (*Id.* at 545:21-546:2.)

45.    Mr. Hedin also testified that he performed manual labor while he was a Level 4 Shift Manager.  However, when Mr. Hedin worked for Amazon, his delivery station was located in a parking lot, and he testified there were far fewer associates assigned to assist.  (Hedin Depo. at 56:19-57:12, 58:5-9.)

46.    Mr. Kazcor testified that, based on his own experience as a Shift Manager, the physical set up for the Night Sort should take between 30 minutes to one hour, and he did not expect his shift managers to handle the physical tasks.  (Tr. II at 388:5-389:19; Tr. III 458:2-14.)  Mr. Kazcor acknowledged that he did see Level 4 Shift Managers perform manual labor on occasion but testified that it would have been done for training or motivational purposes.  (Tr. III at 458:15-459:3.)  Mr. Kazcor spent some time in the path, about 5 percent of a 10 hour shift, for training purposes.  (Tr. II at 396:9-18.)

47.    Although Mr. Ortiz testified there were no Tier 1 Associates to assist him during set-up, Mr. Lopez testified that Mr. Ortiz would schedule two to three associates to come in early and assist with the unload.  (Tr. II at 306:9-307:19.)  Similarly, Mr. Kazcor recalled that five to seven Tier 1 Associates would arrive between 10:00 p.m. and 10:30 p.m. to help with set up.  Mr. Abdelaziz corroborated that testimony.  (Tr. III at 465:15-466:7.)

48.    Mr. Ortiz claimed that some of the reasons he felt unable to use his managerial skills because "we were constantly being overloaded with packages."  (Tr. I at 106:6-14.)

49.    Tier 1 Associates routinely failed to show up for shifts, but Amazon accounted for that possibility by overstaffing.  (Tr. II at 344:18-345:7.)  Although Mr. Ortiz did not have the authority to call extra workers into a delivery station, he had tools at his disposal to manage that workload, such as a set amount of overtime.  (Tr. I at 106:6-23, 113:13-18; Tr. II at 343:4-25.)

50.     Mr. Kazcor testified that, on the rare occasion there was shortage of Tier I Associates to cover a shift, he would expect the Level 4 Shift Manager to reallocate labor.  He would not expect a Level 4 Shift Manager to work in the path for long periods of time because there were too many other issues that needed to be addressed.  (Tr. II at 404:3-405:7.)

51.     Mr. Lopez testified that while he was shadowing Mr. Ortiz, he observed Mr. Ortiz walking the floor four to five times during the shift but only "occasionally" working in the path. (Tr. II at 309:17-25, 313:23-314:19; *see also id.* at 318:3-7 (based on observations of Mr. Ortiz at DSF6, no reason to believe Mr. Ortiz was spending his time differently than he had at DSF4).) Mr. Lopez also testified that Mr. Ortiz would monitor data and workflow at the leadership desk. (Tr. II at 310:22-311:18.)  Mr. Lopez never observed Mr. Ortiz spending more than half of his time doing Tier 1 Associate work and believed Mr. Ortiz to be the last manager to jump in to do Tier 1 work.  (*Id.* at 321:17-20, 322:1-7, 322:14:19.)  Based on his conversations with Mr. Ortiz and based on Mr. Lopez's experience shadowing Mr. Ortiz, Mr. Lopez testified that when Mr. Ortiz went into the path it was for training or motivational purposes.  (*Id.* at 324:1-25.)

52.     Mr. Lopez's assessment of the tasks Mr. Ortiz performed were based on his observations while he was training with Mr. Ortiz and based on the times he worked with him following training.  (*Id.* at 305:19-309:16, 338:20-24, 348:6-22.)  Although Mr. Lopez admittedly was not present for the duration of each of Mr. Ortiz's shifts, the Court finds that Mr. Lopez was a more credible witness on this issue.  (*See id.* at 339:4-340:23.)

53.     Although Mr. Ortiz testified that he would play music during his shifts, he claimed the speakers he used were about the size of an apple and were too large to fit on the rolling cart he used when he walked around a delivery station.  He also denied spending significant time at the leadership desk acting as a DJ.  (Tr. I at 175:2-176:7, 178:11-17.)  Mr. Abdelaziz contradicted that testimony and stated Mr. Ortiz spent approximately 70-80% of his time at the leadership desk playing music because the speaker was too large to move around on the cart.  (Tr. III at 466:9-15, 468:2-469:20.)  Mr. Abdelaziz explained why he was able to recall Mr. Ortiz so well, and the Court finds his testimony more credible than Mr. Ortiz's testimony on how much time Mr. Ortiz spent on manual labor.

14

54.     Ms. Bania, who spent time observing managers at each of the three facilities at issue, saw shift managers performing physical labor in the path "on rare occasions" and emphasized it was not a Level 4 Shift Manager's core responsibility to do that work.  Ms. Bania did not, however, recall observing Mr. Ortiz during one of his shifts.  (*Id.* at 571:1-11, 590:7-20.)

55.     There is no evidence that while he worked for Amazon, Mr. Ortiz complained that he was not able to or not permitted to take a rest or meal break.  (Tr. III at 587:24-588:4.)

56.     Mr. Ortiz was scheduled to work four ten hour days per week, which was the typical work schedule for a Level 4 Shift Manager.  (Tr. I at 129:21-23; Tr. II 359:1-20.)  Mr. Ortiz testified that, on average, he worked between 44 and 48 hours per work week and would occasionally take lunch breaks but did not take rest breaks.  (Tr. I at 144:12-146:8, 148:24-149:10.)

57.     Mr. Lopez testified that Level 4 Shift Managers sometimes did work more than 40 hours per week but testified that if he saw a manager "working excessively", he would probably say something to them.  (Tr. II at 360:16-362:1.)

58.     There is nothing in the record to suggest Amazon disciplined Mr. Ortiz for spending too much time on manual labor.  Mr. Lopez and Mr. Nevado, who knew Mr. Ortiz, testified he met their expectations.  (Tr. I at 140:9-18; Tr. II at 351:6-352:4; Tr. IV at 622:12-623:4.)

59.     Mr. Ortiz attempted to create a calendar that reflected: (1) the dates on which he worked; and (2) the number of regular and overtime hours worked per day.  (TX 133.)  Mr. Ortiz testified that he "believed" he worked the days reflected on his calendar and relied on his belief to explain why he thought his calendar was more accurate than a schedule produced by Amazon.  (Tr. at 274:13-275:3, 276:24-277:19; TX 104.)

60.     Although the Court does not find all of Mr. Ortiz's testimony credible, it does credit his testimony that he regularly worked between 44 and 48 hours per work.  That testimony was consistent with Mr. Martin and Mr. Merid who also testified that they regularly worked more than 40 hours.  (Tr. III at 517:19-22, 548:1-5.)  However, the Court finds that TX 133 is not a reliable indicator of the total number of overtime hours Mr. Ortiz purportedly worked.  Mr. Ortiz's

United States District Court
Northern District of California

United States District Court
Northern District of California

calendar does not always coincide with a schedule created by Amazon, and the Court gives more weight to that schedule than it does to Mr. Ortiz's memory of the dates he worked. (*Compare* TX 104 *with* TX 133; *see, e.g.,* Tr. II at 270:1-15.)  In addition, Mr. Ortiz knew his work-week consisted of four ten-hour days, but TX 133 is based upon an eight-hour workday.

61.     Amazon terminated Mr. Ortiz on December 11, 2016 for a violation of its safety protocols: he stood on a conveyor belt, fell off, and was injured.  (Tr. II at 217:4-218:9.)  Mr. Ortiz admitted that "in a moment of panic," he asked Mr. Lopez to lie about the incident and report that he had fallen on stairs rather than on the conveyor belt.  (*Id.* at 221:19-25, 222:23-223:2.)

62.     The Court finds that Mr. Ortiz's credibility on the material issue of how much time he spent "in the path" is undermined by witnesses like Mr. Lopez and Mr. Abdelaziz who directly contradicted his testimony.  In addition, although both Mr. Martin and Mr. Merid testified that they did some physical labor, they each testified they spent less than 50% of their shifts on those tasks.  Finally, the Court finds Mr. Ortiz's credibility was undercut by some of the representations on his resumes, which did not accurately represent when or why he left Amazon.  (Tr. I at 202:10-203:15, 205:17-207:2, 219:4-22:117; TX 119, 167-168.)

### CONCLUSIONS OF LAW

1.     Mr. Ortiz has the initial "burden of proving [he was] not properly compensated for work performed."  *Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal. 4th 1, 40 (2014).

2.     Based on FOF 60, the Court concludes Mr. Ortiz worked over 40 hours per week on a regular basis during his tenure at Amazon.  Therefore, unless he is exempt, Mr. Ortiz would be entitled to overtime pay and scheduled rest and meal breaks.  *See, e.g., Heyen v. Safeway Inc.*, 216 Cal. App. 4th 795, 816 (2013); Cal. Lab. Code §§ 510(a)(1), 511, 515.

3.     "[U]nder California law, exemptions from statutory mandatory overtime provisions are narrowly construed."  *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 794 (1999), and Amazon bears the burden to show, by a preponderance of the evidence, that Mr. Ortiz was exempt. *Duran*, 59 Cal. 4th at 26; *see also Safeway Wage & Hour Cases,* 43 Cal. App. 5th 665, 673 (2019)

United States District Court
Northern District of California

("*Safeway Cases*").[8]

4.      Amazon contends Mr. Ortiz is subject to Wage Order 7-2001's executive exemption.  To meet its burden, Amazon must demonstrate that: Mr. Ortiz's "duties and responsibilities involve the management of the enterprise in which [he] is employed or of a customarily recognized department or subdivision thereof; Mr. Ortiz customarily and regularly directed the work of two or more other employees therein; Mr. Ortiz had the authority to hire or fire other employees or show that his suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees was given particular weight; Mr. Ortiz customarily and regularly exercised discretion and independent judgment; Mr. Ortiz was primarily engaged in duties which meet the test of the exemption…; and Mr. Ortiz earned a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment."[9]  8 Cal. Code Regs. § 10070(1)(A)(1)(a)-(f).

5.      The Court previously determined that Amazon met its burden on five of those elements.  Mr. Ortiz worked the Night Sort, which is a customarily recognized department or subdivision" of Amazon.  (SF 4; *see also* Order on MSJ at 6:17-18.)  Mr. Ortiz conceded he customarily and regularly directed the work of two or more other employees in the Night Sort.  (Order on MSJ at 6:7-8:8; *see also* Tr. I at 164:25-165:5, 166:10-13; TX 170 at 2.)[10]  Amazon

---

[8]      Mr. Ortiz makes a number of assertions about Amazon's business model and the means by which it has achieved its success.  (Dkt. No. 264, Ortiz Post-Trial Brief at 1:7-2:9 & nn. 1-2.)  Mr. Ortiz relies on these assertions, in part, to argue he did not use discretion and judgment while at Amazon.  The documents on which Mr. Ortiz relies for these assertions are not part of the record.  (Dkt. No. 248, Stipulated Admitted Exhibit List.)  Mr. Ortiz also has not supported those assertions with specific citations to testimony presented at trial.  Moreover, as set forth in COL 5, below, the Court resolved that issue against Mr. Ortiz when it resolved Amazon's motion for summary judgment.

Even if the Court assumes that Amazon required Mr. Ortiz to follow standard practices, the record supports a conclusion that Amazon relied on Mr. Ortiz to "exercise the discretion needed to make [its facilities] operate according to [its] practices and procedures, schedules, and schematics."  *Batze v. Safeway, Inc.*, 10 Cal. App. 5th 440, 463 (2017).

[9]      Full-time employment is defined in Labor Code section 515(c) as 40 hours per week.

[10]      For the first two months Mr. Ortiz worked at Amazon, Tier 1 Associates were employed by a staffing agency.  Mr. Ortiz was told that he needed to provide feedback to associates – such as moving associates around or comments on performance - through a "coach" who also was employed by the staffing agency.  After that time, the Tier 1 Associates were hired by Amazon.

United States District Court
Northern District of California

gave particular weight to Mr. Ortiz's suggestions and recommendations about advancement, promotions, or changes in status for employees.  (Order on MSJ at 8:24-10:20.)  Mr. Ortiz also customarily and regularly exercised discretion and independent judgment.  (*Id.* at 10:21-13:12.)  Finally, Mr. Ortiz's annual salary of $68,500 was equivalent to no less than two times the state minimum wage for full-time employment.  (*Id.* at 5 n.6; FOF 10.)

6.     The only issue before the Court is whether Mr. Ortiz "primarily" engaged in duties that meet the test of the exemption.  "[P]rimarily" means "means more than one-half the employee's work time."  8 Cal. Code Regs. § 11070(2)(K); *see also Ramirez*, 20 Cal. 4th at 798 n.4.

7.     To meet its burden on this prong of the executive exemption, Amazon must show that Mr. Ortiz spent "more than 51% of [his] time on managerial tasks in any given workweek."  *Batze*, 10 Cal. App. 5th at 473 n.36.  The Court can make reasonable inferences about Mr. Ortiz's activities during the relevant period based on his "activities in earlier and later periods, particularly where there is nothing to suggest that [his] duties and responsibilities changed significantly."  *Id.* at 479.

8.     Mr. Ortiz's testimony did not suggest his duties and responsibilities varied throughout his tenure at Amazon.  Accordingly, the Court concludes a week-by-week analysis of his duties is not required.  *See Batze,* 10 Cal. App. 5th at 479 (concluding trial court did not err in failing to conduct a week-to-week analysis where employees did not testify their duties "varied markedly from store to store or week to week").

9.     "[E]xempt work" includes "all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions," as set forth in various provisions of Federal Regulations in force in 2001.  8 Cal. Code Regs. § 11070(1)(A)(1)(e) (citing 29 C.F.R. §§ 541.102, 541.104-541.111, 541.115-541.116.)

---

(Tr. I at 96:4-97:17, 100:13-17.)  Mr. Ortiz asked certain witnesses about their knowledge of "co-employment", but he does not explain the significance of that testimony in his post-trial briefs.  He also has not argued how these facts impact this element of the executive exemption or why that testimony could overcome his responses to Amazon's requests for admissions.

10.     Under California law, tasks cannot be categorized as "hybrid, … i.e., activities that have both exempt and nonexempt aspects. … [E]ach discrete task [must] be separately classified as *either* exempt or nonexempt." *Heyen*, 216 Cal. App. 4th at 822 (internal quotations omitted, emphasis in original). Yet, "identical tasks may be 'exempt' or 'nonexempt' based on the purpose they serve within the organization or department." *Id.* Looking to the purpose of a particular task "is intended to capture the narrow category of work that is not inherently managerial but is 'directly and closely related' to management and the supervision of employees." *Safeway Cases*, 43 Cal. App. 5th at 682.

11.     "Under the relevant federal regulations, managerial and supervisory tasks within the scope of the exemption are generally easily recognized[.]" *Wesson v. Staples the Office Superstore LLC,* 68 Cal. App. 5th 746, 761 (2021).

> For example, it is generally clear that work *such as* the following is exempt work when it is performed by an employee in the management of his department or the supervision of the employees under [them]: … training of employees; …; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; … [and] providing for the safety of the [employees] and the property." *Id.*

29 C.F.R. § 541.102(b) (2001) (emphasis added); *Safeway Cases*, 43 Cal. App. 5th at 676-77. Contrary to Mr. Ortiz's assertion, the text of the regulation does not support a conclusion that this list is exhaustive.

12.     Similarly, "[n]onexempt work is easily identifiable where, as in the usual case, it consists of the same nature as that performed by the nonexempt subordinates of the 'executive.'" *Safeway Cases*, 43 Cal. App. 5th at 678 (quoting 29 C.F.R. § 541.111(b) (2001)); *accord Wesson*, 68 Cal. App. 5th at 761. For example, in a retail setting such as a supermarket, "tasks such as restocking or making sales to customers are nonexempt *unless* done for training or demonstration purposes." *Safeway Cases*, 43 Cal. App. 5th at 679 (citing *Heyen*, 216 Cal. App. 4th at 821, 822-23) (emphasis added).

13.      In order for "work to be 'directly and closely related' to managerial work, it must be 'different from the work performed by subordinates.'" *Id.* at 683 (quoting 29 C.F.R. § 541.108(a) (2001)).  Thus, if a manager's work appears identical to tasks performed by their subordinates, that work "must serve a different function, directly and closely related to the management and supervision of the" facility to qualify as exempt.  *Id.*

14.      The Court considers "first and foremost" the work Ortiz "actually performed."  8 Cal. Code Regs. § 10070(1)(A)(1)(e).  The Court credits Mr. Ortiz's testimony that he engaged in tasks that also were performed by Tier 1 Associates, such as unloading trucks, moving pallets, and sorting packages.  Therefore, Mr. Ortiz spent some time doing nonexempt work.

15.      Mr. Hedin testified that he spent the bulk of his time on tasks that could be considered nonexempt, but the Court concludes his work experience was not similar to Mr. Ortiz's experience.  The Court places little weight on that testimony in assessing whether Mr. Ortiz spent more than 51% of his time on nonexempt tasks.  Mr. Martin and Mr. Merid, whose experiences at Amazon appear closer to Mr. Ortiz's experience, each testified to spending less than half their time on what could be considered nonexempt tasks.  The Court also finds Mr. Lopez and Mr. Abdelaziz more credible about the nature of the work Mr. Ortiz actually performed and the time he spent on what could be considered nonexempt work.  Mr. Ortiz's testimony about the amount of time he spent doing nonexempt tasks also is undermined by his resumes and social media posts. *See, e.g., Patel v. Nike Retail Servs.,* No. 14-cv-04781-RS, 2015 WL 3413429, at *6-8 (N.D. Cal. May 27, 2015) (noting plaintiff characterized her work as managerial on resume); *Wilbur v. Sligan Containers Corp.*, No. 06-cv-02181-MCE-EFB, 2008 WL 3863700, at *6 (E.D. Cal. Aug. 19, 2008).  The Court concludes that Mr. Ortiz did not spend more than 51% of his time engaged in nonexempt tasks.

16.      This conclusion is bolstered by Mr. Ortiz's admissions that one of his purposes for working in the path was to motivate the Tier 1 Associates.  (FOF 41).  By doing so, Mr. Ortiz's time in the path served a different function, which was "directly and closely related to" the management and supervision of the delivery stations.  *Safeway Cases*, 43 Cal. App. 5th at 683.

17.      The Court also considers Amazon's "realistic expectations and the realistic

United States District Court
Northern District of California

requirements of the job." 8 Cal. Code Regs. § 10070(1)(A)(1)(e). Amazon's job description for Level 4 Shift Managers is persuasive evidence that it expected Mr. Ortiz to spend the majority of his time engaging in the "key duties" listed. The job description, however, is not dispositive. "[I]f hours worked on [management] were determined solely through the employer's job description, then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality." *Ramirez*, 20 Cal. 4th at 802.

18. The testimony from Mr. Lopez, Mr. Nevado, and Mr. Kazcor reinforces the conclusion that Amazon realistically expected Mr. Ortiz to spend his time supervising and managing the Tier 1 Associates and that those expectations conformed with the realistic requirements of the job. (FOF 15-16, 25-26, 46-47, 50.) That same is true for Ms. Bania's testimony regarding the reasons Amazon included the physical requirements on the job description, which was not refuted by Mr. Ortiz. (FOF 36.) *Cf. Heyen*, 216 Cal. App. 4th at 828-829 (considering testimony regarding from managers who worked at stores other than the plaintiffs store and, based on that testimony, finding employee's practice did not diverge from employer's realistic expectations because employer had "unrealistic" expectations regarding grocery stores' operating ratios).

19. There is no evidence in the record that Mr. Ortiz was disciplined for spending too much time in the path. If the Court had credited Mr. Ortiz's testimony that he was spending most of his time on nonexempt tasks, that might weigh in his favor. *Cf. Ramirez*, 20 Cal. 4th at 802 (fact-finder may consider whether employer expressed displeasure at sub-standard performance and whether those expressions were realistic). However, the record shows that Amazon was impressed by Mr. Ortiz's performance, which was reflected in the fact that he was selected to help train an incoming Vice-President and was selected to help improve DSF4's performance. (FOF 30-32; TX 108 at PLTF001703**.**) It is implausible that Amazon rewarded Mr. Ortiz in this way because he spent the majority of time doing the same work the Tier 1 Associates and did so for the same reasons they did. Similarly, even if the Court assumes Amazon leanly staffed the delivery stations, the Court finds it implausible that Mr. Ortiz's manual labor made the difference between a station meeting or failing to meet its metrics on any given day. Accordingly, the Court

concludes that Amazon realistically expected that Mr. Ortiz would be "primarily engaged" in nonexempt work.

20.     Finally, even if the Court credits Mr. Ortiz's testimony that he was spending the majority of his time "in the path," *which it does not*, the Court concludes that would have deviated from Amazon's realistic expectations for his position and would not rebut Amazon's showing that he was properly classified as exempt. *Ramirez*, 20 Cal. 4th at 802 ("an employee who is supposed to be engaged in [exempt tasks] during most of his [or her] working hours and falls below the 50 percent mark due to his [or her] own substandard performance should not thereby be able to evade a valid exemption").

21.     Accordingly, the Court concludes Amazon has met its burden to show that, at all relevant times, Mr. Ortiz was subject to the executive exemption and was not entitled to overtime or to rest and meal periods.  Because Mr. Ortiz has not prevailed on his individual claims, he is not an aggrieved employee for purposes of his PAGA claim.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Amazon and against Mr. Ortiz.  The Court shall enter a separate judgment, and the Clerk shall close this file.

**IT IS SO ORDERED**.

Dated: May 20, 2022

JEFFREY S. WHITE
United States District Judge

United States District Court
Northern District of California